MAGISTRATE JUDGE DURKIN
JUDGE CUMMINGS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | **Superseding Indictment** |
|---|---|---|
| | ) | No. 19 CR 864 |
| v. | ) | |
| | ) | Violations: Title 18, United States |
| RISHI SHAH, | ) | Code, Sections 1014, 1341, 1343, 1344, |
| SHRADHA AGARWAL, | ) | 1957 |
| BRAD PURDY, and | ) | |
| ASHIK DESAI | ) | **UNDER SEAL** |

**FILED**

## COUNT ONE

The SPECIAL MAY 2019 GRAND JURY charges:

NOV 2 1 2019

1. At times material to this Indictment:

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

*Relevant Individuals and Entities*

a. Outcome Health ("Outcome") was a privately held healthcare information and advertising company with its headquarters in Chicago, Illinois. Prior to January 2017, it was known as ContextMedia.

b. Defendant RISHI SHAH ("SHAH") was Outcome's co-founder and Chief Executive Officer. SHAH owned approximately 80% of Outcome.

c. Defendant SHRADHA AGARWAL ("AGARWAL") was Outcome's President. AGARWAL was branded as a co-founder of Outcome. AGARWAL owned approximately 20% of Outcome Health.

d. Defendant BRAD PURDY ("PURDY") was Outcome's Chief Operating Officer and Chief Financial Officer.

e. ASHIK DESAI ("DESAI") was Outcome's Executive Vice President of Sales and Analytics.

1

f.      Executive A was Outcome's Chief Operating Officer during January 2017.

g.      Executive B was Outcome's Chief Operating Officer during part of 2017.

h.      Executive C was Outcome's Chief People Officer.

i.      Executive D was Outcome's Director of Client Success.

j.      Controller A was Outcome's Controller.

k.      Marketing Sciences SVP A was Outcome's Senior Vice President of Marketing Sciences.

l.      Chief of Staff A was SHAH's Chief of Staff at Outcome.

m.      Chief of Staff B was AGARWAL's Chief of Staff at Outcome.

n.      Analysts A, B, C, and D were Sales Analysts at Outcome.

o.      Salesperson A was an Outcome salesperson who sold advertising space on Outcome's screens to Outcome's clients.

p.      Employee A and Employee B were employees at Outcome.

q.      Pharma A, Pharma B, Pharma C, and Pharma D were pharmaceutical companies ("pharma clients") that contracted for advertising campaigns with Outcome, either directly or through an ad agency.

r.      Investor A, Investor B, and Investor C were venture capital investors.

s.      Entity A was a potential investor that was solicited by Outcome but did not invest in Outcome.

2

t.    Auditor A was an outside auditor that audited Outcome's 2015 and 2016 financial statements.

u.    Headhunter A was the headhunting firm that placed Executive A, among others, at Outcome.

v.    Bank A, Bank B, Bank C, Bank D, Bank E, and Bank F were financial institutions within the meaning of 18 U.S.C. § 20.

w.    Voxer was an application that permitted users to exchange voice and text messages. Outcome executives and employees, including SHAH, AGARWAL, PURDY, and DESAI, used Voxer to communicate with each other.

*Outcome Health*

x.    Outcome placed television screens, tablets, and wallboards that displayed educational content into doctor's offices and then sold advertising space on those devices to pharma clients and other clients. This was referred to as "point-of-care" advertising.

y.    The clients that contracted with Outcome typically signed contracts that specified the length of the advertising campaign and the number of screens, tablets, and wallboards on which, and the frequency with which, the advertisements were supposed to run. Some of Outcome's contracts with clients contained return-on-investment ("ROI") guarantees, typically guaranteeing that the advertising campaigns would deliver two or three dollars of additional revenue for every dollar spent on advertising.

z.      In negotiating such a contract, a pharma client, or the media agency negotiating on its behalf, typically sent Outcome a list of specific doctors that the company wanted to target with its proposed advertising campaign. The targeted doctors typically were high-prescribing doctors in the medical specialties likely to prescribe the clients' respective drugs. Outcome responded by representing the number of targeted doctors and/or doctor's offices which were actually within its network. This was referred to as the "list-match" process.

aa.      While the advertising campaigns were actually being run, many pharma clients—or the media agencies working on their behalf—required Outcome to provide them with proofs of performance ("POPs") on a monthly basis. These POPs were usually affidavits signed by an Outcome employee stating that the advertisements had run on the contracted number of screens. Outcome also provided some clients with reports reflecting information regarding patients' engagement with Outcome's tablets.

bb.      Outcome agreed to have third-party companies, including Measurement Company A, measure the performance of its advertising campaigns and provide that information to its clients. Measurement Company A, which had data showing the quantities of drugs prescribed by specific health care providers, conducted studies that evaluated the effectiveness of an advertising campaign by comparing the prescribing behavior of doctor's offices exposed to the advertisements against a group of similar doctor's offices where the advertisements did not run. These studies were used to calculate the ROI for the advertising campaigns.

Measurement Company A sent the results of the studies to Outcome, which later provided the results to its clients. These studies were typically referred to as "performance studies," "ROI reports," or "Measurement Company A reports."

cc.    Outcome maintained an office in New York City that was primarily devoted to sales of advertising to pharma clients and to the media agencies that represented the pharma clients. The Outcome team that called the doctor's offices to pitch installation of televisions, tablets, and wallboards was based in Outcome's Chicago office.

dd.    It was material to Outcome's clients that Outcome actually had in its inventory the doctors and doctors' offices that Outcome represented that it had during the list-match process; that Outcome ran the clients' advertisements on the number of TVs, tablets, and/or wallboards that were set forth in the contracts; that Outcome ran the clients' advertisements on the contracted number of devices during the entire time period set forth in the contract; that Outcome ran the clients' advertisements with the frequency set forth in the contract; that Outcome ran the clients' advertisements in the doctor's offices that Outcome represented it would during the list-match and contracting process; that Outcome met or exceeded any ROI guarantee set forth in a contract; that Outcome did not run competitors' advertisements on the same devices if the contract so-provided; and that Outcome accurately reported patient engagement metrics for tablets.

