UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> RISHI SHAH; SHRADHA AGARWAL; BRAD PURDY; and ASHIK DESAI. | No. 19 CR 864 <br><br> Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Defendants have been indicted on charges of fraud in connection with their former business. The indictment identified certain property belonging to Defendants as being subject to forfeiture because it is alleged to be "derived" from the alleged fraud. *See* 21 U.S.C. § 853(a)(1). The Court then granted the government's motion for a protective order freezing the property. R. 27 (Nov. 22, 2019); R. 71; R. 72 (Dec. 16, 2019). Two of the four defendants, Rishi Shah and Shradha Agarwal, have moved to amend the protective order to exclude money they transferred to their defense attorneys' accounts. *See* R. 75; R. 76. They seek to use that money for their defense in this case. That motion is denied.

**Background**

In 2006, Shah and Agarwal founded a company called Outcome Health to sell electronic advertising on screens in doctor's office waiting rooms. The company grew rapidly. To fund expansion, the company obtained a $110 million loan in early 2016, followed by a $375 million loan in late 2016. By 2017, the company employed over 500 people. That year, the company raised about $487.5 million from equity investors.

As a result, the company paid a $225 million dividend to Gravitas Holdings, LLC, an entity controlled by Shah and Agarwal.

Later in 2017, the press reported that the company had "misled pharmaceutical companies by charging them for ad placements on more video screens than [had been] installed" and "provided inflated data to measure how well ads performed." R. 75-2 at 3. Subsequently, the company became the subject of government investigations, and its investors and lenders filed complaints against the company, Shah, and Agarwal, in New York and Delaware courts. Shah and Agarwal also asserted claims against the investors and lenders, although they never filed causes of action in any court.

Those disputes were settled on January 26, 2018. The parties mutually released their claims in exchange for the following consideration:

- Shah and Agarwal resigned from the company and gave up their controlling interest in the company, by surrendering nearly 50% in equity;
- Shah and Agarwal paid $159 million to the company;
- Shah and Agarwal paid $31 million to the investors;
- Shah and Agarwal waived their company-provided legal indemnification coverage;
- Shah and Agarwal were paid severances of $400,000 and $500,000, respectively;
- The company, investors, and lenders permitted Shah and Agarwal to keep remaining legal retainers that had already been paid to law firms; and

- The company, investors, and lenders permitted Shah and Agarwal to keep about $31 million in equity in Gravitas.

*See* R. 75-2 at 4.

In anticipation of the indictment in this case, Shah and Agarwal transferred about $10.3 million of the $31 million they received in the settlement to their attorneys' firms' accounts. Shah and Agarwal do not dispute that this $10.3 million is traceable to the $31 million they received in the settlement. They also do not dispute that the $31 million is traceable to the $225 million dividend they received after the $487.5 million equity investment the company received in 2017.

The government seeks to freeze the $10.3 million as forfeitable. Shah and Agarwal argue that they require these funds to retain their current counsel. The Court has received some evidence regarding Shah and Agarwal's other assets potentially available to pay their attorneys. Besides the $10.3 million at issue on this motion, Shah has about $4 million on account with his attorneys leftover from prior indemnification payments made by the company on his behalf. Agarwal has about $1 million in cash. They both own properties valued in excess of $1 million that are currently used as primary residences. Shah and Agarwal presented evidence of extensive current and anticipated debts. By contrast, the government presented evidence indicating that Shah and Agarwal continue to maintain positive net cash flows. *See* R. 94 (and documents cited therein). Current counsel estimate that Shah and Agarwal's defense will cost about $14-15 million.

## Analysis

Under 28 U.S.C. § 853(a)(1), any person convicted of certain federal crimes "punishable by imprisonment for more than one year shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." Additionally, "[u]pon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property described in subsection (a) for forfeiture under this section." 28 U.S.C. § 853(e)(1).

"Under long-settled circuit law, the pretrial restraint of a defendant's assets 'without affording the defendant an immediate, postrestraint, adversary hearing at which the government is required to prove the likelihood that the restrained assets are subject to forfeiture violates the due process clause to the extent that it actually impinges on the defendant's qualified sixth amendment right to counsel of choice.'" *United States v. Jones*, 844 F.3d 636, 640-41 (7th Cir. 2016) (quoting *United States v. Moya-Gomez*, 860 F.2d 706, 731 (7th Cir. 1988)). "If the district court finds that the defendant has insufficient alternative assets with which to pay counsel, but the government fails to justify its retention of all the frozen assets, 'then the court must order the release of funds in an amount necessary to pay reasonable attorneys' fees for counsel[.]'" *Jones*, 844 F.3d at 640-41 (quoting *Moya-Gomez*, 860 F.2d at 730). In other words, the Seventh Circuit has held that if a defendant can demonstrate a bona fide need for restrained funds to retain counsel, the government has the burden to

demonstrate that funds are traceable to the alleged fraud. If the government satisfies that burden, the funds are unavailable to pay defense counsel.

