UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

    v.

RISHI SHAH,
SHRADHA AGARWAL, and
BRAD PURDY

No. 19 CR 864

Hon. Thomas M. Durkin
United States District Judge

## **GOVERNMENT'S AMENDED PROPOSED INSTRUCTION NO. 8**

A person acts knowingly if he or she realizes what he or she is doing and is aware of the nature of his or her conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said.

You may find that a defendant acted knowingly if you find beyond a reasonable doubt that he or she believed it was highly probable that any of the following facts were true, and that he or she took deliberate action to avoid learning that fact:

- Outcome was materially under-delivering on its contracts with pharmaceutical clients;
- Outcome's revenue was materially inflated; or
- Outcome manipulated numbers in IMS ROI reports and presented the falsified performance reports to clients and investors.

You may not find that a defendant acted knowingly if he or she was merely mistaken or careless in not discovering the truth, or if he or she failed to make an effort to discover the truth.

GOVERNMENT INSTRUCTION NO. 8
Seventh Circuit Pattern Instruction (2022) 4.10 (modified)

<u>Defendants' Objection</u>

Defendants object to the proposed "ostrich" instruction, which is at odds with the government's theory here, inconsistent with the model as drafted, and highly prejudicial.

First, the Seventh Circuit has made clear that an ostrich instruction "'should *not be given* unless there is evidence that the defendant engaged in behavior that could reasonably be interpreted as having been intended to shield him from confirmation of his suspicion that he was involved in criminal activity.'" *United States v. Guzman-Cordoba*, 988 F.3d 391, 407 (7th Cir. 2021) (quoting *United States v. Macias*, 786 F.3d 1060, 1062 (7th Cir. 2015) (emphasis added)). Thus, the defendant must not only "'believe that there is a high probability that a fact exists' but also 'must take deliberate *actions* to avoid learning of that fact.'" *United States v. Mikaitis*, 33 F.4th 393, 398-99 (7th Cir. 2022) (quoting *United States v. Macias*, 786 F.3d 1060, 1062 (7th Cir. 2015) and *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011)).

Here, the government's allegations are starkly to the contrary. The government has maintained that Defendants knowingly and intentionally participated in the fraud scheme and took deliberate steps to keep *other people* from finding out about the fraud, not themselves. *See*, e.g., Indictment para. 3 ("To conceal the scheme, SHAH, AGARWAL, PURDY, and DESAI did the following: (a) marginalized, undermined, and ignored whistleblowers who raised concerns about the fraud; (b) hid the under-delivery on the advertising campaigns from Deloitte; and

(c) at times siloed information by directing Outcome employees not to include the Outcome salespeople who were interacting directly with the clients on certain communications[.]").

The proposed instruction will be inappropriate because, under the government's theory, no defendant both believed there was a "high probability" of a fact showing illegal behavior and took "deliberate actions to avoid learning of that fact" (*See Macias*, 786 F.3d at 1062 (reversing guilty verdict when there was insufficient evidence showing that defendant "act[ed] to avoid learning the truth" (citation omitted)).

Further, even were the instruction appropriate to be given, the government's list of seven leading, broad, and conclusory allegations characterized as "facts" is inconsistent with the model as drafted and highly prejudicial. It improperly equates these allegations with "facts as to which knowledge is in question" when in effect these are mere allegations which must substantiated with specific facts. For this reason, the Seventh Circuit's pattern instructions do not contemplate such leading, broad, and conclusory descriptions—but rather direct that a specific, precise "fact as to which knowledge" is in question must be specified for the jury's consideration (see Seventh Circuit Pattern Instruction (2022) 4.10 ("You may find that the defendant acted knowingly if you find beyond a reasonable doubt that he believed it was highly probable that [state fact as to which knowledge is in question, e.g., 'drugs were in the suitcase,' 'the financial statement was false,'] and that he took deliberate action to

avoid learning that fact. . . .")). As such, at a minimum, the instruction should not be given in its current form.

## Government's Response

The government's proposed instruction is consistent with the language of Seventh Circuit pattern instruction no. 4.10 and Seventh Circuit case law and comports with the evidence admitted at trial.

"An ostrich instruction informs the jury that actual knowledge and deliberate avoidance of knowledge are the same thing." *United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir. 1986). Further, "[w]hen someone knows enough to put him on inquiry, he knows much." *Id*.

At trial, defendants claimed lack of guilty knowledge at trial, which satisfies the first prong for issuing a deliberate-avoidance instruction. *United States v. Carani*, 492 F.3d 867, 873 (7th Cir. 2007) (ostrich instruction is appropriate "where (1) the defendant claims a lack of guilty knowledge, and (2) the government has presented evidence sufficient for a jury to conclude that the defendant deliberately avoided learning the truth.") The defense conceded that a significant fraud occurred at Outcome, but blamed Ashik Desai and his subordinates for the fraud. As set forth in greater detail below, a multitude of individuals raised concerns about Outcome's fraudulent business practices. In response, defendants took action: they attacked, undermined and in some cases pushed those individuals out of the company. In these circumstances, and considering the additional evidence set forth below, an ostrich

instruction is appropriate. *See Ramsey*, 785 F.2d 184, 189 ("If a person with a lurking suspicion goes on as before and avoids further knowledge, this may support an inference that he has deduced the truth and is simply trying to avoid giving the appearance (and incurring the consequences) of knowledge.") *Id*.

