UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19 CR 864 |
| | ) | |
| RISHI SHAH, | ) | |
| SHRADHA AGARWAL, and | ) | Judge Thomas M. Durkin |
| BRAD PURDY | ) | |
| | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION
TO MOTION TO DISMISS INDICTMENT OR FOR NEW TRIAL**

As of the start of trial in January 2023, the indictment had been pending against defendant Rishi Shah for more than three years. During that three-year window, the defendant never moved to dismiss the indictment. Three months *after* the jury convicted him at trial, the defendant filed a motion to dismiss the indictment. R. 490. Yet Rule 12 requires defendants to file motions to dismiss before trial. The defendant's failure to timely file the motion constitutes waiver.

The substance of the motion is also flawed. The defendant attempts to repackage his forfeiture arguments as grounds for a post-trial motion to dismiss or for a new trial. But the tracing of assets for potential forfeiture has no relevance to the elements of the charged offenses, and thus had no influence on the grand jury's decision to indict. In any event, the petit jury's resounding verdict against Shah renders harmless any possible error in the grand jury.

In addition to rehashing forfeiture arguments he has already made in prior filings or at hearings, the defendant advances a claim that an FBI forensic accountant provided false testimony to the grand jury related to forfeiture. The Court should reject this inaccurate and unfair claim. In fact, the accountant's testimony was truthful. Further, the challenged testimony only related to the

1

tracing of assets for forfeiture, which provides no basis to dismiss an indictment or grant a new trial.

Shah's attempt to shoehorn forfeiture issues into a motion to dismiss or for a new trial is misguided and without support in the law. The motion should be denied.

## ARGUMENT

### I. The Defendant's Failure to Timely File a Motion to Dismiss Constitutes Waiver.

#### A. Legal Standard

"Under Fed. R. Crim. P. 12(b)(2) motions to dismiss an indictment must be made before trial or they are waived." *United States v. Cathey*, 591 F.2d 268, 271 (5th Cir. 1979). Specifically, Federal Rule of Criminal Procedure 12(b)(3) requires that certain motions "must be made before trial," including motions alleging "a defect in instituting the prosecution, including. . . (v) an error in the grand jury proceeding . . ." and motions alleging "a defect in the indictment or information." Fed. R. Crim. P. 12(b)(3)(A) and (B). *See United States v. Figueroa-Ocampo,* 138 F. App'x 988, 989 (9th Cir. 2005) (citing Rule 12 and concluding that "the district court properly dismissed [defendant's] motion to dismiss the indictment as untimely" because the defendant "waited until six months after trial to file his motion"); *United States v. Zitt*, No. 2:09-CR-35, 2011 WL 5183348, at * 2 (N.D. Ind. Oct. 31, 2011) ("failure to timely raise [Rule 12(b)] motions constitutes waiver"). A court may consider an untimely motion to dismiss "if the party shows good cause." Fed. R. Crim.P. 12(c)(3).

#### B. Analysis

As set forth below, the defendant's motion to dismiss the indictment is untimely and thus waived. Further, the defendant has not established good cause. As a result, the motion should be denied.

On April 11, 2023, after a trial of nearly three months, the jury returned guilty verdicts against defendants Shah, Shradha Agarwal and Brad Purdy. R. 447. Each were convicted on more than a dozen counts. *Id*. On July 14, 2023, more than three months after his conviction at trial, and on the date that *post-trial* motions were due, Shah filed the present motion to dismiss the indictment. R. 490, 491. In the motion, Shah asks the court to dismiss the indictment because an FBI forensic accountant purportedly lied before the grand jury and because the Court granted a motion for a protective order that restrained "all right, title and interest" in certain assets. R. 491 at 1. He asserts that the government violated his Fifth and Sixth Amendment rights. As set forth in greater detail below, the accountant did not lie in the grand jury. The defendant's other claims are similarly unavailing. But the Court should deny this motion at the outset because the motion— which constitutes a motion alleging "a defect in instituting the prosecution" and "a defect in the indictment"—is untimely under Rule 12 and thus the argument was waived. Fed. R. Crim. P. 12(b)(3); *United States v. Whitfield*, 590 F.3d 325, 358-59 (5th Cir. 2009) (affirming denial of motion to dismiss that was filed after trial began in which defendant claimed government presented false testimony to grand jury and presented a factually incorrect indictment and noting that "a motion alleging a defect in the indictment must be made before trial" and "[f]ailure to comply with this rule generally constitutes waiver") (citations omitted). *See also Bauzó-Santiago v. United States*, 435 F.Supp.3d 357, 376 (D.P.R. 2020) ("Motions to dismiss the indictment after trial are not timely."), *citing United States v. Lyons*, 703 F.2d 815, 821 (5th Cir. 1983) (holding that a post-trial motion to dismiss allegedly duplicitous counts in an indictment was untimely).

Further, the defendant has not established good cause. In an attempt to justify this puzzling, post-trial motion to dismiss, the defendant leads with a false premise, claiming that he did not have

the information he needed for the motion until shortly before the accountant testified at trial in March 2023:

> It was not until three years later, in the midst of trial, that the Government produced discovery to Mr. Shah that revealed the existence of the illegal restraint. The discovery divulged that the Government had presented testimony to the grand jury that "all right, title, and interest" in the property described in the Indictment was subject to forfeiture, when, as the Government now admits, it never had the evidence to justify so sweeping a restraint.

R. 491 at 1.[1] Contrary to that claim, and setting aside the defendant's mischaracterization of the testimony of the accountant, the government in fact disclosed both the transcript of the accountant's testimony and all grand jury exhibits for her testimony in January 2020, less than two months after the indictment was returned in November 2019. Ex. A (1/17/20 discovery letter that provided that the government was producing "grand jury transcripts, GJ statements, and GJ exhibits" with an accompanying index that listed the transcript of the accountant's grand jury testimony by name, date, and Bates number, and included the grand jury exhibits used during her testimony). Notably, the transcript of the accountant's grand jury testimony and the accompanying exhibits are the same two exhibits that the defendant attached to the present motion to dismiss and discussed in great detail in the motion. R. 490 at 6-7 (attaching the transcript of the testimony as Ex. 2 and the GJ exhibits as Ex. 3). The government did not disclose the grand jury testimony for the first time "in the midst of trial;" it produced the grand jury transcript of the accountant's testimony and accompanying exhibits for the *second time* during trial—both productions were before her testimony—as a courtesy to and for the convenience of the defense group. In other words, notwithstanding Shah's current counsel's representations, by the time the trial started in January 2023, the defendant had the transcript with the supposedly false grand jury testimony for

---

[1] After making this assertion about when the government produced discovery, the defendant next states, "These facts are undisputed." R. 491 at 2. The facts are not only disputed; the defendant's factual representations are inaccurate.

about three years, and could have filed a motion to dismiss during that time. Yet he waited until three months *after trial* to file this motion. *Cf. Whitfield*, 590 F.3d at 359 (rejecting claim of "good cause" for untimely motion to dismiss based on purportedly perjured grand jury testimony where the government "furnished [defendant] with a copy of the indictment and a transcript of the grand jury proceedings well before trial . . . therefore he has no excuse for failing to move for dismissal prior to trial").