*Revenue Recognition*

ee.     Revenue recognition was the practice of recording and reporting the revenue a company earned in its accounting records and financial statements. Outcome claimed to follow Generally Accepted Accounting Principles ("GAAP") when recording and reporting its revenue.  Under GAAP, Outcome earned revenue, and thus revenue could be recognized, when it performed according to the terms of its contracts with clients, including by delivering the advertisements to the contracted number of screens and by achieving the ROI guarantee, if the contract contained one.

ff.     Under GAAP, if Outcome did not run the advertisements on the number of screens or offices required by the contract, it could not recognize the entire amount of revenue for the contract.  It could recognize only the amount of revenue that was proportional to the number of screens or offices where it delivered the advertisements.  If Outcome did not achieve the contracted ROI guarantee for an advertising campaign, Outcome could not recognize the entire amount of revenue for that contract.  If the ROI was not achieved, then Outcome had to provide a "make good" to the client, either in the form of a cash refund proportional to the shortfall on the revenue guarantee or additional free advertising (a "media credit") proportional to the shortfall.  Any make good required deferring a proportional amount of the contract into the next year, or until whenever the obligation was satisfied.

*The Fraudulent Scheme*

2.     Beginning no later than 2011 and continuing until at least 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL,
BRAD PURDY, and
ASHIK DESAI

defendants herein, along with others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud Outcome's clients, lenders, investors, and auditors and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

3.     It was part of the scheme that RISHI SHAH, SHRADHA AGARWAL, BRAD PURDY, ASHIK DESAI, and others, in order to obtain millions of dollars from clients and to maintain the appearance of extraordinary revenue growth, knowingly did the following: (a) falsely represented to Outcome's clients that Outcome had in its network specific doctors and doctor's offices that the clients were targeting for advertising; (b) lied to clients about how many screens the clients' advertisements were running on; (c) falsely inflated patient engagement metrics associated with Outcome tablets; (d) caused material under-delivery on Outcome's advertising campaigns with its clients; (e) caused clients to pay for advertising that was not delivered; (f) caused the material inflation of revenue in Outcome's financial statements; and (g) used Outcome's inflated financial statements to obtain a $110 million loan in April 2016, a $375 million loan in December 2016, and $487.5 million in equity financing in 2017. To conceal the scheme, SHAH, AGARWAL, PURDY, and DESAI did the following: (a) marginalized, undermined, and ignored whistleblowers who raised concerns about the fraud; (b) hid the under-delivery on the advertising

7

campaigns from Auditor A; and (c) at times siloed information by directing Outcome employees not to include the Outcome salespeople who were interacting directly with the clients on certain communications, such as internal emails regarding making up data that would be presented to clients and emails about the numbers of screens being installed in doctor's offices.

*Overselling Inventory*

4.      It was further part of the scheme that SHAH, AGARWAL, PURDY, DESAI, and others sold and caused others to sell inventory to clients that Outcome did not have. During the list-match process, when clients sent Outcome a list of specific doctors or doctor's offices that the clients wanted to target with an advertising campaign, SHAH, AGARWAL, PURDY, DESAI, and others who worked at their direction inflated the match on certain occasions by falsely representing that Outcome had in its network a higher number of doctors or offices on the clients' lists than it actually had.

5.      It was further part of the scheme that when some clients asked not only for the number of doctors and doctor's offices that Outcome matched during a list match but also asked which specific doctors and doctor's offices had matched against Outcome's network, SHAH, AGARWAL, PURDY, DESAI, and others who worked at their direction falsely indicated that certain offices and doctors were in Outcome's network when that was not true and on other occasions falsely claimed that Outcome could not provide the client with the list of doctors and offices due to privacy concerns.

6.     It was further part of the scheme that, to conceal misrepresentations made during the list-match process and to maintain the client relationship, SHAH, AGARWAL, PURDY, DESAI, and others who worked at their direction made sure that subsequent lists shared during a later list match with the same client included the same offices and doctors that were represented to have been in Outcome's network during a prior list match.

*Under-delivery and Deltas*

7.     It was further part of the scheme that, as a result of SHAH, AGARWAL, PURDY, and DESAI's practice of selling and causing others to sell inventory that Outcome did not have, Outcome under-delivered on its advertising campaigns.  The under-delivery—which was the difference between the contracted number of screens or offices and the actual number of screens or offices in which Outcome was running the campaigns—was sometimes referred to as a "delta" or a "gap."

8.     It was further part of the scheme that SHAH, AGARWAL, PURDY, DESAI, and others at Outcome were aware of the campaign deltas and kept track of the deltas in emails and spreadsheets, which were sometimes referred to as "delta reports," and other times as "growth models."

9.     It was further part of the scheme that despite the under-delivery on advertising campaigns, SHAH, AGARWAL, PURDY, DESAI, and others working at their direction caused monthly affidavits to be sent to clients that falsely represented that Outcome had performed its contractual obligations by running advertisements on the contracted number of screens and offices.

10.     It was further part of the scheme that despite the under-delivery on the advertising campaigns, SHAH, AGARWAL, PURDY, DESAI, and others working at their direction caused clients to be invoiced on a monthly basis as if the campaigns had run on the contracted number of screens and offices and knowing that these invoices served as representations that the campaigns were running as contracted.

11.     It was further part of the scheme that even if Outcome had sufficient total inventory to run an advertising campaign, on certain occasions it did not have all of the specific offices and doctors that the clients believed they had purchased during the list-match process, and SHAH, AGARWAL, PURDY, DESAI, and others working at their direction caused the advertising campaigns to run in these "off-target" offices while concealing from clients that such substitutions had occurred.

*False Tablet Metrics*

12.     It was further part of the scheme that, after Outcome started to install tablets in exam rooms in approximately late 2013 or early 2014, PURDY, DESAI, and others working at their direction, with the knowledge and approval of AGARWAL, provided clients with inflated patient engagement metrics regarding how frequently patients interacted with Outcome's tablets, including the number of clicks by patients.