To be sure, Shah and Agarwal argue that they have a bona fide need for the $10.3 million in order to pay the anticipated $14-15 million bill for their current attorneys' defense of this case. It is undisputed, however, that Shah has $4 million that the government is not seeking to freeze, that is dedicated to financing his defense. Shah and Agarwal also do not dispute that they have significant other assets. They argue that these assets are not available to pay for their defense because they: are needed for their daily expenses; are illiquid; or are less than their current or anticipated debts. Without making a finding on this dispute, the Court assumes that Shah and Agarwal do not have sufficient assets to meet a $14-15 million attorney bill. At the same time, Shah and Agarwal are currently represented by some of the more expensive attorneys in the country. The evidence of Shah and Agarwal's finances causes the Court to suspect that they might be able to retain equally sophisticated, but less expensive, defense with the assets that are available to them.

Presumably aware of the possibility that their substantial assets (even if illiquid or off-set by debt and other obligations) would undermine at least the appearance of bona fide need, Shah and Agarwal insist that they can demand a hearing to determine whether there is probable cause to believe that the funds at issue are traceable to the alleged fraud *without* demonstrating that they have a bona fide need for the funds to retain counsel. Never having directly addressed the issue, the Seventh Circuit has acknowledged in dicta that due process might require such a

5

hearing. *See United States v. Kirschenbaum*, 156 F.3d 784, 793 (7th Cir. 1998) ("[T]he Second Circuit's due process analysis could also be seen to support the broader notion that without regard to the need to obtain counsel, a defendant is entitled to a hearing on the restraint of his property. . . . Because [the defendant] has not adequately presented the issue on appeal, we will not decide this close question."). And the Ninth Circuit appears to have held that it does. *See United States v. Roth*, 912 F.2d 1131, 1133 (9th Cir. 1990) ("The law of our circuit therefore remains that in order for a restraining order under § 853 to be constitutional, the district court must hold a hearing under Rule 65 to determine whether probable cause exists to issue an injunction."). More recently, a district court found that due process required it to provide "pretrial judicial review of the challenged seizure warrants," even though the defendant raised "no Sixth Amendment claim that the seizure of the Disputed Funds implicates his right to counsel." *United States v. Bikundi*, 125 F. Supp. 3d 178, 183, 191 (D.D.C. 2015). However, most circuit courts have held that a threshold showing of bona fide need is necessary for a defendant to challenge an asset restraint imposed under 21 U.S.C. § 853(e). *See United States v. Jamieson*, 427 F.3d 394, 406 n.3 (6th Cir. 2005) (citing cases); *United States v. Cosme*, 796 F.3d 226, 233 & n.2 (2d Cir. 2015) ("Having explicitly confirmed his sufficient access to funds for his defense and having expressly waived his right to a *Monsanto* hearing and the related Sixth Amendment challenges in the two stipulations, Cosme has no independent constitutional entitlement to an adversarial hearing on his Fourth and Fifth Amendment challenges. . . . We note also that several sister circuits have indicated

that a pretrial, post-deprivation adversarial hearing is not required absent Sixth Amendment concerns." (citing cases)); *see also Kaley v. United States*, 571 U.S. 320, 353 (2014) (Roberts, J. dissenting) ("To even be entitled to the hearing, defendants must first show a genuine need to use the assets to retain counsel of choice."). No binding authority requires such a hearing in this Court.

But regardless of whether Shah and Agarwal have demonstrated, or are required to demonstrate, bona fide need, there is sufficient evidence for the Court to find probable cause that the funds at issue are derived from the alleged fraud, meaning that the funds are not available to pay counsel even on a showing of bona fide need. The government has the burden to demonstrate probable cause if Shah and Agarwal can demonstrate bona fide need. It is not clear who has the burden of proof if due process requires a hearing even without a showing of bona fide need, because, as already noted, most courts do not permit a hearing in such circumstances. In any event, the dispute here is not truly of an evidentiary nature. Shah and Agarwal *do not* dispute that the funds at issue are traceable to the dividend that is indisputably a product of the alleged fraud.