Though the defense claims that the ostrich instruction is inconsistent with the government's theory of the case, the evidence presented at trial supports both actual knowledge and deliberate-avoidance theories. *See United States v. Ramirez*, 574 F.3d 869, 879 (7th Cir. 2009) (rejecting defense challenge to deliberate avoidance instruction where evidence supported both actual knowledge and deliberate avoidance and explaining "[t]he government may present evidence that supports both theories.")

Trial evidence of deliberate avoidance (most of which also support an inference of actual knowledge) includes:

- The delta reports, growth models, and discussions about the deltas suggested that Outcome was massively underdelivering on ad campaigns. Despite the underdeliveries, Outcome's reported revenue numbers increased substantially between 2011 and 2016.

- On March 19, 2016, in an email response to Jayanth Surakanti and Shradha Agarwal related to the agenda for an executive team meeting, Shah said that he didn't want an "inquisition" on deltas at the meeting and made clear that any discussion about deltas needed to be pre-cleared with him, "I don't want Matt to recommend new ideas not cleared by me as it will turn into an inquisition rather than an update to the group on how well address the gap. This isn't a meeting for brainstorming on how to fill the gap as many people don't work in those areas and we don't want to spend every meeting on that topic. That should be discussed and pre-cleared ahead of time and Exec is a place to update the group and discuss business level issues." GX 557.

- Numerous analysts raised concerns about Outcome's unethical business practices in exit interviews. At least three written exit interviews were sent to Brad Purdy. As set forth below, the analysts raised concerns about the lack of integrity and ethics at Outcome, including with respect to the ROI reports, delivery on contracts, and the use of the analysts to cover up the fraud:

    o On May 9, 2016, in response to a question about the qualities Outcome should look for in her replacement, Araba Appiagyei-Dankah wrote in part, "Someone for whom integrity was not a #1 concern; they should be willing to operate in shades of ethical gray." GX 580.

    o On June 16, 2016, in response to a question about what made him start to look for a new job, Isaiah Samuel wrote, "Inconsistencies in what was promised and what was delivered…Lack of sincerity and integrity from supervisors and leadership and ultimately being put in situations that felt morally compromising." GX 585.

    o On July 8, 2016, in response to a question about the qualities Outcome should look for in her replacement, Anjolie Kulkarni wrote, "Ethical issues with how sponsorship 1) reports ROI 2) fulfills contracts and 3) uses the analytics team to cover up these issues." GX 592. In response to a question about what Outcome could do be become a better company, Kulkarni wrote, in part, "There's a lot of potential at CM…But, being ethical and honest with how our campaigns are doing is absolutely critical to acquiring business in a fair way." *Id*.

- Collin Williams, who was Outcome's in-house attorney, talked to Purdy about the concerns expressed by the analysts. During that conversation, Purdy undermined the analysts, saying that they were young and didn't understand the business model. Trial Tr. 6380.

- Shah and Agarwal were aware that Outcome salesperson David Jundt quit after seeing Desai present false numbers at a client meeting in 2016. GX 673 (11/28/17 text chain between Shah, Agarwal and Desai). They did not confront Desai about it or discipline him. Shah later put Desai back in charge of sales and operations, which included responsibility for ROI reports.

- On December 26, 2016, Desai sent Shah and Purdy a lengthy Voxer in which he discussed Outcome's practice of sending clients false affidavits and "massive inventory gaps." GX 704. He cautioned Shah and Purdy from calling attention to the massive inventory gaps because of the potential

revenue implications for Outcome.  In a response, Shah told Desai that he wanted Desai and Purdy to make the call on how to handle the issue. GX 707.

- In advance of his meeting with Shah, Sameer Kazi told head of HR Madan Nagaldinne about his concerns about Outcome's fraudulent business practices.  As set forth in a Voxer from Nagaldinne that was sent to Agarwal Shah and Desai, Kazi told Nagaldinne that Outcome was committing fraud, and that he was concerned that more than 50% of Outcome's revenue could be recalled.  GX 760b.  This Voxer led to a flurry of communications, including discussion about (1) whether Kazi could be trusted, (2) the potential that Kazi would go public or repeat the information to others, and (3) firing Kazi.