Furthermore, the face of the indictment and the protective order both clearly flagged for Shah that the government was alleging forfeiture of and restraining the entirety of the assets identified, even though each asset, in some instances, was tied only to a smaller transfer of traceable proceeds. *See e.g.*, Dkt. 14 at 39 ¶3a ("*All right, title, and interest* in Investment Fund A, held in the name of Jumpstart Ventures II, LLC, including *but not limited to*, approximately $60,000.00 in capital contributions on or around May 31, 2018) (emphasis added); 11/22/19 Protective Order at 2 ¶1a (identifying as SUBJECT PROPERTY under restraint, for example, "*All right title, and interest* in [Investment Fund A], held in the name of Jumpstart Ventures II, LLC, *including but not limited to*, approximately $60,000.00 in capital contributions on or around May 31, 2018") (emphasis added). The whole point of alleging specific transactions in the forfeiture allegations was to explicitly identify the amount of traceable proceeds. The claim that Shah was unable to discover that entire assets, beyond those portions linked to traceable proceeds, were being restrained until after receiving Poelking's grand jury testimony mid-trial is absurd.

The defendant also had the ability to assess the accuracy of the accountant's testimony and the scope of the protective order long before trial. First, Shah and Agarwal were the ones who made the investments in the first place. The funds that were invested in the assets listed in the forfeiture allegations were sent from the bank accounts of Shah, Agarwal, Gravitas, and Jumpstart.

As records reflect and as Shah has admitted, he and Agarwal own Gravitas and Jumpstart, which were the entities used to invest in the assets at issue. R. 93-1, ¶ 2. In short, Shah and Agarwal themselves invested in these funds and they did so from bank accounts that they controlled. Thus, they knew how much they had invested and where the funds originated, which meant that they had the ability to gauge the accuracy of the accountant's grand jury testimony.[2]

Second, as with the transcript of the grand jury testimony and the exhibits, the government disclosed the relevant bank records in discovery to the defendants shortly after the indictment was returned. In particular, in January and February 2020, the government produced the bank records for the Shah, Agarwal, Gravitas and Jumpstart accounts from which Shah and Agarwal made the investments. The dates for the productions are set forth in the chart below:

| RS and SA Bank Accounts | Date Produced to RS | Date Produced to SA |
| --- | --- | --- |
| Gravitas Holdings (Pershing x6290) | 1/13/2020 2/21/2020 | 1/13/2020 2/21/2020 |
| Jumpstart Capital LLC (Signature Bank x6647) | 1/13/2020 | 1/13/2020 |
| Jumpstart Ventures II LLC (JPMorgan Chase (x9006) | 1/13/2020 | 1/13/2020 |
| Jumpstart Ventures II LLC (Pershing x7892) | 1/13/2020 2/21/2020 | 1/13/2020 2/21/2020 |
| Rishi Shah (JPMorgan Chase x7050) | 1/13/2020 | 1/13/2020 |
| Rishi Shah (JPMorgan Chase x9002) | 1/13/2020 | 1/13/2020 |
| Rishi Shah (Pershing x5573) | 1/13/2020 2/21/2020 | 1/13/2020 2/21/2020 |
| Rishi Shah (Fidelity x9049) | 1/13/2020 2/21/2020 | 1/13/2020 2/21/2020 |
| Shradha Agarwal (JPMorgan Chase x5964) | 1/13/2020 | 1/13/2020 |
| Shradha Agarwal (JPMorgan Chase x6297) | 1/13/2020 | 1/13/2020 |

Ex. B.[3] Considering that Shah and Agarwal themselves made these investments and possessed the grand jury testimony and exhibits as of January 2020, and that the government produced to them

---

[2] The government also provided the defense with a copy of the motion for the protective order and the protective order. R. 75.

[3] Exhibit B is a cover letter and index for discovery produced as part of "Production Volume 2," a production made in January 2020, and a discovery letter and index for "Production Volume 4," which was produced in February

copies of their own bank records in early 2020, the defendants had ample time and opportunity to trace the flow of the funds and assess the grand jury testimony and the scope of the protective order before trial.

The defendant had no excuse for failing to file the motion to dismiss before trial. The motion should be denied.

## II.     Even if the Motion to Dismiss Were Timely, It Has No Merit.

Turning to the substance, Shah has not identified any basis to dismiss the indictment. Going with a kitchen-sink approach, he claims that the Court should dismiss the indictment because (1) the government violated his due process rights by presenting false testimony related to forfeiture in the grand jury, R. 491 at 12-13; (2) the government violated federal forfeiture laws when it obtained a protective order that excessively restrained his assets, *Id*. at 6-7; and (3) the excessive restraint violated his Sixth Amendment rights. *Id*. at 7-10. None of his arguments have merit.

### A.  The Due Process Claim

#### a.  Legal Standard

A federal court may "dismiss an indictment for misconduct before the grand jury" only where the misconduct violates "one of those few, clear rules which were carefully drafted and approved by th[e Supreme] Court and by Congress to ensure the integrity of the grand jury's functions." *United States v. Williams*, 504 U.S. 36, 46 (1992) (quotation marks omitted). The Seventh Circuit has "reserved the possibility that knowing use of perjured testimony, amounting

---

2020. Production Volume 2 included not only bank records, but records from the funds in which Shah and Agarwal invested (*i.e.*, the assets that were restrained), which meant that the defendants had the opportunity to trace the monies with records on both ends: from their own bank accounts and from the investment funds. Most of the relevant bank records were produced in January 2020; some additional bank records were produced in February 2020 as part of Production Volume 4.

to the creation of trumped-up charges, *might* justify the dismissal of an indictment." *United States v. Fountain*, 840 F.2d 509, 513 (7th Cir. 1988) (emphasis added).

Even if a clearly defined rule is violated, the indictment may be dismissed only if the defendant is prejudiced, *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988), meaning that the violation "substantially influenced the grand jury's decision to indict," or "there is grave doubt that the decision to indict was free from [such] influence." Further, a "petit jury's guilty verdicts render harmless any possible error in the grand jury proceedings." *United v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004) (citing *United States v. Mechanik,* 475 U.S. 66, 72–73 (1986) and *United States v. Knight,* 342 F.3d 647, 713 (7th Cir. 2003)).