*Inflation of Revenue and Deceiving Auditors*

13.     It was further part of the scheme that SHAH, AGARWAL, PURDY, and DESAI knowingly concealed and caused to be concealed the extent of the under-

delivery from Controller A, other members of Outcome's Accounting Department, and Auditor A in the following ways:

a.      SHAH, AGARWAL, PURDY, and DESAI falsely represented and caused to be falsely represented that Outcome's contracts with clients permitted initial under-delivery if it was made up with later over-delivery—what was referred to as "weighted average" delivery—when pharma clients had not approved of such delivery. As a result, Controller A, Outcome's Accounting Department, and Auditor A did not know about the extent of Outcome's under-delivery on advertising campaigns or that the under-delivery was concealed from clients, causing Outcome to recognize revenue for advertising campaigns in periods for which the revenue should not have been recognized, and to report false and materially inflated revenue in its financial statements.

b.      In response to requests from Auditor A for proof that Outcome had delivered on its obligations under the contracts with pharma clients, DESAI, in consultation with PURDY, instructed analysts to fabricate lists of locations where Outcome's devices had supposedly played the clients' advertising content to make it appear to Auditor A, Controller A, and Outcome's Accounting Department that Outcome had satisfied its contractual obligations,  causing Outcome to recognize revenue for advertising campaigns in periods for which the revenue should not have been recognized, and to report false and materially inflated revenue in its financial statements.

11

14. It was further part of the scheme that, for the purpose of inducing Auditor A to approve Outcome's financial information for 2015 and 2016 so that Outcome could provide to lenders and investors audited financial statements with fraudulently inflated revenue, SHAH, AGARWAL, and PURDY falsely stated to Auditor A during annual fraud inquiry meetings, that if an individual at Outcome acted unethically, that individual would be terminated immediately.

15. It was further part of the scheme that, for the purpose of inducing Auditor A to approve Outcome's financial information for 2015 and 2016 so that Outcome could provide to lenders and investors audited financial statements with fraudulently inflated revenue, SHAH, AGARWAL, and PURDY falsely stated to Auditor A during annual fraud inquiry meetings that they were not aware of any fraudulent activities occurring at Outcome during the years 2015 and 2016, with the exception of one disclosure in 2015 that was not related to the allegations in this indictment.

16. It was further part of the scheme that, for the purpose of inducing Auditor A to approve Outcome's financial information for 2015 and 2016 so that Outcome could provide to lenders and investors audited financial statements with fraudulently inflated revenue, SHAH, AGARWAL, and PURDY knowingly signed Auditor A management representation letters in which they falsely and fraudulently confirmed, for example, that: (i) SHAH, AGARWAL, and PURDY had no knowledge of any fraud or suspected fraud affecting Outcome involving management, employees who had significant roles in Outcome's internal control over financial reporting, or

others, where the fraud could have a material effect on the financial statements; and (ii) SHAH, AGARWAL, and PURDY had no knowledge of any allegations of fraud or suspected fraud affecting Outcome's financial statements communicated by employees, former employees, or involving others; knowing that those representations were false and misleading.

*$110 Million Loan*

17. It was further part of the scheme that in or around March and April 2016, in order to obtain a $110 million loan from Banks A, B, C, D, and E—in the form of a $90 million term loan and a $20 million line of credit—SHAH and PURDY, with AGARWAL's knowledge and approval, provided and caused to be provided to the lenders materially false and misleading financial information regarding Outcome, including (a) audited and interim financial statements for 2014 and 2015 that reflected false and materially inflated revenue numbers, and (b) audited financial statements for 2015 whose approval by Auditor A had been obtained by false statements and omissions to Auditor A. The term loan resulted in a payment of a $30.2 million dividend to SHAH and a $7.5 million dividend to AGARWAL.

18. It was further part of the scheme that on or about March 15, 2016, SHAH and PURDY provided and caused to be provided to the lenders a PowerPoint presentation that they knew contained materially false financial information regarding Outcome, including false and inflated revenue numbers.

19. It was further part of the scheme that on or about March 16, 2016, PURDY provided and caused to be provided to the lenders a borrower authorization

letter that stated that the information Outcome provided to the lenders did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained not materially misleading, knowing that the statement was false because Outcome had provided materially false and misleading information to the lenders.

20.     It was further part of the scheme that on or about April 8, 2016, in order to obtain the $110 million loan, Outcome, with PURDY as signatory, entered into a Credit Agreement with the lenders that contained statements that SHAH and PURDY knew were false and misleading, including representations (a) that Outcome's 2015 financial statements fairly presented, in material respects, the financial positions of Outcome in accordance with GAAP, and (b) that none of the reports, financial statements or other written information provided to the lenders contained any material misstatement of fact or omitted to state any material fact necessary to make the statements not misleading.

21.     It was further part of the scheme that SHAH and PURDY concealed and caused to be concealed from lenders that Outcome sold inventory it did not have to clients, under-delivered on advertising campaigns, and hid the under-delivery from its clients.

*$375 Million Loan*

22.     It was further part of the scheme that in or around November and December 2016, in order to obtain approximately $375 million—in the form of a $325 million term loan and a $50 million line of credit—from a group of lenders, comprised

14

of Banks A, B, and F, and a consortium of debt investors, SHAH and PURDY, with AGARWAL's knowledge and approval, provided and caused to be provided to the lenders materially false and misleading financial information regarding Outcome, including (a) audited and interim financial statements for 2014, 2015, and 2016 that reflected false and materially inflated revenue numbers, and (b) audited financial statements whose approval by Auditor A had been obtained by false statements and omissions to Auditor A. The debt investors provided the majority of the capital for the $325 million term loan; Banks A, B, and F provided the line of credit. SHAH, PURDY, and AGARWAL used the term loan proceeds to finance the acquisition of AccentHealth, another point-of-care vendor, and refinance the April 2016 loans.

23.     It was further part of the scheme that, in order to have Outcome's debt rated and to obtain the $375 million loan, SHAH and PURDY made a presentation to rating agencies and Bank A on or about November 7, 2016, and made false statements during the presentation, including false and misleading statements about Outcome's revenue.