Instead, the question here is a legal one: whether the settlement agreement Shah and Agarwal reached with the company, the lenders, and the investors, cleans the funds of the taint associated with their undisputed allegedly illegal source. Shah and Agarwal argue that because the $31 million they received in the settlement agreement was their "compensation for giving up their company-provided indemnity coverage and releasing their claims against the Investors and Lenders, the

7

Government cannot meet its burden to show that the assets are subject to forfeiture." R. 75-2 at 15. The government contends that title to the $31 million, which is indisputably part of the $225 million dividend traceable to the alleged fraud, vested upon the commission of the allegedly fraudulent act, well before the settlement agreement was executed. *See* R. 80 at 9. Shah and Agarwal argue further, however, that regardless of who technically has title to the funds, because the $31 million is what they received in consideration for waiving their indemnification rights, they should be allowed to use part of the $31 million to finance their defense. They contend that prohibiting this use is the equivalent of allowing the government to freeze funds paid under the indemnification agreement, and an indemnification agreement cannot be subject to forfeiture because it cannot be said to be "something of value, directly or indirectly, that they would not have received but for the alleged fraud," as is required by the relevant statute, 18 U.S.C. § 853. *See* R. 75-2 at 18. In essence, they argue that since the indemnification rights were not tainted, any independent consideration they received in exchange for those right similarly must be untainted.

Shah and Agarwal's argument rests on the premise that the victim of a crime can undermine the government's right to seek forfeiture of criminal proceeds by agreeing to permit the defendant to keep them. *They cite no authority for this contention.* Rather, they appeal to the Court's sense of fairness and argue that freezing the funds at issue is akin to freezing their indemnification rights because they exchanged the rights for the funds. They contend that permitting the

8

government to freeze the funds sets a bad precedent considering the prevalence of the use of indemnification agreements for these purposes.

The problem with this argument is that, normally, funds paid under an indemnification agreement never reach a defendant's hands. Here, Shah and Agarwal, through their alleged fraud, acquired actual possession of the funds at issue. They were then able to leverage their possession of those funds to escape civil lawsuits. Of course, Shah and Agarwal gave up some valuable consideration in the settlement agreement. But that does not change the fact that Shah and Agarwal benefited from their possession of the dividend funds in a way they would never have been able to benefit from their right to indemnification.

Moreover, the Court notes that Shah and Agarwal did not surrender their indemnification rights for nothing. Rather, they escaped serious pending civil litigation, that risked a judgment in the hundreds of millions of dollars. The Court presumes that Shah and Agarwal would argue that without some way to pay their attorneys in this case—whether under the indemnification agreement or with the $31 million—the settlement agreement is an unfair deal they would not have made. But they have not expressly made this argument to the Court, and considering the relatively small value of indemnification in this case (Shah and Agarwal argue that it will cost about $14-15 million) in comparison to the hundreds of millions of dollars of liability Shah and Agarwal faced in civil liability, it is unlikely that the indemnification rights and the $31 million at issue here played a significant role in Shah and Agarwal's decision to enter the settlement agreement. And regardless of

9

their actual motivations for making the deal, removing the $31 million from the equation does not make the deal patently unfair.

In any event, the forfeiture statute's breadth—encompassing proceeds derived "directly or indirectly" from the alleged fraud, 21 U.S.C. § 853(a)(1)—means that the Court should not engage in speculation about the value of the settlement agreement's consideration, as Shah and Agarwal's argument requires. To the extent there is any merit to Shah and Agarwal's argument—which the Court finds there is not because the funds at issue are indisputably traceable to the fraud—it asks the Court to examine the relative value of the consideration paid by the various parties to the settlement agreement. Considering the many competing motivations for the settlement and the uncertain value of much of the consideration (most notably the value of Shah and Agarwal's equity in the company and the money damages caused by their fraud), this is a nearly impossible task. And certainly not one that is called for in determining traceability under a statute as broad as 21 U.S.C. § 853.

Lastly, the Court notes that Shah and Agarwal could be understood to be arguing that they "substituted" the dividend funds for their indemnification rights in the form of permission to retain $31 million. *See* 21 U.S.C. § 853(p) ("substitute property" is defined in part as property that "has been transferred or sold to, or deposited with, a third party"). Unlike funds that are proceeds derived from alleged criminal activity, "substituted" property, i.e., property that is purchased with illegally acquired funds, cannot be frozen prior to conviction, only after. *See Jones*, 844 F.3d at 641 (pretrial restraint permitted for "tainted assets prior to trial, but not the

10

restraint of substitute assets"). But Shah and Agarwal have not argued that the $31 million is substitute property. Nor could they, as the funds are indisputably derived from the dividend which is indisputably derived from Shah and Agarwal's alleged fraud.

The settlement agreement does not cleanse that taint. In hindsight, Shah and Agarwal likely wish the company was still obligated to indemnify them. But that decision was a privately bargained for exchange that ultimately is irrelevant to the fact that the $31 million is tainted, including the portion they wish to use to pay their attorneys' fees. The tainted funds were properly frozen.

## Conclusion

Therefore, Shah and Agarwal's motion is denied.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: April 8, 2020

11