- At the January 25, 2017 meeting, Shah started the one-on-one meeting with Kazi by attacking him, including by telling Kazi that he was a "bull in a China shop," which was part of Shah's plan to force Kazi out of the company. Kazi had planned to show Shah a spreadsheet that memorialized issues surrounding overselling inventory and under-delivery on various advertising campaigns, and related to manipulation of ROI reports, but Shah did not show interest in discussing the issues or even ask how Kazi knew of the issues and instead returned to the topic of negative feedback that Shah said he received about Kazi.  Based on Shah's response to the concerns he raised, Kazi decided that he longer wanted to be associated with Outcome, gave Shah his laptop and phone, and walked out.

- When Agarwal learned what Adam Prowker and Liane Pierce had shared with Kazi, Agarwal accused him of "not very good leadership" in a Voxer to Shah and suggested that they should fire Prowker and Pierce: "we may just have to clean up in a lot of different areas of that org." GX 747.

- About one week later, Shah had a contentious meeting with Prowker, in which Shah berated him for supposedly failing to understand Outcome's business. GX 818 (recording of the meeting between Prowker, Shah, Desai, and Surakanti). After the meeting, Prowker correctly sensed that Shah was about to fire him, and had his lawyer send a whistleblower letter to Shah. The letter from Prowker's lawyer provided that Prowker, "has serious concerns about the manner in which OH is measuring and reporting its deliverables to clients. Based on information available to Dr. Prowker, including the data reports from Quintiles IMS, it appears the Company is artificially inflating the performance results it reports to clients to create the false appearance that it is providing content to more physician offices that is actually the case and is also inflating actuals by measuring offices that are not live."  GX 834.

- The day after receiving the whistleblower letter from Prowker's attorney, Shah told Purdy that he wanted Prowker to be fired, "I'd like to fire him and I'm just asking is that OK, once he's written his letter, to just fire him…" GX 845.

- On January 30, 2017, Sahir Raoof made a formal complaint to Nagaldinne, who notified Agarwal that, "[Raoof alleged] willful misrepresentation of inventory data by 'sales and management' he says that the entire GS team is worried that we might be perpetuating fraud and some of them have gone to lawyers to ask for advice…" GX 820. Agarwal forwarded the complaint to Shah and Desai. Shortly thereafter, Shah referred to Raoof as "toxic" and a "troublemaking f-er," and Desai placed Raoof on a reduction in force list.

- On February 6, 2017, Bridget O'Donnell met with Rishi Shah after a Town Hall meeting. O'Donnell brought her laptop with her to the meeting in order to show Shah evidence of the ROI report manipulation. During the meeting, O'Donnell expressed concern about Prowker's abrupt departure, and about Outcome lying to or misleading clients. She even turned her partially-open laptop towards Shah, and said, "Here, I have this analysis on my computer." Trial Tr. 7445. Even though she showed Shah her laptop screen, Shah did not review the documents on her laptop. Shah told O'Donnell that there were "operational inefficiencies" that she did not understand, Trial Tr. 7444, and directed her to talk to Desai.

- Shah asked O'Donnell to email him the spreadsheets she had referred to during the meeting. O'Donnell did not email the spreadsheets to Shah because she was concerned that she might be fired if she did so. Trial Tr. 7449.

- On February 15, 2017, Bryan Morgan emailed Purdy and Desai, reporting underdelivery fraud and ROI report manipulation, "Some time has passed since I initially expressed my concerns regarding how the Outcome Health programs deploy vs how they are contracted, in addition to the glaring inconsistencies between result presentations received from IMS and presentations that are ultimately delivered to our clients... I did, however, want to make clear that I am unwilling/unable to participate in what I believe to be morally/ethically objectionable business practices..." GX 862.

- Purdy forwarded the Morgan email to Shah, who ignored the substance of Morgan's email and wrote, "Very shocking. Bryan very clearly and explicitly resigned..." GX 862. Purdy responded with a similar email to Morgan, "Bryan, I am shocked and disappointed by this communication. You resigned to our Founder and CEO and in the presense of his Chief of Staff…" GX 863.

- All three defendants repeatedly lied to Deloitte at annual fraud inquiry meetings, including meetings in March 2017. For example, they lied by saying that if an Outcome employee acted unethically, that person would be terminated immediately. GX 652. They also falsely denied knowledge of any actual, suspected or alleged fraud. *Id*.

- After Shah and Agarwal heard reports that Desai was altering the IMS ROI reports, they did not confront Desai about it. Instead, they marginalized and sidelined the individuals who raised concerns about it, and Shah protected Desai and later placed Desai back in charge of operations at Outcome.

- In the midst of all of these (and other) reports of fraud at Outcome, the defendants raised hundreds of millions of dollars from investors—with a principal purpose of generating a $225 million dividend to Shah and Agarwal— without disclosing Outcome's deceptive practices.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney
Northern District of Illinois

By:    *s/ Matthew F. Madden*
Matthew F. Madden
Saurish Appleby-Bhattacharjee
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:    *s/ William E. Johnston*
William E. Johnston
Kyle C. Hankey

Assistant Chiefs
1400 New York Ave NW
Washington, D.C. 20530

Dated: March 24, 2023