### b. Analysis

In an ill-conceived attempt to buttress his due process claim targeting the grand jury testimony of the accountant, Shah again turns to his inaccurate claim that the government did not disclose the transcript of the accountant's grand jury testimony and grand jury exhibits until after the trial began. R. 491 at 14-15 ("To make matters worse, the Government's failed to reveal the existence of the false testimony to Mr. Shah's counsel until the midst of trial, instead withholding that evidence from Mr. Shah's counsel for more than three years…Until that time [during trial], for all Mr. Shah's counsel knew, the Government may have presented evidence to the grand jury to trace every last dollar of the assets it had restrained to the alleged criminal activity.").[4] As set forth above, the transcript of accountant's testimony, the grand jury exhibits, and the relevant bank

---

[4] Of course, the defendant not only had the grand jury materials, he had a copy of the indictment itself, which reflected the forfeiture allegations. Thus, the defendant was on notice that the government was seeking to forfeit "all right, title and interest" in various assets, including but not limited to specific contributions made on certain days. The notion that this position was concealed from him is not based in reality.

records were disclosed in discovery in January and February 2020, approximately three years before trial. The Court should reject this misleading attempt to tar the government.[5]

In any event, the government did not present any false testimony to the grand jury. In particular, the accountant never testified that every dollar that that Shah and Agarwal invested in the assets at issue was traceable as fraud proceeds. And she never uttered the phrase "all right, title and interest" in the grand jury. Instead, the accountant prepared charts that were used as grand jury exhibits that reflected the specific amounts that were traceable as fraud proceeds, including Grand Jury Exhibit Forfeiture 2, a portion of which is reflected here:

17 GJ 974
Assets Subject to Forfeiture Attributable to the Capital Raise in 2017

| Source of Funds | Funds Transferred To | Asset | Amount Traceable to Criminal Proceeds |
|---|---|---|---|
| Gravitas Holdings (Pershing x6290) | AP 100 W Huron Investors LLC | All right, title, and interest in approximately 17.747958% of AP 100 W Huron Investors, LLC | $ 2,537,695.00 |
| Gravitas Holdings (Pershing x6290) | Guild Capital, LLC | All right, title, and interest in investments made with Guild Capital Entities | $ 25,000.00 |
| Gravitas Holdings (Pershing x6290) | Guild Capital, LLC | All right, title, and interest in investments made with Guild Capital Entities | $ 100,000.00 |
| Gravitas Holdings (Pershing x6290) | Guild Capital, LLC | All right, title, and interest in investments made with Guild Capital Entities | $ 100,000.00 |
| Gravitas Holdings (Pershing x6290) | Guild Capital LLC | All right, title, and interest in investments made with Guild Capital Entities | $ 75,000.00 |
| Gravitas Holdings (Pershing x6290) | Guild Capital LLC | All right, title, and interest in investments made with Guild Capital Entities | $ 175,000.00 |
| Gravitas Holdings (Pershing x6290) | Institutional Venture Partners XVI LP | All right, title, and interest in Institutional Venture Partners XVI, LP | $ 500,000.00 |
| Gravitas Holdings (Pershing x6290) | Institutional Venture Partners XVI LP | All right, title, and interest in Institutional Venture Partners XVI, LP | $ 550,000.00 |
| Gravitas Holdings (Pershing x6290) | Institutional Venture Partners XVI LP | All right, title, and interest in Institutional Venture Partners XVI, LP | $ 250,000.00 |
| Gravitas Holdings (Pershing x6290) | Institutional Venture Partners XVI LP | All right, title, and interest in Institutional Venture Partners XVI, LP | $ 250,000.00 |
| Gravitas Holdings (Pershing x6290) | Institutional Venture Partners XVI, LP | All right, title, and interest in Institutional Venture Partners XVI, LP | $ 250,000.00 |
| Gravitas Holdings (Pershing x6290) | L Squared Capital Management LP | All right, title, and interest in L Squared Capital Management, LP | $ 31,724.00 |
| Gravitas Holdings (Pershing x6290) | L Squared Capital Management LP | All right, title, and interest in L Squared Capital Management, LP | $ 38,418.00 |
| Gravitas Holdings (Pershing x6290) | L Squared Capital Management LP | All right, title, and interest in L Squared Capital Management, LP | $ 38,375.00 |
| Gravitas Holdings (Pershing x6290) | L Squared Capital Management LP | All right, title, and interest in L Squared Capital Management, LP | $ 38,441.00 |
| Gravitas Holdings (Pershing x6290) | L Squared Capital Management LP | All right, title, and interest in L Squared Capital Management, LP | $ 38,951.00 |
| Gravitas Holdings (Pershing x6290) | L Squared Capital Management LP | All right, title, and interest in L Squared Capital Management, LP | $ 40,604.00 |
| Gravitas Holdings (Pershing x6290) | L Squared Capital Management LP | All right, title, and interest in L Squared Capital Management, LP | $ 38,375.00 |
| Gravitas Holdings (Pershing x6290) | L Squared Capital Management LP | All right, title, and interest in L Squared Capital Management, LP | $ 38,157.00 |

Ex. A; R. 490, Ex. 3. Using the first asset on the chart as an example and reading from left to right, the chart reflected that the source of the funds invested was the Gravitas bank account at Pershing ending in 6290; the funds were transferred to AP 100 W Huron Investors LLC; the asset was identified as "all right, title and interest in approximately 17.747958% of AP 100 W Huron Investors LLC;" and the "amount traceable to criminal proceeds" was $2,537,695.

---

[5] The defendant also refers to emails and analysis of the accountant. R. 491 at 3; 490 at 6. These were produced to the defense during trial in advance of the accountant's testimony. They are statements of a government witness under 18 U.S.C. § 3500 (the Jencks Act). The production was early, as the government is not required to produce Jencks Act material until after a government witness testifies on direct examination. 18 U.S.C. § 3500(b).

The "amount traceable to criminal proceeds" and "asset" columns are crucial. In the former column, the accountant listed the specific amounts she had traced from the fraud proceeds into the specific investments at issue. Again, the accountant did not represent in that column that every dollar that Shah and Agarwal invested in each fund was traceable as fraud proceeds; rather, those specific amounts listed in the "amount traceable" column were the amounts she had traced, with the specific dates on the right showing when those fraud proceeds were invested. In some cases, the bank records—which both parties possessed—reflected that the amount traceable was 100% of what Shah and Agarwal had invested, while in other cases the bank records reflected that it was less than 100%. But in every case, some portion of the investment had been purchased with fraud proceeds, as set forth in the "amount traceable" column.

The "asset" column contains the language that the defendant claims is false. But the "all, right, title and interest" language was simply how the government identified the asset in the indictment. And the identification of the asset that the government planned to forfeit is not an assertion of fact that can be proven true or false.[6] It is certainly no ground for a claim of perjury.

Taking an unfair and strained view of her testimony, the defendant claims that the accountant made several false statements in the grand jury. The challenged statements are as follows:

> Q: And does it [GJ Ex. Forfeiture 1] accurately summarize the assets that you were able to identify as being purchased with the proceeds of fraud?
> A: Yes.
> ***
> Q: And does this [GJ Ex. Forfeiture 2] show additional assets that were purchased with proceeds of fraud?
> A: Yes.

---

[6] At most, the government made a drafting error in how it identified the forfeitable part of each asset in the indictment and protective order, describing it as "all right, title, and interest in [the asset] *including but not limited* to [the transfer of the specific traceable proceeds]" when it should have described it as "all right, right, title and interest in [the asset] *associated with* [the transfer of the specific traceable proceeds]." But that drafting error in no way makes Ms. Poelking's testimony false.

> \*\*\*
> Q: So these assets[GJ Ex. Forfeiture 3], you believe, contain proceeds of both the
> April 2016 loans and the December 2016 loans and the capital raise in 2017?
> A: Yes.