24.     It was further part of the scheme that on or about November 8, 2016, PURDY provided and caused to be provided to the lenders and debt investors a PowerPoint presentation that he knew contained false and misleading information, including false statements about Outcome's revenue.

25.     It was further part of the scheme that during a presentation SHAH and PURDY made to lenders and debt investors on or about November 29, 2016, SHAH

15

and PURDY made false and misleading statements, including false statements about Outcome's revenue.

26. It was further part of the scheme that in or around November 2016, SHAH and PURDY provided and caused to be provided to the lenders and debt investors Outcome's audited financial statements for 2013, 2014, and 2015, and interim financial statements for 2016, knowing that the financial statements contained false information, including false and materially inflated revenue numbers.

27. It was further part of the scheme that on or about December 23, 2016, in order to obtain the $375 million loan, Outcome, with SHAH as signatory, entered into a Credit Agreement with the lenders that contained statements that SHAH and PURDY knew were false, including the representations (a) that Outcome's 2013, 2014, 2015 and 2016 (through September 30, 2016) financial statements fairly presented the financial condition of Outcome and were prepared in accordance with GAAP, and (b) all written information made available to the lenders was correct in all material respects and did not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements not misleading.

28. It was further part of the scheme that SHAH and PURDY concealed and caused to be concealed from lenders and debt investors that Outcome sold inventory it did not have to clients, under-delivered on advertising campaigns, and hid the under-delivery from its clients.

*$487.5 Million Capital Raise*

29.     It was further part of the scheme that, in order to obtain approximately $487.5 million from equity investors between March and July 2017, SHAH and PURDY, with AGARWAL's knowledge and approval, provided and caused to be provided to the equity investors materially false and misleading information regarding Outcome, including (a) audited and interim financial statements for 2014, 2015, and 2016 that reflected false and materially inflated revenue numbers, and (b) audited financial statements whose approval by Auditor A had been obtained by material false statements and omissions to Auditor A. The capital raise resulted in a $225 million dividend payment to an entity under SHAH and AGARWAL's control, for the benefit of SHAH and AGARWAL.

30.     It was further part of the scheme that SHAH and PURDY concealed and caused to be concealed from investors that Outcome sold inventory it did not have to clients, under-delivered on advertising campaigns, and hid the under-delivery from its clients.

*Concealment*

31.     It was further part of the scheme that SHAH, AGARWAL, PURDY, DESAI, and others working at their direction misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, acts done in furtherance of the scheme and the purposes of those acts, such as the following:

        a.     SHAH, AGARWAL, PURDY, and DESAI marginalized, undermined, and ignored whistleblowers who raised concerns about the scheme. For

example, in or around 2015, when Analyst A raised concerns to AGARWAL about the deltas and Outcome's practice of selling inventory that it did not have, AGARWAL responded by saying that Outcome threw "smoke bombs," that others could not see what was happening behind the smoke, and that everything would be fixed by the time the smoke cleared.

b.      SHAH, AGARWAL, PURDY, and DESAI at times siloed information at Outcome, including by directing Outcome employees not to share information regarding the numbers of screens being installed in doctor's offices with the Outcome salespeople in the New York office who were dedicated to selling advertising on those screens to clients and by directing Outcome employees not to include Outcome salespeople on emails when they discussed making up data to present to clients. For example, in an August 8, 2013 email to SHAH and DESAI, AGARWAL stated in part: "Guys – any time we're having a back and forth discussion on what data to use, let's take the SS [sponsorship sales] person off the chain. I've noticed their confidence level in our data change dramatically when presenting to clients if they believe it's accurate vs made-up."

c.      SHAH, AGARWAL, PURDY, DESAI, and others working at their direction discouraged clients from conducting their own internal studies of the performance of Outcome's advertising campaigns, as such studies could reveal Outcome's under-delivery and misrepresentations to clients about where the advertising campaigns were running. SHAH, AGARWAL, PURDY, DESAI, and others working at their direction instead encouraged clients to allow Outcome to

direct Measurement Company A to conduct the performance studies, which gave Outcome greater control over the performance studies and how the results of the studies were presented to clients.

      d.     DESAI fraudulently altered key performance metrics in Measurement Company A reports prior to sending them to clients in order to conceal the campaign deltas and to make it appear that the advertising campaigns were more effective than they actually were.

      e.     After SHAH and AGARWAL heard reports that DESAI was altering the Measurement Company A reports, SHAH and AGARWAL did not confront DESAI about it. Instead, SHAH protected DESAI and later, after Executive A resigned, placed DESAI back in charge of operations at Outcome.

      f.     After publication of an October 2017 newspaper article about certain aspects of the fraud scheme at Outcome, SHAH and AGARWAL falsely portrayed themselves as victims of rogue employees to Outcome's investors and lenders.

      g.     SHAH lied to Outcome's employees at an Outcome Health Town Hall on or about October 12, 2017, which was the day the newspaper article about the fraud at Outcome was published. Specifically, when asked, "When were the allegations of [Measurement Company A] third-party results' manipulation first raised to you?," SHAH falsely responded, "We learned about this specific concern through the internal review process about a few weeks ago . . . ."

*Execution of Scheme*

32.　　On or about February 2, 2015, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly caused to be delivered by the United States Mails, according to the direction thereon, an envelope addressed to Chicago, Illinois, containing a check payable to ContextMedia, Inc. for $53,790, which was payment for an advertising campaign for Drug A, which was manufactured by Pharma A;

In violation of Title 18, United States Code, Section 1341.

## COUNT TWO

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.     On or about February 4, 2015, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,<br>
SHRADHA AGARWAL, and<br>
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly caused to be delivered by the United States Mails, according to the direction thereon, an envelope addressed to Chicago, Illinois, containing a check payable to ContextMedia, Inc. for $229,170, which was payment for an advertising campaign for Drug B, which was manufactured by Pharma B;

In violation of Title 18, United States Code, Section 1341.