R. 490 at 6-7; Def. Ex. 2. Each of those responses was true because the assets at issue were in fact purchased with fraud proceeds. The fact that the accountant did not qualify her answer by saying that—for some of the assets—Shah and Agarwal invested *some* non-traceable funds as well does not render her response false.

An example illustrates the infirmity of the defendant's position. Say, for instance, an employee receives a significant year-end bonus and decides to buy a new car. To purchase the car, the employee uses the proceeds of his bonus and $5,000 that his spouse gave him. A neighbor sees the new car and asks: did you buy that car with the proceeds of your year-end bonus? The employee's response: yes. The answer is plainly true even though the employee used both the bonus and money from his spouse to buy the car, just as the accountant's answers in the grand jury were true.

Further, assuming only for purposes of argument that the government had presented inaccurate testimony that every dollar of every asset was traceable as fraud proceeds, that would not rise to the level of grand jury misconduct justifying dismissal of an indictment. *Fountain*, 840 F.2d at 513 (reserving the possibility that knowing use of perjured testimony, *amounting to the creation of trumped-up charges*, _might_ justify the dismissal of an indictment.") (emphasis added). Stated differently, inaccurate testimony about forfeiture would not amount of a violation of "one of those few, clear rules which were carefully drafted and approved by th[e Supreme] Court and by Congress to ensure the integrity of the grand jury's functions." *Williams*, 504 U.S. at 46.

Moreover, the defendant cannot establish prejudice. He only challenges grand jury testimony related to the forfeiture allegation, which has no bearing on the elements of the offense.

11

*See United States v. Vincent*, 416 F.3d 593, 600-601 (7th Cir. 2005) (affirming denial of motion to dismiss based on purportedly false grand jury testimony where claimed false statement "had no relevance to the mail or wire fraud charges" as it did not relate to an element of the offense, and grand jury's role was to assess whether evidence established probable cause in support of the elements of proposed charges). Thus, by definition, any purported violation did not "substantially influence[] the grand jury's decision to indict," or cause "grave doubt that the decision to indict was free from [such] influence." *Bank of Nova Scotia*, 487 U.S. at 263. *See also Roth*, 777 F.2d at 1204 ("The second requirement … that the indictment would not have been issued except for the perjured testimony, confines judicial intervention to cases of prejudicial misconduct, that is, to cases where the misconduct made a difference.").

Notably, Shah has not cited a single case that supports dismissal of an indictment based on grand jury testimony related to forfeiture. Indeed, he has not even cited any case that addresses that issue. And the only case he relies on in support of his due process claim—*United States v. Useni*, 516 F.3d 634 (7th Cir. 2008)—severely undercuts his argument. R. 491 at 13. In *Useni*, a case involved an illegal gambling operation, the defendant asserted that a witness falsely testified in the grand jury that the defendant owned a bingo hall. *Id*. at 656. The Seventh Circuit affirmed the district court's rejection of the claim because whether or not the defendant owned the bingo hall "was irrelevant to the grand jury's decision to indict him because ownership was not an element of any of the charged offenses." *Id*. Similarly, in this case, any testimony about whether or not certain assets were either entirely or only partially derived from criminal proceeds was irrelevant to the grand jury's decision to indict, as the traceability of Shah's assets was not an element of any charged offense.

Finally, Shah ignores the dispositive impact of the jury verdict against him. *Morgan*, 384 F.3d at 443 ("a petit jury's guilty verdicts render harmless any possible error in the grand jury proceedings."). The jury verdict is yet another reason to deny the motion, as it forecloses his grand jury challenge. *Fountain*, 840 F.2d at 509 ("It is impossible to imagine evidence sufficient to produce a conviction that would not also produce an indictment.").

### B. The Forfeiture-Law Claims

#### a. Legal Standard

Federal Rule of Criminal Procedure 7(c)(1) provides that an "indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." The Seventh Circuit has explained that "[a]n indictment is legally sufficient if it (1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (citations omitted). "An indictment is reviewed on its face, regardless of the strength or weakness of the government's case." *Id.* (citation omitted). "To successfully challenge the sufficiency of an indictment, a defendant must demonstrate that the indictment did not satisfy one or more of the required elements and that he suffered prejudice from the alleged deficiency." *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013). "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Id.* (*citing United States v. Hausmann*, 345 F.3d 952, 955 (7th Cir. 2003)).

To establish a basis for forfeiture, an indictment must contain "notice to the defendant that the government will seek the forfeiture of property as part of any sentence." Fed. R. Crim. P.

32.2(a). Further, an indictment "need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." *Id.*

### b. Analysis

The defendant's forfeiture-related claims are a rehash of positions he took at the forfeiture hearing, and that he made in other filings. In addition to being repetitive, his arguments are totally unmoored to the applicable legal standards that govern his motion. He does not cite Rule 7. Nor does he bother to cite Rule 32.2. He claims that the government violated federal forfeiture laws when it obtained the protective order that restrained his assets and he takes issue with the tracing methods used by the government. But these claims go far beyond the four corners of the indictment and provide no basis to dismiss an indictment. *United States v. DiFonzo*, 603 F.2d 1260, 1263 (7th Cir. 1979) ("The defendant is not permitted to transcend the four-corners of the indictment in order to demonstrate its insufficiency."). And Rule 7 and Rule 32.2 only require that the government provide notice that it seeks to forfeit property. *See United States v. Silver*, No. 15-CR-93, 2018 WL 1406617, at *8 (S.D.N.Y. Mar. 20, 2018) (denying motion to dismiss indictment based on defense claim that government was seeking to forfeit excess amounts that were not traceable to the charges because the indictment put the defendant on notice that the government sought to seek forfeiture and "[i]f [the defendant is convicted… he certainly may challenge the amount of any forfeiture money judgment that the government seeks"); *United States v. Harbour*, No. 19-CR-898, 2020 WL 5501310, at *2 (D. Ariz. Sept. 11, 2020) (denying motion to dismiss forfeiture allegation where defendant claimed indictment failed to establish factual nexus between charged conduct and an amount of money identified as subject to forfeiture because it was a factual matter for trial, not a basis for a motion to dismiss); *United States v. Dote*, 150 F. Supp. 2d 935, 943 (N.D. Ill. 2001) (explaining the amount of money subject to forfeiture is a matter for the government to

14

prove at trial and not an issue the court can resolve on a motion to dismiss a forfeiture allegation in the indictment).

As the authority set forth above establishes, a motion to dismiss is not the right vehicle to challenge whether assets identified in a forfeiture allegation are in fact proceeds of charged offenses. Unsurprisingly, the defendant has not cited any cases dismissing substantive charges in an indictment—or, for that matter, forfeiture allegations—based on a challenge to the traceability of assets identified in a forfeiture allegation.