## COUNT THREE

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.     On or about May 4, 2015, at Chicago, in the Northern District of Illinois, and elsewhere,

### BRAD PURDY,

defendant herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email to Analyst A and ASHIK DESAI, which was routed through Google's computer servers located outside the state of Illinois, which provided, "Hey do either of you have this in deck format," in response to an email from Analyst A to BRAD PURDY and ASHIK DESAI that provided in part, "Here are a couple sample reports of some #'s we've used in SS [sponsorship sales]. @AD [ASHIK DESAI] – I've mentioned to BP [BRAD PURDY] that these are inflated. Wanted to make sure you're comfortable with using numbers at these magnitudes for potential use in presentations with systems . . .";

In violation of Title 18, United States Code, Section 1343.

## COUNT FOUR

The SPECIAL MAY 2019 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

3.      On or about May 14, 2015, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly caused to be delivered by the United States Mails, according to the direction thereon, an envelope addressed to Chicago, Illinois, containing a check payable to ContextMedia, Inc. for $89,100, which was payment for an advertising campaign for Drug C, which was manufactured by Pharma C;

In violation of Title 18, United States Code, Section 1341.

## COUNT FIVE

The SPECIAL MAY 2019 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.      On or about November 14, 2015, at Chicago, in the Northern District of Illinois, and elsewhere,

### RISHI SHAH,

defendant herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email to Employee A and ASHIK DESAI, which was routed through Google's computer servers located outside the state of Illinois, which provided in part, "[Y]ou have to make sure not to talk about total installs in the everyone email – this is a big deal because sponsorship is on there too and they're selling much larger quantities for next year.";

In violation of Title 18, United States Code, Section 1343.

## COUNT SIX

The SPECIAL MAY 2019 GRAND JURY further charges:

1.    The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.    On or about February 26, 2016, at Chicago, in the Northern District of Illinois, and elsewhere,

### ASHIK DESAI,

defendant herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email message from ASHIK DESAI to BRAD PURDY, which was routed through Google's computer servers located outside the state of Illinois, asking for PURDY's guidance on how to conceal the deltas on advertising campaigns from Auditor A;

In violation of Title 18, United States Code, Section 1343.

## COUNT SEVEN

The SPECIAL MAY 2019 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.      On or about March 17, 2016, at Chicago, in the Northern District of Illinois, and elsewhere,

BRAD PURDY,

defendant herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from BRAD PURDY to a banker at Bank A, which was routed through Google's computer servers located outside the state of Illinois, and which attached a borrower authorization letter that falsely stated that the information Outcome provided to lenders in connection with seeking a $110 million loan did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained not materially misleading;

In violation of Title 18, United States Code, Section 1343.

## COUNT EIGHT

The SPECIAL MAY 2019 GRAND JURY further charges:

1.      The allegations in paragraph 1 of Count One of the Indictment are realleged here.

2.      On or about March 23, 2016, at Chicago, in the Northern District of Illinois, and elsewhere,

BRAD PURDY,

defendant herein, along with others known and unknown to the Grand Jury, knowingly made a false statement to Bank A, the deposits of which were then insured by the Federal Deposit Insurance Corporation, by sending a copy of an Outcome financial statement reflecting inflated revenue numbers to a Bank A employee, for the purpose of influencing Bank A and other participating banks to offer a loan to Outcome;

In violation of Title 18, United States Code, Section 1014.

## COUNT NINE

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraph 1 of Count One of the Indictment are realleged here.

2.     Beginning no later than 2011 and continuing until at least 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, knowingly participated in a scheme to defraud, and to obtain money, funds, and other property owned by and under the custody and control of Bank A, Bank B, Bank C, Bank D, and Bank E by means of materially false and fraudulent pretenses, representations and promises, as further described herein.

3.     The allegations in paragraphs 3 through 31 of Count One of the Indictment are realleged here.

4.     On or about April 8, 2016, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, knowingly executed the above-described scheme when they caused Bank A, Bank B,

Bank C, Bank D, and Bank E to fund a $90 million term loan and a $20 million line of credit to Outcome;

In violation of Title 18, United States Code, Section 1344.

## COUNT TEN

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 31 of Count One and paragraphs 1 through 4 of Count Nine of the Indictment are realleged here.

2.     On or about June 15, 2016, at Chicago, in the Northern District of Illinois, and elsewhere,

### RISHI SHAH,

defendant herein, did knowingly engage in a monetary transaction within the United States, by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, namely a wire transfer in the amount of $450,000 from SHAH's bank account at JPMorgan to the bank account at Citibank of the owner of a house at 924 North Clark, Chicago, Illinois, such funds involving the proceeds of specified unlawful activity, that is, bank fraud, in violation of Title 18, United States Code, Section 1344, as described in paragraphs 1 through 4 of Count Nine of the Indictment;

In violation of Title 18, United States Code, Section 1957.

## COUNT ELEVEN

The SPECIAL MAY 2019 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.      On or about July 22, 2016, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly caused to be delivered by the United States Mails, according to the direction thereon, an envelope addressed to Chicago, Illinois, containing a check payable to ContextMedia, Inc. for $1,071,202.56, which included payment for an advertising campaign for Drug D, which was manufactured by Pharma D;

In violation of Title 18, United States Code, Section 1341.

## COUNT TWELVE

The SPECIAL MAY 2019 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 31 of Count One and paragraphs 1 through 4 of Count Nine of the Indictment are realleged here.

2.      On or about August 12, 2016, at Chicago, in the Northern District of Illinois, and elsewhere,

### RISHI SHAH,

defendant herein, did knowingly engage in a monetary transaction within the United States, by, through, and to a financial institution affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, namely a wire transfer in the amount of $65,423.49 from SHAH's bank account at JPMorgan Chase to the bank account of a private jet charter service, such funds involving the proceeds of specified unlawful activity, that is, bank fraud, in violation of Title 18, United States Code, Section 1344, as described in paragraphs 1 through 4 of Count Nine of the Indictment;

In violation of Title 18, United States Code, Section 1957.

## COUNT THIRTEEN

The SPECIAL MAY 2019 GRAND JURY further charges:

1. The allegations in paragraph 1 of Count One of the Indictment are realleged here.

2. Beginning no later than 2011 and continuing until at least 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,<br>
SHRADHA AGARWAL, and<br>
BRAD PURDY,

defendants herein, and others known and unknown to the Grand Jury, knowingly participated in a scheme to defraud, and to obtain money, funds, and other property owned by and under the custody and control of Bank A, Bank B, and Bank F by means of materially false and fraudulent pretenses, representations and promises, as further described herein.