In essence, the defendant is attempting to challenge the protective order via a motion to dismiss the indictment. That can be done directly—as the defendant has already done by his recent motion to amend the protective order and by his opposition to the motion for a preliminary order of forfeiture. His attempt to obtain a dismissal of an indictment in these circumstances is without legal basis.[7]

### C.    The Sixth Amendment Claim

#### a.  Legal Standard

The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel, including a limited right to counsel of choice. U.S. Const. Amend VI;  *see also Powell v. Alabama,* 287 U.S. 45, 53, (1932) (Sixth Amendment provides a defendant a "fair opportunity to secure counsel of his own choice."). That guarantee includes, among other things, "the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–25 (1989).

---

[7] The defendant made a series of forfeiture-related arguments, including a challenge to the tracing done by the government. They are a rehash of arguments he made at the forfeiture hearing, and his brief in opposition to the motion for a preliminary order of forfeiture is due today. The government will respond to these arguments in its reply in support of the POF.

The "Sixth Amendment right to counsel of his choice . . . is more limited than the Sixth Amendment right to have some counsel." *United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998). "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988) (citing *Morris v. Slappy*, 461 U.S. 1, 13-14, (1983) and *Jones v. Barnes*, 463 U.S. 745 (1983)).

### b. Analysis

Shah—a man of extraordinary wealth who has retained at least 19 attorneys in this matter, including some of the most prominent, expensive attorneys in the country and who as of one month ago was represented by at least 10 attorneys from three or more law firms—claims that the protective order's restraint violated his Sixth Amendment right to choice of counsel. R. 491 at 7-10; R. 482 at 7-8. He argues that he need not show a bona fide need under the Sixth Amendment in order to be entitled to the release of untainted funds, and that even if he is required to show bona fide need, he has done so. *Id*. at 9-12.

After the defendant filed this motion to dismiss, the Court granted the defendant's separate motion to amend the protective order. R. 500. That order provided at least in part the relief the defendant seeks in the current motion by ordering the release of untainted funds. *Id*. In that ruling, the Court did not reach any Sixth Amendment claims. *Id*. As set forth below, the Court should reject the defendant's Sixth Amendment claims in the current motion.

16

### 1. The motion is untimely and thus waived.

As an initial matter, and as set forth above, *supra* at 2-5, the defendant's post-trial motion to dismiss the indictment based on a Sixth Amendment claim is untimely and thereby waived. Fed. R. Crim. P. 12; *Zitt*, 2011 WL 5183348, at *2 ("failure to timely raise [Rule 12(b)] motions constitutes waiver"); *see also United States v. Lindell*, 766 F. App'x 525, 528 (9th Cir. 2019) (explaining that the defendant "failed to object to the government's continued restraint of allegedly untainted funds until after trial" and thus they forfeited the argument and it was subject to plain error review on appeal); *United States v. Balotin*, No. 3:19-CR-191, 2023 WL 2264181, at *21 (M.D. Fl. Feb. 28, 2023) (denying motion for new trial based on claim that government violated his Sixth Amendment right to counsel and noting that defendant "fail[ed] to show any cause for his decision to wait to raise this Sixth Amendment challenge only after he was convicted at trial").

The defendant has not shown good cause for this belated Sixth Amendment claim. Though the defendants moved to amend the protective order before trial, the defendant mischaracterizes that litigation; Shah did not advance the substitute asset/commingled asset Sixth Amendment argument that he has raised post-trial. In an attempt to justify this untimely claim, the defendant suggests that the government had concealed from him and the Court that the protective order had restrained commingled assets, R. 491 at 1 ("What the Government did not tell the Court is that… [commingled assets were restrained]"), and states that it was a mere government "claim[] that the funds at issue were traceable to [] $30.2 million to Mr. Shah that the Government purported to trace to the crimes alleged in the indictment." *Id*. This is not accurate. In fact, nothing was hidden from the defense or Court, and in the pre-trial litigation, the defendants simply never made the argument they raised post-trial: that it was inappropriate to restrain "all right, title and interest" in assets that contained—in some cases—some non-traceable funds. Instead, as the Court emphasized

in denying the motion, the pre-trial motion to amend the protective order was entirely focused on monies that the defendants admitted were traceable to fraud proceeds:

> In anticipation of the indictment in this case, Shah and Agarwal transferred about $10.3 million of the $31 million they received in the settlement to their attorneys' firms' accounts. Shah and Agarwal do not dispute that this $10.3 million is traceable to the $31 million they received in the settlement. They also do not dispute that the $31 million is traceable to the $225 million dividend they received after the $487.5 million equity investment the company received in 2017.

R. 108 at 3. In other words, the tracing of the $10.3 million at issue in the pre-trial litigation was straightforward and undisputed; all of it was proceeds. The defendants asserted that the taint was somehow cleansed by a subsequent civil settlement, which the Court rightly and resoundingly rejected. *Id*. at 7-11.

And the defendant had all the relevant information necessary to make the current Sixth Amendment claim before trial. Indeed, as emphasized above, the Indictment and protective order clearly identified that entire assets were being restrained, not just those portions of the assets linked to traceable proceeds; he and Agarwal were the ones who made the investments and thus knew what they invested; and—contrary to his inaccurate claims—by January 2020, he had the accountant's grand jury testimony and exhibits. Further, in January and February 2020, the government produced copies of their own bank records to them (which he already had since he and Agarwal were the account holders) and discovery obtained from the investment funds (*i.e*, the restrained funds). The briefing on the pre-trial motion to amend the protective order extended into March 2020 and was not resolved until April 2020. R. 103, 108. Shah and his cadre of attorneys—including William Burck of Quinn Emanuel, whom he identifies as his choice of counsel—had ample opportunity to raise this issue before trial. His failure to bring this to the Court's attention before trial prevented the Court from having the ability to timely rule on the issue. The defendant has no excuse for his failure to raise this challenge until after his conviction at trial.

**2. It was the defendant's burden to show bona fide need.**

Had the defendant timely raised this issue, it still would have been his burden to show a bona fide need to use the restrained assets were in fact needed to pay for counsel of choice. *See United States v. Jones*, 844 F.3d 636, 641 (7th Cir. 2016) ("If the district court finds that the defendant has insufficient alternative assets with which to pay counsel, but the government fails to justify its retention of all the frozen assets, 'then the court must order the release of funds in an amount necessary to pay reasonable attorneys' fees for counsel of sufficient skill and experience to handle the particular case.'" (*citing United States v. Moya-Gomez*, 860 F.2d 706, 730 (7th Cir. 1988))); *Moya-Gomez*, 860 F.2d at 730 ("We stress, however, the very limited degree to which we find the present statutory scheme constitutionally infirm. We deal only with a situation where the defendant presents a bona fide need to utilize assets subject to the restraining order to conduct his defense. If the district court finds that the defendant does not have other assets from which such payments can be made, it then must require the government to demonstrate the basis for its assertion, contained in the indictment, that the assets are subject to forfeiture."); *United States v. Kielar*, 791 F.3d 733, 739–40 (7th Cir. 2015) (finding that defendant did not demonstrate a "bona fide need" for the assets to conduct his defense under *Moya-Gomez*, where defendant submitted no documentary evidence other than an unsubstantiated affidavit).