3. The allegations in paragraphs 3 through 31 of Count One of the Indictment are realleged here.

4. On or about December 23, 2016, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,<br>
SHRADHA AGARWAL, and<br>
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, knowingly executed the above-described scheme when they caused Bank A, Bank B,

and Bank F, with participation by debt investors, to fund a $325 million term loan and a $50 million line of credit to Outcome;

In violation of Title 18, United States Code, Section 1344.

## COUNT FOURTEEN

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.     On or about January 23, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH and<br>
SHRADHA AGARWAL,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, a Voxer audio message from SHRADHA AGARWAL to RISHI SHAH, which was routed through Voxer's computer servers located outside the state of Illinois, which provided in part, "[Executive A] . . . said that we are operating an unethical business . . . that Ashik is changing numbers . . . It sounds like he may even share this with others . . . if [Executive D and Marketing Sciences SVP A], in [Executive A's] first week, are coming to him and sharing this, that is not very good leadership on their part and we may just have to clean up in a lot of different areas of that org";

In violation of Title 18, United States Code, Section 1343.

## COUNT FIFTEEN

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.     On or about January 24, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH and
SHRADHA AGARWAL,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an iMessage from RISHI SHAH to SHRADHA AGARWAL and ASHIK DESAI, which was routed through Apple's computer servers located outside the state of Illinois, which provided, "My sense is you potentially quickly cycle [Executive A] and [Marketing Sciences SVP A] and [Executive D] out and bring in people who can fix the issues";

In violation of Title 18, United States Code, Section 1343.

## COUNT SIXTEEN

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.     On or about January 24, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH and<br>SHRADHA AGARWAL,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, a Voxer audio message from RISHI SHAH to SHRADHA AGARWAL, which was routed through Voxer's computer servers located outside the state of Illinois, which provided in part, "Did [Executive C] share how the conversation ended . . . It seems striking that he would say things like, 'Once this goes public,' or 'Once I tell [Headhunter A], once I tell [Executive B].' And I'm a little nervous about not firing him tomorrow if I can't figure out that he's really trustworthy";

In violation of Title 18, United States Code, Section 1343

## COUNT SEVENTEEN

The SPECIAL MAY 2019 GRAND JURY further charges:

1. The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2. On or about January 24, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH and
SHRADHA AGARWAL,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, a Voxer audio message from Executive C that SHRADHA AGARWAL forwarded to RISHI SHAH, which was routed through Voxer's computer servers located outside the state of Illinois, which provided in part, "he opened up the spreadsheet and he said, 'Take a look at this,' and he shows me all of this, that he has kind of done this analysis with a bunch of people . . . and then there are at least 25, 30 probably even more contracts where we are not hitting those ROI guarantees of 3 to 1 or 2 to 1 . . . then he brought up the same issue of the affidavit again . . . saying that that is fraud . . . He kind of said, 'This is a humongous operational problem that we have. This is terrible.' . . . 'Those contracts where you

have collected something and we haven't been able to deliver otherwise.' And then he said, 'I am concerned that more than 50% of our revenue can be recalled. . . .";

In violation of Title 18, United States Code, Section 1343.

## COUNT EIGHTEEN

The SPECIAL MAY 2019 GRAND JURY further charges:

1.    The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.    On or about January 25, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH and
SHRADHA AGARWAL,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an iMessage from RISHI SHAH to SHRADHA AGARWAL, which was routed through Apple's computer servers located outside the state of Illinois, which provided, "It sounds like [Executive A] has been walking around all day affronting people on affidavits et al";

In violation of Title 18, United States Code, Section 1343.

## COUNT NINTEEN

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.     On or about February 1, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,

defendant herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from RISHI SHAH to ASHIK DESAI with the subject line "Fwd: [Marketing Sciences SVP A]", which was routed through Google's computer servers located outside the state of Illinois, which attached a whistleblower letter from an attorney representing [Marketing Sciences SVP A] that provided in part, "Based on information available to [Marketing Sciences SVP A], including the data reports from [Measurement Company A], it appears that the Company is artificially inflating the performance results it reports to clients to create the false appearance that it is providing content to more physician offices than is actually the case and is also inflating actuals by measuring offices that are not live";

In violation of Title 18, United States Code, Section 1343.

## COUNT TWENTY

The SPECIAL MAY 2019 GRAND JURY further charges:

1.    The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.    On or about February 10, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH and
SHRADHA AGARWAL,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from RISHI SHAH to SHRADHA AGARWAL and ASHIK DESAI, which was routed through Google's computer servers located outside the state of Illinois, which provided in part, "I also thought about how those two troublemaking fuckers in Growth strategy were going to exit soon and a few weeks after that see a 450m round in the WSJ from [Investor A, Investor B and Entity A] round valuing us at 5B and probably shed some tears which I'll confide provided some motivation too! Thought I would save that for just this group, ha";

In violation of Title 18, United States Code, Section 1343.

## COUNT TWENTY-ONE

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.     On or about February 14, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an email from BRAD PURDY to RISHI SHAH and ASHIK DESAI, which was routed through Google's computer servers located outside the state of Illinois, which provided, "FYI," and which forwarded an email from Employee B that provided in part, "Some time has passed since I initially expressed my concerns regarding how the Outcome Health programs deploy vs how they are contracted, in addition to the glaring inconsistencies between result presentations received from [Measurement Company A] and presentations that are ultimately delivered to our clients . . . I . . . want to make clear that I am unwilling/unable to participate in what I believe to be morally/ethically objectionable business practices. . .";

In violation of Title 18, United States Code, Section 1343.

## COUNT TWENTY-TWO

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.     On or about March 1, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an interstate wire transfer of $52,180,000 through the Federal Reserve System from Investor A's account at the Bank of New York to an Outcome Inc. bank account at JPMorgan Chase;

In violation of Title 18, United States Code, Section 1343.