Without citation to—and in conflict with—numerous cases that interpret *Luis v. United States*, 578 U.S. 5 (2016), the defendant claims that Justice Thomas's concurrence controls, changing the landscape on this issue, and, as a result, it was not necessary for him to show any need to use the funds for his choice of counsel. R. 491 at 14 n.6. In support of this argument, he cites the Supreme Court's guidance from *Marks v. United States*, 430 U.S. 188 (1977): "When a fragmented court decides a case and no single rationale explaining the result enjoys the assent of

19

five Justices, the holding of the Court may be viewed as that position taken by those Members who

concurred in the judgments on the narrowest grounds. " *Id*. at 193 (internal quotations and citations

omitted).  As the Seventh Circuit has explained:

> This means that *Marks* applies "only when one opinion is a logical subset of other, broader opinions." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc). "[W]hen it is not possible to discover a single standard that legitimately constitutes the narrowest ground for a decision on that issue, there is then no law of the land because no one standard commands the support of a majority of the Supreme Court." *United States v. Alcan Aluminum Corp*., 315 F.3d 179, 189 (2d Cir. 2003).

*Gibson v. Am. Cyanamid Co*., 760 F.3d 600, 619 (7th Cir. 2014). *See also United States v. Gerke*

*Excavating, Inc*., 464 F.3d 723, 724 (7th Cir. 2006) (citing *Marks* and explaining "When a majority

of the Supreme Court agrees only on the outcome of a case and not on the ground for that outcome,

lower-court judges are to follow the narrowest ground to which a majority of the Justices would

have assented if forced to choose.")

In *Luis*, the plurality opinion controls as it reflects the narrowest grounds of the judgment.

*See United States v. Marshall*, 872 F.3d 213, 219 (4th Cir. 2017) (noting that in *Luis* "[a] plurality

of four Justices provided the relevant analysis, while Justice Thomas concurred in the judgment

only"). Specifically, in *Luis*, four members of the Court held that a pretrial restraint of substitute

assets violates the Sixth Amendment *when* the defendant needs the funds for their defense. Justice

Thomas concurred in the judgment, but added that he would not require proof that the defendant

needed the assets.  The narrower ground for the decision—which vacated the opinion below and

remanded to the district court for further proceedings—is that the defendant needed the funds *and*

they were untainted.  It would be a broader basis for reversal to say that the court below erred

merely because the funds at issue were untainted.  Justice Thomas's opinion is not a logical subset

of the plurality opinion.  The plurality's opinion is a logical subset of Justice Thomas'.  Another

way to think of the opinions' overlap is: Justice Thomas would grant relief in every case in which

the plurality would grant relief, but the converse is not true. In short, Justice Thomas's opinion, if controlling, would result in a much more expansive right for defendants than the one recognized by the plurality. *See United States v. Cundiff*, 555 F.3d 200, 209 (6th Cir. 2009) (in applying *Marks* the "'narrowest' opinion refers to the one which relies on the 'least' doctrinally 'far-reaching-common ground' among the Justices in the majority: it is the concurring opinion that offers the least change to the law").

Indeed, post-*Luis*, courts have continued to require defendants to prove that they need the funds at issue. *See United States v. Jones*, 844 F.3d 636, 641–42 (7th Cir. 2016) (reasserting the threshold showings for release of funds and noting that "*Luis* says nothing about timing or burden shifting" and stating "[a]ssuming that Jones's [restrained] life insurance policies were *not* tainted by the fraud, and <u>assuming further that he genuinely needed those assets to retain counsel</u>, we cannot understand why he failed to invoke his right to an immediate hearing under *Moya-Gomez*") (italics in original; underlining added); *United States v. Aventura Techs., Inc.*, 607 F. Supp. 3d 278, 284 (E.D.N.Y. 2022) ("*Luis* does not provide credence to the proposition that a showing of 'need' is now analytically irrelevant."); *United States v. $89,866.18*, No. 2:16-CV-42-JEM, 2021 WL 1560813, at *2 (N.D. Ind. Apr. 21, 2021) ("courts have not interpreted *Luis* to mean that a defendant need no longer show a bona fide need for the funds"); *United States v. Paronuzzi*, No. 4:17-CR-111, 2018 WL 1938463, at *2 (E.D. Va. Apr. 24, 2018) ("Defendant has cited no passage in *Luis* demonstrating that the threshold showings necessary under *Farmer* are no longer required, nor has she cited any other authority subsequent to *Luis* showing that the threshold showings have been abolished. Indeed, as the Government points out, courts post–*Luis* have continued to require the type of threshold showings articulated in *Farmer* before granting a post-seizure probable cause hearing."); *United States v. Stokes*, 1:14-CR-290, 2017 WL 5986231, at *5 (N.D. Ga. Oct. 23,

2017), *report and recommendation adopted*, 2017 WL 5971986 (N.D. Ga. Dec. 1, 2017) ("*Luis* ... does not change the general rule that to be entitled to a hearing to determine whether seized assets are tainted, the defendant must make a prima facie showing of substantial financial need for those assets.").

### 3. The defendant has not and cannot show a bona fide need for the untainted portions of the restrained assets.

The defendant has failed to make a showing that the untainted portions of the restrained assets were at any time needed to pay counsel. And the objective evidence establishes that he did not need the restrained funds in order to retain counsel. Because he did not need the funds to retain counsel, there was no Sixth Amendment choice of counsel violation. *Luis*, 578 U.S. at 10 (holding that "the pretrial restraint of legitimate, untainted assets *needed to retain counsel of choice* violates the Sixth Amendment") (emphasis added).

The defendant glosses over some key points in *Luis*. First, the government in *Luis* effectively pauperized the defendant by restraining all of her assets whether or not they were tainted. *Luis*, 578 U.S. at 8-10. Here, in contrast, the government initially restrained assets directly connected to the fraud,[8] and as set forth below and in other filings, the defendant had immense wealth even after the restraint. Second, in *Luis*, the Supreme Court concluded that the defendant

---

[8] Even though the original protective order on its face restrained entire assets, whether or not the asset had been purchased exclusively with tainted funds, the practical result—temporary restraint—would have been the same in the absence of the government's drafting error. This is because most of the assets restrained were ownership interests in investment funds and privately held companies that were illiquid and indivisible. Indeed, Shah made this very point in his earlier litigation in 2020 to modify the protective order. *See* R. 103 at 2 ("[A]s discussed in the attached affidavit from experienced accountant Kenneth Mathieu, these interests are non-controlling, minority interests in privately held companies or small venture capital funds that are generally subject to restrictions on transfers and lack a secondary market."). Any liquidation would have required court-approval and government agreement, given the risk that liquidation would cause diminution in the forfeitable portion of the asset. *See id.* at 3 ("Even if Gravitas and Jumpstart could overcome the transfer restrictions and find a buyer for any of these interests (which is not at all a given), a forced liquidation sale would result in a significantly discounted sale price, most likely less than half of their value."). This cooperative process is identical to what would occur if real estate partially purchased with tainted proceeds were to be sold to release untainted funds. In all cases, the defendant would have to bring the issue to the Court's and the government's attention. Here, Shah did no such thing until after trial.