## COUNT TWENTY-THREE

The SPECIAL MAY 2019 GRAND JURY further charges:

3.      The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

4.      On or about March 16, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly caused to be delivered by the United States Mails, according to the direction thereon, an envelope addressed to Chicago, Illinois, containing a check payable to Context Media Health LLC, for $458,261.62, which included payment for an advertising campaign for Drug E, which was manufactured by Pharma E;

In violation of Title 18, United States Code, Section 1341.

## COUNT TWENTY-FOUR

The SPECIAL MAY 2019 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.      On or about March 20, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an interstate wire transfer of $50,000,000 through the Federal Reserve System from Investor B's account at the Wells Fargo Bank to an Outcome Inc. bank account at JPMorgan Chase;

In violation of Title 18, United States Code, Section 1343.

## COUNT TWENTY-FIVE

The SPECIAL MAY 2019 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.     On or about April 24, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly caused to be delivered by the United States Mails, according to the direction thereon, an envelope addressed to Chicago, Illinois, containing a check payable to ContextMedia, Inc. for $566,799, which included payment for an advertising campaign for Drug A, which was manufactured by Pharma A;

In violation of Title 18, United States Code, Section 1341.

## COUNT TWENTY-SIX

The SPECIAL MAY 2019 GRAND JURY further charges:

1.    The allegations in paragraphs 1 through 31 of Count One of the Indictment are realleged here.

2.    On or about April 28, 2017, at Chicago, in the Northern District of Illinois, and elsewhere,

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY,

defendants herein, along with others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an interstate wire transfer of $15,000,000 through the Federal Reserve System from Investor C's account at the Silicon Valley Bank to an Outcome Inc. bank account at JPMorgan Chase;

In violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATION ONE

The SPECIAL MAY 2019 GRAND JURY further alleges:

1. The allegations contained in Counts 1 through 26 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. Upon conviction of the offenses in violation of Title 18, United States Code, Sections 1341 and 1343 set forth in Counts 1 through 5, 7, 11, 14 through 26 of this Indictment, the defendants, Rishi SHAH, Shradha AGARWAL, and Brad PURDY, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

3. The property to be forfeited includes, but is not limited to, a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the following specific property that the Grand Jury finds probable cause to believe is subject to forfeiture upon conviction of the offenses:

   a. All right, title, and interest in Investment Fund A, held in the name of Jumpstart Ventures II, LLC, including, but not limited to, approximately $60,000.00 in capital contributions submitted on or around May 31, 2018;

   b. All right, title, and interest in the real property and appurtenances commonly known as 924 N. Clark Street, Chicago, IL 60610, with all

improvements and attachments thereon;

        c.     All right, title, and interest in approximately 17.747958% of Investment Company A, held by Gravitas Holdings, LLC, purchased for approximately $2,537,695.00 on or about October 10, 2017;

        d.     All right, title, and interest in Investment Fund B, held in the name of Jumpstart Ventures II, LLC, including, but not limited to, $15,000.00 in capital contributions submitted on or about April 24, 2018;

        e.     All right, title, and interest in investments made with Investment Company B entities, held in the name of Gravitas Holdings, LLC and Jumpstart Ventures II, LLC, including, but not limited to $475,000.00 in capital contributions submitted between August 1, 2017, and November 27, 2018;

        f.     All right, title, and interest in Investment Fund C, including, but not limited to, $12,000.00 in capital contributions submitted by or on behalf of Rishi SHAH, Shradha AGARWAL, Brad PURDY, Gravitas Holdings, LLC, and Jumpstart Ventures II LLC, on or about May 2, 2018;

        g.     All right, title, and interest in Investment Fund D, including, but not limited to, $1,800,000.00 in capital contributions submitted by or on behalf of Rishi SHAH, Shradha AGARWAL, Brad PURDY, Gravitas Holdings, LLC, and Jumpstart Ventures II LLC, between March 2, 2018, and July 9, 2019;

        h.     All right, title, and interest in Investment Fund E, held in the name of Gravitas Holdings, LLC, including, but not limited to, $303,045.00 in capital contributions submitted between September 27, 2017, and July 17, 2019;

i.      All right, title, and interest in Investment Fund F and Investment Fund G, held in the name of Gravitas Holdings, LLC, including, but not limited to, $2,235,621.00 in capital contributions submitted between June 2, 2017, and July 18, 2017;

j.      All right, title, and interest in Investment Fund H, held by Gravitas Holdings, LLC, including, but not limited to, $2,980,631.00 in capital contributions submitted between July 28, 2017, and July 1, 2019;

k.      All right, title, and interest in Investment Fund I, held by Gravitas Holdings, LLC, including, but not limited to, $319,489.00 in capital contributions submitted on or about June 28, 2019;

l.      All right, title, and interest in Investment Fund J, held in the name of Gravitas Holdings, LLC, including, but not limited to, $1,526,821.96 in capital contributions submitted between May 9, 2019, and July 25, 2019;

m.      All right, title, and interest in approximately 60,053 shares of Series A2 Preferred Stock of Start-up Company A, held in the name of Jumpstart Ventures II, LLC;

n.      All right, title, and interest in approximately 90,425 shares of Series B3 Preferred Stock of Start-up Company A, held in the name of Gravitas Holdings, LLC;

o.      All right, title, and interest in approximately 252,045 shares of Series B4 Preferred Stock of Start-up Company A, held in the name of Gravitas Holdings, LLC;

p.    All right, title, and interest in Investment Fund K, held in the name of Gravitas Holdings, LLC, including, but not limited to, $2,222,238.00 in capital contributions submitted on or about August 14, 2017;

q.    All funds and assets on deposit in Account xxxxxx7618 at Kotak Mahindra Bank, including, but not limited to $2,000,000.00, held in the name of Shradha AGARWAL;

r.    All funds and assets on deposit in Account xxxxx6290 and all linked accounts at Pershing, LLC, held in the name of Gravitas Holdings, LLC, including, but not limited to, Accounts xxxxx6076, xxxxx6159, xxxxx3123, xxxxx3129, xxxxx7090, and xxxxx7108, including, but not limited to $7,461,413.17; and

s.    All funds and assets on deposit in Account xxxxx6647 and all linked accounts at Pershing, LLC, held in the names of Shradha AGARWAL and AGARWAL Relative A, including but not limited to $2,050,383.62;

4.    If any of the property described above, as a result of any act or omission of the defendants: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

## FORFEITURE ALLEGATION TWO

5.     The allegations contained in Counts 1 through 26 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(2)(A).

6.     Upon conviction of the offenses in violation of Title 18, United States Code, Sections 1014 and 1344 set forth in Counts 8, 9, 13 of this Indictment, the defendants, Rishi SHAH, Shradha AGARWAL, and Brad PURDY, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violations.