"has a Sixth Amendment right to use her own 'innocent' property to pay a *reasonable* fee for the assistance of counsel." *Luis*, 578 U.S. 23-24 (emphasis added). In this case, Shah claims that he needed a combined total of $14-15 million to fund both his and Agarwal's defense. R. 108 at 3. The defendant offered that astonishing figure with almost no explanation. In fact, Shah and Agarwal did not even explain how much of that figure was needed for Shah's defense as opposed to Agarwal's defense, or why they chose to provide a combined fee amount instead of a separate fee for each defendant. Regardless, that massive fee is not reasonable, and appears to be more of a gum-up-the-works defense tactic meant to manufacture an appellate issue than a reasonable estimate of an attorney's fee. *See* R. 108 at 5 ("The evidence of Shah and Agarwal's finances causes the Court to suspect that they might be able to retain equally sophisticated, but less expensive, defense with the assets that are available to them.").

But even spending a moment in an alternate universe in which $14-15 million could be considered a "reasonable fee" that Shah and Agarwal needed, Shah had sufficient unrestrained assets with which to pay his share of that amount to his counsel of choice. Indeed, Shah had sufficient funds to pay the full $14-15 million—covering both his purported fees and Agarwal's fees. Yet he made other choices. While he spent millions on legal fees, he chose to spend millions more on a high-end lifestyle and speculative investments.

First, not including the restrained assets, Shah had access to more than $20 million post-indictment, easily sufficient to have retained his choice of counsel. In the Court's June 2020 order denying Shah's motion to amend the protective order, the Court accurately observed, "It is undisputed, however, that Shah has $4 million that the government is not seeking to freeze, that is dedicated to financing his defense." *Id.* at 5. In addition, in October 2021, a representative of Guild Capital, a fund in which Shah invested, advised the government that it was wiring $6.7 million to

the Baroda Trust. R. 482, Ex. H.[9] Further, Shah received a payout of more than $9 million from another investment in September 2022, after which he had a balance of approximately $11.8 million in one of his Jumpstart Ventures bank accounts as of September 1, 2022, about five months before the trial started. R. 482, Ex. B at 11. In other words, combining those three amounts alone and not considering Shah's other assets, Shah had more than $20 million that he could have spent on legal fees if he so chose, which was far more than the combined total of $14-15 million that Shah claimed was needed to fund *both* his and Agarwal's defense. R. 108 at 3.

Second, between the time the indictment was returned and present, Shah and the entities he controls—Jump Start Ventures and the Baroda Trust—have disposed of nearly $20 million. *See* Ex. D (Declaration of Megan Poelking) & Ex. E (Poelking charts).[10] Shah's spending from these accounts are notable for their excess: $1.67 million to an American Express credit card; over $300,000 for private jet flights, nearly $200,000 for private charter yachts. Ex. E at 2. The above sums do not even account for the $4.5 million that Quinn Emanuel had in retainer as of January 2020, R. 75 at 13-14, and presumably transferred to Hueston Hennigan LLP and Larson LLP following Quinn's withdrawal from the case. Nor does this sum account for the transfer of $6.7 million transfer in October 2021 to the Baroda Trust. In other words, had Shah truly wanted Quinn Emanuel as his trial counsel, he had the funds to retain them. *See United States v. Balsinger*, 910 F.3d 942, 950-51 (7th Cir. 2018) (rejecting challenge based on *Luis* where government placed pretrial *lis pendens* on a home, which was an untainted asset, where defendant sold home months before trial and also "had access to . . . other significant assets" that could have been used to retain

---

[9] In the earlier litigation, Shah claimed that the Court should not consider the vast assets in Baroda Trust. R. 103 at 4. Yet Shah funded the Baroda Trust, and the beneficiaries are his family members. Further, courts regularly consider whether family members can contribute to defense costs. *See, e.g, Kirschenbaum*, 156 F.3d at 792.

[10] This is based solely on the bank records available to the government, which, for example, does not have Baroda Trust account documents for Firstbank Puerto Rico.

counsel). But because he wanted to continue his life of luxury, and attempt to shield assets in an irrevocable trust, he opted for less expensive, but still excellent, trial counsel. *Cf. United States v. Sachy*, No. 5:18-CR-48, 2022 WL 17177262, at *3 (M.D. Ga. Nov. 23, 2022) (denying defendant's request for release of seized funds to retain counsel of choice where defendant retained seven different attorneys during litigation and explaining "No court has held that the Sixth Amendment guarantees a right to an infinite number of retained attorneys, and nothing in *Luis* or *Monsanto* can be construed to hold that a defendant is entitled to a pretrial release of seized assets to allow his retained attorneys to renegotiate a fee they had already agreed to accept.").[11]

Against this objective evidence of Shah's extraordinary wealth and assets, he counters with a self-serving affidavit from William Burck, whom Shah identifies as his counsel if choice. R. 490, Ex. 1. A grand total of zero documents were attached to the Burck affidavit. No bank records. No records regarding Shah's real estate holdings. No comprehensive list of his assets. No investment account records. No net worth estimate. Rather than attaching relevant documents, Mr. Burck avers that "it was his understanding" that Shah and Agarwal "would not have adequate funds" to retain himself and counsel for Agarwal. Though Mr. Burck does not explain what his understanding is based on, apparently it was based on his conversations with Shah, the architect of a $1 billion fraud scheme. The affidavit is wholly insufficient and provides no meaningful basis for the Court to assess Shah's bona fide need for assets, particularly for an individual of Shah's immense wealth and assets. *Kielar*, 791 F.3d at 739-740 (explaining that defendant did not present sufficient evidence to demonstrate a bona fide need for the assets at issue because "he offered no

---

[11] Shah's citation to *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)—for the proposition that denial of a defendant's choice of counsel is deemed to be structural error, triggering automatic reversal—is misplaced. R. 491 at 19. Automatic reversal applies only when claims of structural error have been preserved. *See Rodriguez v. Chandler*, 492 F.3d 863, 864 (7th Cir. 2007) ("'[S]tructural error' . . . requires a new trial if an objection has been preserved"). Here Shah has not preserved his claim.

documentary evidence, other than an unsubstantiated affidavit" in support of his position); *United States v. Bonventre*, 720 F.3d 126, 133 (2d Cir. 2013) (to qualify for a post-restraint *Monsanto* hearing, defendant must disclose his net worth, provide a comprehensive list of his assets, and explain how he has been paying his significant living expenses; it not enough to contrast his income stream and bank account balances with his living expenses and legal fees).

The Burck affidavit also implies that a statement made by a Quinn Emanuel attorney in a status report was made by the government. The affidavit notes that on May 22, 2020 "the Government filed a status report" that provided:

> In support of his request that he have until June 30 to make a decision on counsel, defendant Shah states as follows. . . The issue is complicated because he has a limited amount of money available to him, and this case is very complex with millions of pages of discovery and a government case-in-chief that is estimated to take as long as ten weeks. . .