7.     The property to be forfeited includes, but is not limited to, a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the following specific property that the Grand Jury finds probable cause to believe is subject to forfeiture upon conviction of the offenses:

a.     All right, title, and interest in Investment Fund A, held in the name of Jumpstart Ventures II, LLC, including, but not limited to, approximately $280,000.00 in capital contributions submitted on or about January 5, 2017;

b.     All right, title, and interest in approximately 3,291 shares of common stock of Start-Up Company B, held in the name of Jumpstart Ventures II, LLC;

c.     All right, title, and interest in Start-Up Company C, including, but not limited to, $18,161.00 in capital contributions submitted by or on behalf of

Rishi SHAH, Shradha AGARWAL, Brad PURDY, Gravitas Holdings, LLC, and Jumpstart Ventures II LLC, on or about January 5, 2017;

        d.     All right, title, and interest in shares of Investment Fund L, formerly known as Investment Fund M, held by Jumpstart Ventures II LLC, including, but not limited to, $1,000,000.00 in capital contributions submitted on or about May 9, 2016;

        e.     All right, title, and interest in Investment Fund N, held by Jumpstart Ventures II LLC, including, but not limited to, $100,000.00 in capital contributions submitted on or about June 28, 2016;

        f.     All right, title, and interest in Investment Company C, held in the name of Jumpstart Ventures II, LLC, including, but not limited to, $50,000 in capital contributions submitted on or about January 5, 2017;

        g.     All right, title, and interest in Investment Company D, held in the name of Jumpstart Ventures II, LLC, including, but not limited to, $200,000.00 in capital contributions submitted on or about August 8, 2016;

        h.     All right, title, and interest in Investment Fund B, held in the name of Jumpstart Ventures II, LLC, including, but not limited to, $175,000.00 in capital contributions submitted between July 15, 2016, and June 14, 2017;

        i.     All right, title, and interest in Investment Fund O, held in the name of Jumpstart Ventures II, LLC, including, but not limited to, $158,879.00 in capital contributions submitted between August 8, 2016, and April 28, 2017;

j.     All right, title, and interest in investments made with Investment Company B entities, held in the name of Gravitas Holdings, LLC and Jumpstart Ventures II, LLC, including, but not limited to $75,000.00 in capital contributions submitted on or about August 12, 2016;

k.     All right, title, and interest in Investment Fund C, including, but not limited to, $22,000.00 in capital contributions submitted by or on behalf of Rishi SHAH, Shradha AGARWAL, Brad PURDY, Gravitas Holdings, LLC, and Jumpstart Ventures II LLC, on or about October 27, 2016;

l.     All right, title, and interest in Investment Company E, including, but not limited to, $35,000.00 in capital contributions submitted by or on behalf of Rishi SHAH, Shradha AGARWAL, Brad PURDY, Gravitas Holdings, LLC, and Jumpstart Ventures II LLC, on or about January 5, 2017;

m.     All right, title, and interest in Investment Fund P, including, but not limited to, $80,000.00 in capital contributions submitted by or on behalf of Rishi SHAH, Shradha AGARWAL, Brad PURDY, Gravitas Holdings, LLC, and Jumpstart Ventures II LLC, on or about January 5, 2017;

n.     All right, title, and interest in Investment Company F, including, but not limited to, $40,000.00 in capital contributions submitted by or on behalf of Rishi SHAH, Shradha AGARWAL, Brad PURDY, Gravitas Holdings, LLC, and Jumpstart Ventures II LLC, on or about July 15, 2016;

o. All right, title, and interest in Investment Fund Q, held in the name of Jumpstart Ventures II LLC, including, but not limited to, $45,000.00 in capital contributions submitted on or about October 11, 2016;

p. All right, title, and interest in approximately 250,454 shares of Series Preferred AA stock of Start-up Company D, held in the name of Jumpstart Ventures II, LLC;

q. All right, title, and interest in approximately 751,362 shares of common stock of Start-up Company D, held in the name of Jumpstart Ventures II, LLC;

r. All right, title, and interest in approximately 361,702 shares of Series B Preferred Stock of Start-up Company A;

s. All right, title, and interest in various items of jewelry purchased from Jewelry Company A on or about December 1, 2017, using funds from Account XXX3805 at Gold Coast Bank, including, but not limited to, jewelry and precious gems valued at approximately $200,000.00;

t. All funds and assets on deposit in Account xxxxxxx3548 at RBL Bank Ltd., including, but not limited to $1,580,917.97, held in the name of Shradha AGARWAL;

u. All funds and assets on deposit in Account xxxxxxx7836 at RBL Bank Ltd., including, but not limited to $333,977.77, held in the name of AGARWAL Relative A;

v.     All funds and assets on deposit in Account xxxxxxxx2006 at HSBC, including, but not limited to $110,166.42, held in the name of AGARWAL Relative A; and

w.     All right, title, and interest in approximately 705,417 shares of Series Seed-3 Preferred Stock of Start-up Company E, held in the name of Jumpstart Ventures II, LLC.

8.     If any of the property described above, as a result of any act or omission of the defendants: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c).

A TRUE BILL:

_____

FOREPERSON


_____
BRIAN HAYES
Attorney for the United States
Acting under Authority Conferred
By 28 U.S.C. § 515


ROBERT ZINK
Chief, Fraud Section
Criminal Division
U.S. Department of Justice


By: _____
William E. Johnston
Assistant Chief
Kyle C. Hankey
Trial Attorney