R. 490, Ex. 1, ¶ 15. The implication that the government made that statement is inaccurate. The truth is that the Court ordered the filing of a joint status report; the government prepared a draft status report and sent it to Quinn Emanuel; a Quinn Emanuel partner added the paragraph quoted above to the status report; and the government filed the status report, which does not mean the government adopted or agreed to statements by Shah's attorneys. In particular, as set forth in Ex. C to this response, a Quinn Emanual lawyer responded to the government's draft status report with an email on May 22, 2020 stating to the undersigned AUSA, "Matt, here is a version with some inserts from us." The defense attorney attached a revised draft with tracked changes that was entitled "Quinn Edits to Status.Report.5.21.20.v.2," with the tracked changes reflected in blue:

### Representation Issues

Counsel for defendants Shah and Agarwal entered limited appearances in this matter to represent the defendants at the arraignment and to litigate their Motion to Amend Protective Order and Vacate Seizure Warrant. The Court denied the motion on April 8, 2020. Dkt. 108. Defendant Shah is in the process of determining whether current counsel will remain on the case or if he will retain new counsel in this matter. Defendant Shah has been working diligently to resolve this matter, but has been delayed because of the travel, business, and economic disruptions associated with the COVID-19 pandemic. The Court resolved the motion for a protective order after the onset of the current crisis. Mr. Shah has spoken to many attorneys in an effort to resolve the issue of who will represent him at his criminal trial. The issue is complicated because he has a limited

99999-00741/12153719.1

1

amount of money available to him, and this case is very complex with millions of pages of discovery and a government case-in-chief that is estimated to take as long as ten weeks. The issue of who will represent Mr. Shah at his criminal trial is obviously of paramount importance to Mr. Shah, and Mr. Shah has spent a great deal of time during the last six weeks trying to address this issue. Mr. Shah began his search with Chicago attorneys, but that aspect of his search was difficult because many Chicago criminal defense attorneys have conflicts that would preclude those attorneys from representing Mr. Shah. Mr. Shah has since expanded his search to lawyers in other cities. Given the importance of this decision, Mr. Shah would like to meet with whomever he selects to represent him in person before making that decision. But Mr. Shah's ability to do so has been severely hampered by the current pandemic. Mr. Shah understands the need to have this issue resolved expeditiously but respectfully requests that the Court permit him at least until June 30, 2020 to make this decision, given the current circumstances.

Defendant Agarwal is in the process of retaining new counsel in this matter.

Defendants Shah and Agarwal request that the Court allow them until June 30, 2020, to

In short, the government did not make the statement quoted in the Burck affidavit; Shah's counsel did. The suggestion to the contrary should be rejected.

Shah also relies on other cases that are no longer good law or distinguishable. For example, he cites a district court case that in turn relied on *United States v. Udziela*, 671 F.2d 995, 999 (7th Cir. 1982). As this Court and the Seventh Circuit have explained, *Udziela* predated *Bank of Nova Scotia* and did not survive it. *United States v. O'Brien*, No. 17-CR-239-1, 2018 WL 453746, at \*2 fn.1 (N.D. Ill. Jan. 17, 2018) ("Notably, *Provenzano* and *Udziela* predated the Supreme Court's decision in *Bank of Nova Scotia* and did not apply its prejudice standard for dismissing an indictment based on grand jury misconduct…. *see also Vincent*, 416 F.3d at 602 ("To the extent that *Udziela* mandates the dismissal of an indictment without a showing of prejudice, it does not survive *Bank of Nova Scotia*."")).

The defendant also discusses the Second Circuit's decision in *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) at length, even though the case is easily distinguishable. R. 491 at 15-16. *Stein* was a tax shelter case in which the government egregiously pressured KPMG not to advance legal fees to any subjects who did not cooperate with the government's investigation. *Id*. at 137-39. Addressing a related constitutional violation, Judge Kaplan found that "this behavior shocks the conscience." *United States v. Stein*, 495 F.Supp.2d 390, 415 (S.D.N.Y. 2007). *Stein* has no application in this case, where nothing in the record suggests, as in *Stein*, that "the government conducted itself in a manner that evidenced a desire to minimize the involvement of defense attorneys." *Stein*, 541 F.3d at 143 (quotation marks omitted).

## III.    The defendant is not entitled to a new trial.

Defendant Shah styles his motion as one to dismiss the indictment or for a new trial. In the supporting memorandum, Shah makes only a passing claim that he is entitled to a new trial,

but then pivots to saying that in fact the appropriate remedy is dismissal. R. 491 at 15-18. To the extent the Court is inclined to entertain such a request a for a new trial, it should be rejected.

Motions for a new trial pursuant to Federal Rule of Criminal Procedure 33 "are disfavored[.]" *United States v. Jenkins*, 218 F.R.D. 611, 613 (N.D. Ill. 2003) (citing *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998)). Although Rule 33, by its plain language, "permits a court to 'vacate any judgment and grant a new trial if the interest of justice so requires,'" *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016), granting such relief is "reserved for only the most extreme cases," and should be approached "with great caution." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (citations omitted); *see also United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) ("A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.") (citation omitted).

"The ultimate inquiry is whether the defendant was deprived of a fair trial," and a "new trial should be granted only if the evidence preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Friedman*, 971 F.3d 700, 713 (7th Cir. 2020) (citations omitted). Put differently, "[a] new trial is 'warranted only when all other, less drastic remedies are inadequate[.]'" *United States v. Lawrence*, 788 F.3d 234, 244 (7th Cir. 2015) (quoting *United States v. Warren*, 454 F.3d 752, 760 (7th Cir. 2006)).

"The Seventh Circuit has repeatedly clarified that underdeveloped and merely perfunctory arguments like this are waived." *United States v. Morales*, 572 F. Supp. 3d 502, 508 (N.D. Ill. 2021) (citing *United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011); *United States v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011); *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012)); *see also United States v. Andreas*, 150 F.3d 766, 769 (7th Cir. 1998) ("perfunctory and undeveloped arguments (even constitutional ones) are waived") (citing *United States v. Berkowitz*,

927 F.2d 1376, 1384 (7th Cir. 1991)); *United States v. Capri*, No. 05 CR 202, 2007 WL 2323209, at *6 (N.D. Ill. Aug. 9, 2007) (denying motion for a new trial predicated on "perfunctory and undeveloped" arguments); *United States v. Fechete*, No. 06 CR 923-1, 2008 WL 4200286, at *2 (N.D. Ill. Sept. 10, 2008) (denying motion for acquittal or new trial where the "asserted grounds are completely conclusory and set forth no explanation or citation to the record whatsoever and, in virtually every instance, no citation to any legal authority"). And it is not the Court's or the government's duty to fashion or respond to Shahs undeveloped arguments. The Court should therefore deem Shah's motion for a new trial, based on perfunctory claims of error, waived.

## CONCLUSION

For these reasons, the government respectfully requests that the Court deny Shah's post-trial motion to dismiss or for a new trial.

Respectfully submitted,
MORRIS PASQUAL
Acting United States Attorney

By:    *s/ Matthew F. Madden*
Matthew F. Madden
Assistant United States Attorney
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 469–6045

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice