**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 19 CR 864 |
| v. | |
| RISHI SHAH, et al., | Hon. Thomas M. Durkin |
| Defendants. | United States District Judge |

**DEFENDANT RISHI SHAH'S REPLY IN SUPPORT OF MOTION**
**FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY FOR NEW TRIAL**

i

TABLE OF CONTENTS

Summary and Introduction ............................................................................................ 1

Discussion ...................................................................................................................... 5

    I.      The Government Failed to Prove Mr. Shah Defrauded Pharmaceutical Companies ....... 5

        A.     The Statements Cherry-Picked by the Government Do Not Prove
                Mr. Shah's Knowing Participation in Mr. Desai's Scheme or Mr.
                Shah's Intent to Defraud .............................................................................. 8

        B.     The Mere Existence of Deltas, or Mr. Shah's Knowledge Thereof,
                Does Not Prove Mr. Shah's Knowing Participation in Mr. Desai's
                Scheme or Intent to Defraud ...................................................................... 11

        C.     David Ma's Testimony Does Not Prove Mr. Shah's Knowing
                Participation in Mr. Desai's Scheme or Intent to Defraud .......................... 15

    II.     The Government Failed to Prove Mr. Shah Defrauded Investors and Lenders ............. 19

        A.     The Government Has Not Proven Mr. Shah's Knowledge of Falsity
                or Intent to Defraud as to Statements Made to Deloitte .............................. 20

        B.     The Government Has Not Proven Mr. Shah's Knowledge of Falsity
                or Intent to Defraud as to Statements to Investors and Lenders ................. 23

        C.     Mr. Shah's Equity Stake in Outcome Does Not Prove Intent to
                Defraud ...................................................................................................... 24

Conclusion ................................................................................................................... 25

TABLE OF AUTHORITIES

Page(s)

Chiarella v. United States,
   445 U.S 222 (1980) ............................................................................ 6
Greer v. Advanced Equities, Inc.,
   683 F. Supp. 2d 761 (N.D. Ill. 2010)................................................ 25
In re Baxter Int'l Inc. Sec. Litig.,
   2021 WL 100457 (N.D. Ill. Jan. 12, 2021)........................................ 25
Ingram v. United States,
   360 U.S. 672 (1959) .................................................................... 11, 24
Kostovetsky v. Ambit Energy Holdings, LLC,
   242 F. Supp. 3d 708 (N.D. Ill. 2017) ................................................ 12
Perlman v. Zell,
   185 F.3d 850 (7th Cir. 1999) .............................................................. 1
Piaskowski v. Casperson,
   126 F. Supp. 2d 1149 (E.D. Wis.) ...................................... 5, 147, 17, 18
United States ex rel. Main v. Oakland City Univ.,
   426 F.3d 914 (7th Cir. 2005) ......................................................... 6, 12
United States v. Delay,
   440 F.2d 566 (7th Cir. 1971) .............................................................. 4
United States v. Durrive,
   902 F.2d 1221 (7th Cir. 1990) ............................................................ 2
United States v. Fenzl,
   670 F.3d 778 (7th Cir. 2012) ......................................................... 1, 13
United States v. Garcia,
   919 F.3d 489 (7th Cir. 2019) .............................................................. 2
United States v. Harra,
   985 F.3d 196 (3d Cir. 2021) .............................................................. 17
United States v. Harris,
   942 F.2d 1125 (7th Cir. 1991) ....................................................... 4, 24
United States v. Johnson,
   937 F.2d 392 (8th Cir. 1991) ............................................................ 17
United States v. Jones,
   2012 WL 366893 (N.D. Ill. Feb. 1, 2012) ........................................ 17
United States v. Lang,
   644 F.2d 1232 (7th Cir. 1981) ........................................................ 5, 8
United States v. Pearlstein,
   576 F.2d 531 (3d Cir. 1978) ..................................................... 4, 23, 24
United States v. Santos,
   201 F.3d 953 (7th Cir. 2000) ............................................................ 16
United States v. Stapleton,
   293 F.3d 1111 (9th Cir. 2002) ............................................................ 2
United States v. Steffen,
   687 F.3d 1104 (8th Cir. 2012) .......................................................... 13
United States v. Thomas,
   453 F.2d 141 (9th Cir. 1971) ............................................................ 25

*United States v. Warner*,
  2006 WL 2583722 (N.D. Ill. Sept. 7, 2006) ............................................................. 23
*United States v. Wilson*,
  879 F.3d 795 (7th Cir. 2018) ...................................................................................... 3, 18
*Williams v. Aztar Indiana Gaming Corp.*,
  351 F.3d 294 (7th Cir. 2003) ....................................................................................... 9

SUMMARY AND INTRODUCTION

In its Response, the Government follows the same approach it did at trial, lumping together all three defendants with one another and with Ashik Desai, instead of focusing sufficient attention on what Mr. Shah knew and when. And, despite acknowledging that Mr. Shah does not contest the existence of a fraudulent scheme engineered by Mr. Desai, Resp. (Doc. #502) at 28, the Government devotes the vast majority of its briefing to establishing that scheme's existence. *See* Resp. (Doc. #502) at 2–26. The reason for the Government's smokescreen is clear: there is insufficient evidence that Mr. Shah ***knowingly participated*** in Mr. Desai's scheme and ***intended to defraud*** Outcome's customers, lenders, and investors. The absence of evidence proving these essential elements beyond a reasonable doubt requires that this Court grant Mr. Shah's motion for judgment of acquittal.

Even drawing all inferences in favor of the Government, as the Court must on a motion for acquittal, the Government's evidence fails to show beyond a reasonable doubt that Mr. Shah was a knowing participant in Mr. Desai's scheme. In attempting to persuade this Court otherwise, the Government relies principally upon evidence that Mr. Shah came to learn of "pervasive under-deliveries," or "deltas." Resp. (Doc. #502) at 30. At most, the existence of such under-deliveries means that Outcome breached its contracts with its pharmaceutical company customers (notwithstanding the undisputed fact that Outcome regularly provided "make-goods" for shortfalls). But "[b]reach of contract is not fraud, and a series of broken promises therefore is not a pattern of fraud." *Perlman v. Zell*, 185 F.3d 850, 853 (7th Cir. 1999).

Proof of Mr. Shah's participation in a scheme to defraud therefore required more than awareness of Outcome's past failures to perform—it required that Mr. Shah knew materially false representations were being made to customers ***at the time they were being made***. *See United States*

1

*v. Fenzl*, 670 F.3d 778, 783 (7th Cir. 2012) (explaining "a decision made after the contract was signed" to break a promise contained therein would not "support a determination of fraud"). The trial evidence, even viewed in the light most favorable to the Government, does not support that finding beyond a reasonable doubt. *See United States v. Garcia*, 919 F.3d 489, 497 (7th Cir. 2019) ("The question [is] not whether a logical set of inferences could show the charge was possibly or even likely true, but whether it could be inferred **beyond a reasonable doubt** that the defendant was guilty as charged." (emphasis added)); *cf. United States v. Durrive*, 902 F.2d 1221, 1228 (7th Cir. 1990) (holding that because the prosecution must "establish guilt beyond a reasonable doubt," there must be "substantial evidence" "connect[ing] a particular defendant to a conspiracy").[1]

Remarkably, despite canvassing nearly a decade of the Defendants' internal and external communications, the Government could not produce a single instance of Mr. Shah instructing anyone at Outcome to "overbill" its customers when it fell short. *See* Resp. (Doc. #502) at 5. Nor did any of the Government's witnesses testify that Mr. Shah was aware of any of the materially false representations upon which the Counts at issue[2] were based. To the contrary, Mr. Desai himself testified (and the Government does not dispute) that multiple aspects of the scheme did not involve Mr. Shah, and Mr. Desai even concealed his actions from Mr. Shah.[3]

---

[1]    Although conspiracy is not charged as a separate count, "[b]ecause an essential element of these offenses is a fraudulent scheme, mail and wire fraud are treated like conspiracy in several respects." *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002). "Like co-conspirators, knowing participants in the scheme are legally liable for their co-schemers' use of the mails or wires." *Id.*

[2]    The jury convicted Mr. Shah on Counts 1, 2, 4, 5, 9–19, 22, and 24–26. *See* Verdict (Doc. #445). The jury acquitted Mr. Shah of Counts 20, 21, and 23.

[3]    Including alteration of ROI figures (Tr. at 4551:9-16); false affidavits (Tr. at 4018:13-18); false screenshots (Tr. at 4205:24-4206:3; *see also id.* at 4599:25-4600:6); tablet metrics (Tr. at 3927:11-13). Mr. Desai also admitted to "name dropping" Mr. Shah when Mr. Shah was not actually involved. Tr. at 5813:22-24.

2

Faced with this lack of evidence, the Government falls back upon empty slogans, repeating its trial theme that Outcome was "built on a lie" and "rotten as its core." Resp. (Doc. #502) at 1, 29. Notably absent from the Government's brief, however, is any mention of Jason Ketchum—the only witness present in the early years of Outcome Health. Mr. Ketchum refuted the Government's theory head on, testifying that he had witnessed Mr. Shah being transparent with customers about projections, among other things, *see* Tr. 1879:24–1880:2, and that customers and salespeople alike were aware of Outcome's "sell, then build" business model, *see* Tr.1652:19–25. So complete was Mr. Ketchum's rejection of the Government's theory that during its Closing, the Government invited the jury to disregard their own witness's testimony. *See* Tr. at 9213:8–9 ("Fortunately, you can put his testimony aside . . . ."). Regardless of the impropriety of that instruction to the jury, this Court is not at liberty to accept the Government's invitation. In evaluating Mr. Shah's motion for judgment of acquittal, the Court must "examine the evidence as a whole, including that presented by the defendant." *See United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018).

Conveniently ignoring Mr. Ketchum's testimony, the Government instead focuses exclusively on the testimony of David Ma—who admitted that he had never received direct instruction from Mr. Shah on the fraud in which he was involved, Tr. 2869:24–2871:5—and a handful of cherry-picked statements from unrelated emails and interviews. None of these provides convincing evidence of fraudulent intent on Mr. Shah's part, let alone proof beyond a reasonable doubt. Instead, to infer that Mr. Shah had knowledge of Mr. Desai scheme based on such meager circumstantial evidence requires the impermissible "piling of inference upon inference." *United States v. Harris*, 942 F.2d 1125, 1129 (7th Cir. 1991) (rejecting what amounted to "indirect" and "inconclusive" evidence establishing intent").

3

This Court likewise cannot sustain Mr. Shah's convictions as to the counts of investor and lender fraud, because each relies upon the same premise that the Government failed to establish with respect to pharmaceutical companies: that Mr. Shah knew of Mr. Desai's fraudulent scheme. As it did at trial, the Government focuses its Response on (1) statements made by Mr. Shah to Deloitte during its audit of Outcome's financials, and (2) statements made to investors and lenders, such as that Outcome had "never missed an ROI guarantee." To be sure, the Government produced competent evidence that some of those statements were made, but not that Mr. Shah knew of the *falsity* of any such statements at the time they were made. Where, as here, the inference that Mr. Shah made ignorant misstatements is at least "as strong as the inference" that he knew the statements to be false, the "evidence necessarily fails to establish guilt beyond a reasonable doubt." *United States v. Delay*, 440 F.2d 566, 568 (7th Cir. 1971) (directing entry of a judgment of acquittal). Moreover, even if Mr. Shah had "occasionally made false or misleading statements," that would not establish his participation in the "overall fraudulent scheme." *United States v. Pearlstein*, 576 F.2d 531, 544 (3d Cir. 1978). To properly convict Mr. Shah, the Government needed to show that statements Mr. Shah made were not only false, but that they were made knowingly and in furtherance of Mr. Desai's scheme—and to do so beyond all reasonable doubt. The Government has entirely failed to carry that burden.

The standard confronting Mr. Shah on a motion for judgment of acquittal is high, but it is not insuperable. The Government's Response—and the scant circumstantial evidence it marshals—confirms that this is the rare case in which the jury's conviction cannot stand. "To take away [Mr. Shah's] liberty based on the weak circumstantial evidence present here would do violence to the standard of proof beyond a reasonable doubt." *Piaskowski v. Casperson*, 126 F. Supp. 2d 1149, 1156–57 (E.D. Wis.), *aff'd sub nom. Piaskowski v. Bett*, 256 F.3d 687 (7th Cir.

2001). For that reason and the others discussed below, Mr. Shah respectfully requests that the Court enter a judgment of acquittal, or, at a minimum, order a new trial.

**DISCUSSION**

As explained below, the Government's Response fails to prove Mr. Shah's intent or knowing participation in (1) mail or wire fraud of pharmaceutical companies, as alleged in Counts 1, 2, 4, 5, 11, and 25, or (2) wire or bank fraud of lenders and investors, as alleged in Counts 9, 13, 22, 24, and 26.[4] Having failed to prove that Mr. Shah knowingly and intentionally engaged in fraud, the Government also failed to prove that Mr. Shah knew the transactions in Counts 10 and 12 "involved criminally derived property," as explained in Mr. Shah's opening motion. *See* Mot. (Doc. #489).

## I.     The Government Failed to Prove Mr. Shah Defrauded Pharmaceutical Companies

To be guilty of mail and wire fraud, Mr. Shah "had to knowingly and willfully participate in the scheme to defraud, through representations made ***knowing they were false and (made) with the intent to defraud***." *United States v. Lang*, 644 F.2d 1232, 1240 (7th Cir. 1981) (emphasis added) (cleaned up). Prior to trial, Mr. Shah moved for a bill of particulars to obtain clarity as to what false representations the Government would rely upon at trial for the pharmaceutical company fraud counts (Doc. #156), but it was not until closing argument that the Government finally revealed its theory that the false representations consisted of (1) "anytime a projection was used" without the client's knowledge to determine the number of screens Outcome would deliver—i.e., a fraudulent omission,[5] and (2) "representations of full delivery," including "the

---

4     Mr. Shah also joins Ms. Agarwal and Mr. Purdy's arguments, as before, including with respect to Counts 14 through 19.

5     Although the Government characterizes the use of projections as a fraudulent omission, a fraudulent omission can only be the basis for a fraud prosecution if there was some underlying

5

invoices themselves" and any accompanying proof of performance affidavits, to the extent there was under-delivery. Tr. at 9416:18–9417:2, 9417:22–9418:22; *see generally* Tr. at 9415–9425 (summarizing pharmaceutical fraud counts).[6] In its Response, the Government does not even attempt to argue that it showed Mr. Shah's knowledge of each—or, indeed, any—of the particular false representations upon which Counts 1, 2, 4, 11, and 25 are based. Nor does the Government dispute that Mr. Shah, not having been involved in managing individual campaigns as Outcome's CEO, was unaware of the specifics of any charged campaign, such as whether there had been under-delivery and whether and to what extent a projection had been used in a list match.[7]

Instead, as it told the jury, the Response asserts that the Government need only show Mr. Shah's knowledge that "the same types of false representations [were] being made to clients," as

---

independent duty to disclose the omitted information. *See Chiarella v. United States*, 445 U.S 222, 228 (1980) ("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary duty or other similar relation of trust and confidence.'"). Absent that showing, the use of projections cannot be considered a false representation, because at most they would have constituted representations as to what Outcome hoped to do. Promises and predictions of the future cannot constitute false representations for purposes of the federal fraud statutes, unless the Government demonstrates there was no intent to honor such promises at the time. *See United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 914 (7th Cir. 2005) ("[F]raud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do."); *see infra* p. 11–12.

[6]    That understanding of the Government's theory is also confirmed by the Government's questioning of the pharmaceutical company witnesses regarding the materiality of these representations or omissions. *See, e.g.*, Tr. at 1965:20–1966:23, 1976:21–1978:18 (Bautista testimony).

[7]    And even if he had such knowledge, Mr. Shah would not have been responsible for communicating directly with the customers, and he would have reasonably expected that those responsible—such as Mr. Desai—had communicated transparently and truthfully with the customers. *See* Tr. at 4884:5–10 (Desai testifying that "the salespeople are the vehicle to the client"); Tr. at 8142:3–6 (Lynn Meier testifying that she "would have expected Mr. Crandall and not Mr. Shah to give [her] any campaign-specific updates").

opposed to knowledge of "any specific shortfall on any specific campaign." Tr. at 9416:13–20; *see* Resp. (Doc. #502) at 27 (claiming Defendants are "moving the goal posts"). The problem with that argument is that not every campaign had under-delivery. *See, e.g.*, Tr. at 5037:5–9 (Desai testifying that there were times when Outcome had excess inventory, depending on the therapeutic category); Tr. at 5526:7–16 (Desai testifying that some documents reflected excess inventory and over-delivery); Tr. at 5853:9–5854:14 (Qsymia example). It is also undisputed that Outcome's practice of selling projected inventory had been disclosed to many customers—including at Mr. Shah's instruction, during the time he was hands-on. *See, e.g.*, Tr. at 1324:23–1325:2 (Ketchum testifying to Outcome "explicitly disclosing how many sites it is currently in and what it projects to be in the future" in 2012–2013); Tr. at 18472–6 (Ketchum testifying that Mr. Shah was "explicitly instructing [him] to disclose to clients that a list match was based on growth"); Tr. at 4170:5–11 (BMS example); Tr. at 5803:1–20 (Desai testifying that Mr. Shah told him "don't make a claim that these doctors are already installed, say[] it's the call list").

Consequently, without knowing that Outcome had under-delivered on a particular campaign or that a projection had been used, and without visibility into what the customers had previously been told, Mr. Shah could not have known that the charged representations or omissions were false at the time they were made. Put another way, the Government's evidence does not disqualify the possibility that Mr. Shah, in good faith, believed that any representations made to the customers at issue in Counts 1, 2, 4, 11, and 25 were true. *See* Final Jury Instructions (Doc. #444) at Instruction No. 39 ("If a defendant acted in good faith, then he or she lacked the intent to defraud required to prove the offenses of mail-, wire-, and bank fraud . . . . A defendant acted in good faith if, at the time, he or she honestly believed the truthfulness of the representations or promises that the government has charged as being false or fraudulent."). It is not Mr. Shah's

burden to prove his good faith, but rather the Government's burden to contradict such good faith beyond a reasonable doubt. *See id.* The Government's failure to prove Mr. Shah's knowledge of the falsity of the representations at issue therefore requires acquittal on the pharmaceutical company fraud counts. *See Lang*, 644 F.2d at 1240.

Even if the Government had fairly characterized its burden on the elements of knowing participation and intent (which it has not), the Government failed to make a showing that Mr. Shah was aware of even the "types" of misrepresentations being made by Mr. Desai. Tr. at 9416:13–20. Instead, in an effort to tie Mr. Shah to false representations made at Mr. Desai's instruction years later, the Government returns to its slogan that Outcome was "built on a lie." Resp. (Doc. #502) at 29. As proof that Mr. Shah "built" Outcome "on a lie," the Government cites (1) a handful of cherry-picked statements from emails and interviews, (2) evidence that Mr. Shah was aware of under-delivery, and (3) the testimony of David Ma, who was not even present when Outcome was being "built." But without resort to impermissible speculation, none of that evidence comes close to proving Mr. Shah's knowing participation beyond a reasonable doubt.

### A. The Statements Cherry-Picked by the Government Do Not Prove Mr. Shah's Knowing Participation in Mr. Desai's Scheme or Mr. Shah's Intent to Defraud

The only pieces of evidence from Outcome's early years that the Government cites are: (1) GX 2, an email Mr. Shah sent to Ms. Agarwal, (2) GX 70, an interview Mr. Shah and Ms. Agarwal gave at a public event in Chicago, (3) an email chain discussing a campaign for Xeljanz (GX 330, GX 337, GX 1928). That the Government believes this to be "considerable trial evidence regarding defendants' individual acts of deception," Resp. (Doc. #502) at 31, reveals just how thin its evidence actually is.

The Government places the greatest weight on GX 2, an isolated email exchange between Mr. Shah and Ms. Agarwal that the Government moved into evidence without any context or

accompanying testimony. To be clear: GX 2 does not relate to any of the Counts of which Mr. Shah was indicted, or even the customers involved in those Counts. *See* GX 2 at 3 (email regarding "Cycloset" to a representative at Santarus). Nor does the email discuss a list match, a proposal, or a contract. *See* Resp. (Doc. #502) at 3 ("The fraud sprouted with the list-match process."). Instead, Mr. Shah and Ms. Agarwal were discussing a sales email sent by Mr. Svec, in which he stated generally that Outcome was "currently in the waiting rooms of 1/3 of all endocrinologists." GX 2. Specifically, Mr. and Ms. Agarwal were debating whether to round down to one-fourth or round up to one-third. Far from showing fraudulent intent, that sales email, touting the size of Outcome's network to someone who was never a customer, is "nothing more than sales puffery"—not a specific representation of how many waiting rooms Outcome could deliver to Cycloset. *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003). And Mr. Shah's belief that a "weighted average" across the year was a sufficient basis to represent that Outcome was in 1/3 (rather than 1/4) of waiting rooms in one context—a high-level, introductory email—does not establish that he approved of Mr. Desai's concealing projections from customers years later in an entirely different context—i.e., list matches and other proposals for particular campaigns.

Unable to make its case on GX 2 alone, the Government next relies upon GX 70, an interview Mr. Shah and Ms. Agarwal gave at a public event in Chicago, which the Government played multiple times at trial. Specifically, the Government points to the phrase "smoke bomb," and Mr. Shah's supposed admission that Outcome had to deliver the number of screens it promised customers, "[o]therwise it's fraud." Resp. (Doc. #502) at 3. Only by stripping Mr. Shah's statements of their full context can the Government claim that video demonstrates Mr. Shah's fraudulent intent. During the same interview, Mr. Shah and Ms. Agarwal explained:

> We needed money to install more screens for which we need advertisers, advertisers
> need more screens to actually give us any money. So a lot of it was really kind of

going step by step, adding a few screens and then telling the advertisers: "Hey, *we have 50, we're projecting on 200. If you start January 1st with us— it's November 15th—we'll be there*. . . . That's how we kept growing. It really was a step by step and we knew each incremental step that would mean something more to the advertisers.

GX 70 at 0:49:54–0:50:55 (emphasis added). In other words, whatever throwing a "smoke bomb" meant, it did not mean that Mr. Shah and Ms. Agarwal were lying to advertisers. Rather, as their own statements reflect, advertisers were being told—or, at least, Mr. Shah and Ms. Agarwal **believed** that they were being told—that Outcome was "projecting" how many screens it would have by a certain date, while continuing to grow and add screens.

They further explained that Outcome's projections were "realistic," good faith estimates of what it could deliver:

So you're peeking into the future. So we peeked into the future in 2007. And we said how many offices could we deliver? . . . So you gotta peek into the future and be a visionary, but a realistic visionary. ***Because you're going to be accountable for that execution.***

GX 70 at 1:00:05–1:00:44 (emphasis added). With that full context included, Mr. Shah's statements in GX 70 are best understood as a reflection of Mr. Shah's good faith belief that appropriate disclosures were being made to customers both at the point of sale and the point of delivery. They are certainly not proof beyond a reasonable doubt that he was knowingly and intentionally "concealing material facts from pharma clients, while billing them for non-existent services." Resp. (Doc. #502) at 3.

Likely recognizing that the aforementioned pieces of evidence are at best equivocal on the question of Mr. Shah's knowledge and intent, the Response cites a single campaign, Humira, in which "defendants and Desai" supposedly "plotted" "to shift inventory from Humira to Xeljanz" in order to fulfill Xeljanz's contract. Resp. (Doc. #502) at 31. Even assuming that shift did, in fact, "ensur[e] under-deliveries on both clients' campaigns," Mr. Shah did not respond to any of the

10

emails in which the alleged "plotting" occurred. *Id.* (citing GX 330, GX 337, GX 1928). And at trial, Mr. Desai testified that it was he and Mr. Purdy (not Mr. Shah) who "made the decision to transfer sites from Humira to Xeljanz." Tr. at 3679:5–7. That Mr. Shah was copied on emails attempting to fulfill Xeljanz's contract is hardly evidence that he "jointly decid[ed]" with Mr. Desai what to do—much less that he intended to defraud Xeljanz or Humira. Indeed, the relevant emails say nothing about concealing any shortfall from customers. Nor do they contain information about the Xeljanz or Humira contracts necessary for Mr. Shah to know that the reshuffling "violated category-exclusivity" or caused under-delivery on both customers' campaigns. Resp. (Doc. #502) at 31. For a CEO receiving hundreds, if not thousands, of emails a day, such emails would not have raised any alarm bells (if he even read them—which the Government did not even attempt to prove). Certainly, they do not prove Mr. Shah's knowledge beyond a reasonable doubt. And with such weak evidence even of knowledge that any specific representations were false, intent to defraud cannot be established beyond a reasonable doubt. *Cf. Ingram v. United States*, 360 U.S. 672, 680 (1959) ("[T]o establish the intent, the evidence of knowledge must be clear, not equivocal.").

**B.    The Mere Existence of Deltas, or Mr. Shah's Knowledge Thereof, Does Not Prove Mr. Shah's Knowing Participation in Mr. Desai's Scheme or Intent to Defraud**

Given the lack of evidence of Mr. Shah's words and actions, the Government relies principally on evidence that Mr. Shah was aware of "pervasive under-deliveries," or "deltas." Resp. (Doc. #520) at 30. Putting aside the fact there were few deltas in the pre-Desai period, there are multiple problems with equating knowledge of deltas with knowledge of fraud.

To begin with, deltas were ordinarily reported to Mr. Shah in an aggregated form, at the level of therapeutic areas (e.g., rheumatology), and not at the level of individual campaigns or contracts. Tr. at 2946:20–2947:3. As a result, while Mr. Shah was aware of inventory shortfalls

11

for certain therapeutic areas, he typically was not aware of campaign-specific shortfalls.[8] Without such awareness, he would not have known that any particular "representation of full delivery" to any particular customer was false.

More importantly, even if the Government had proven Mr. Shah's knowledge of instances of campaign-specific under-deliveries, such knowledge would not equate to intent to defraud. Under-delivery is, at most, a breach of contract. Fraud requires more than breach of contract, and intent to defraud requires more than knowledge of breaches of contract. *See United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 914 (7th Cir. 2005) ("[F]raud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do."); *Kostovetsky v. Ambit Energy Holdings, LLC*, 242 F. Supp. 3d 708, 724 (N.D. Ill. 2017) (distinguishing fraud and breach of contract, as the former requires "contemporaneous fraudulent intent:"); *see also Fenzl*, 670 F.3d at 783 (explaining that under the mail and wire fraud statutes, "a decision made after the contract was signed" to break a promise contained therein would not support a fraud claim); *United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012) ("A fraud claim is permitted only if it arises from acts that are separate and distinct from the contract. If the same rule did not apply in the criminal context, every breach of a [contractual] agreement could give rise to criminal fraud prosecution.").

Thus, even if the Government showed that Outcome fell short of what it had promised to deliver to any particular customer, that would not be sufficient to establish a criminal fraud without

---

[8] Indeed, the only campaign-specific "delta report" Mr. Shah received was GX 549, an audit that provided a snapshot of delivery in July 2016. And in Ms. Pierce's email transmitting the audit, she included "an action plan with scheduled dates of expansion for the programs that require it"— i.e., an action plan to close the gaps. GX 549. As a result, GX 549 cannot establish under-delivery for any campaign beyond that single point in time.

corresponding evidence of misrepresentations relating to the existence and extent of under-deliveries. The Government cites no such misrepresentations. Instead, it claims that Outcome acted fraudulently by "billing its clients as if it were delivering in full," which, under the Government's theory, concealed the under-delivery. Resp. (Doc. #502) at 30.[9] To prove Mr. Shah's knowing participation in fraud, then the Government was required to show Mr. Shah's knowledge of such false representations being made to customers with regard to under-deliveries—which it did not do. None of the emails or reports discussing deltas say *anything* about concealing those deltas from customers—a fact conveniently omitted by the Government. Nor is there a single message informing Mr. Shah that customers would be billed as if there had been full delivery despite under-delivery, let alone one in which Mr. Shah instructed that to be done.

The only evidence the Government cites for their claim that the practice of overbilling customers "stemmed directly from Shah" is testimony from Mr. Ma that Mr. Shah continued to push to increase sales goals despite knowing of deltas. Resp. (Doc. #502) at 31. On its face, this inference is an enormous leap; given the circumstances, it is downright absurd. What CEO does not push its sales team to increase their goals? To conclude from Mr. Shah's sales goals for the

---

[9]     That theory fails for the additional reason that many of Outcome's campaigns were sold as "weighted average" campaigns—especially in the early years, when Mr. Shah was directly involved in selling. *See, e.g.*, Tr. at 3576:22–3577:5 (Novo Nordisk 2013), Tr. at 4344:18–4346:9 (Lantus 2011); DX 10675 (Novo Nordisk Novolog and Levemir 2012); Tr. at 4450:17–25 (Novo Nordisk had bought "a weighted average" from 2010 to 2013); *see also* Tr. at 4361:2–4 (Q. "What we've just reviewed here, every one had weighted average, right?" A. "The ones that we've reviewed here, yes."); Tr. at 4456:18–25 (Mr. Shah "was involved in many conversations with the client about weighted average"'). In such campaigns, Outcome would start with fewer screens and the number of screens over the course of the campaign in order to hit a certain average—but the client would be billed equal amounts each month. *See* DX 10675; Tr. at 4357:2–12. In other words, billing did not equate to delivery, and billing for more screens than were actually delivered in a particular month did not conceal under-delivery. Moreover, even in those cases where Outcome failed to disclose an under-delivery, the Government would have been required to establish some noncontractual duty of disclosure that Outcome violated in order for such an omission to constitute actionable fraud—which the Government has failed to do. *See supra* note 5.

*future* that he had authorized the concealment of deltas *in the past* "is conjecture camouflaged as evidence." *Piaskowski*, 256 F.3d at 693 ("Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation.").

Moreover, Mr. Shah's belief that Outcome could meet aggressive sales goals was reasonable. For one, Outcome was growing quickly, with inventory growth outpacing revenue growth. Tr. at 5000:5–8. For another, Outcome did not have deltas in every therapeutic areas—in fact, some areas had excess inventory. *See, e.g.*, Tr. at 5037:5-9 (Desai testifying that there were times when Outcome had excess inventory, depending on the therapeutic category); Tr. at 5526:7–16 (Desai testifying that some documents reflected excess inventory). And as explained below, Mr. Shah first verified that Outcome's membership team would be able to meet those sales goals. *See infra* § II-C.

Not only is there a complete lack of proof that Mr. Shah was aware of over-billing, but the evidence at trial showed what Mr. Shah actually believed was happening in cases of under-delivery: Outcome was "making good," which is common in the marketing industry, *see* Tr. at 2070:11–14. It is undisputed that make-goods were done at times to compensate customers for under-delivery. *See, e.g.*, Resp. (Doc. #502) at 24 (discussing Entresto make-good); Tr. at 2036:3–9 (Bautista testifying that Outcome offered a make-good with respect to the Rexulti campaign); Tr. at 1348:13–20 (Ketchum testifying to make-goods for Eisai and Contour); Tr. at 1421:2–8 (Ketchum testifying to a make-good for Humira); Tr. at 6314:7–12 (Chin testifying that Outcome offered a make-good for Tradjenta); Tr. at 555:4–6 (Desai testifying to a "make-good that we were doing on a Target Health campaign").

14

Mr. Desai also repeatedly reassured Mr. Shah that any under-deliveries were not problematic, because "when Outcome had ROI guarantees and fell short, . . . Outcome provided a make-good." Tr. at 1271:19–22; *see also* GX 715 (Desai reassuring Mr. Shah that following a "shortage in offices for six months" for Entresto, Outcome was "very transparent and candid with the client, and we kinda had a full make-good plan in front of them"). Whether or not make-goods were actually being done, the evidence showed that they were sufficiently prevalent that Mr. Shah reasonably believed that any under-deliveries were being disclosed to—not concealed from—customers, especially given Mr. Desai's repeated assurances to that effect.

### C. David Ma's Testimony Does Not Prove Mr. Shah's Knowing Participation in Mr. Desai's Scheme or Intent to Defraud

All that remains is the Government's repeated assertion that Outcome was "built on a lie"—a phrase used by David Ma during his testimony at trial. *See* Resp. (Doc. #502) at 25 (quoting David Ma as testifying that Outcome was "built on a lie"). But Mr. Ma, who joined Outcome in 2014, had no direct knowledge of how Outcome was "built," let alone Mr. Shah's role in any lies. Mr. Ma admitted that he "never received direct direction from Rishi Shah on any of the things that" he testified about. Tr. at 2870:17–2871:5. Nor did Mr. Ma share with Mr. Shah his concerns about Outcome's business practices. Tr. at 2871:13–16, 2872:12–21, 2873:16–19. In fact, the Government did not introduce a single direct communication between Mr. Ma and Mr. Shah into evidence. Tr. at 2878:13.

Instead, Mr. Ma's conclusion about Mr. Shah's involvement in Mr. Desai's fraud was based on a single interaction, Tr. at 3027:23–3029:3, 3116:14–19—one that Mr. Ma admitted he had misremembered during his direct testimony. *See* Tr. at 2920:7–17. Mr. Ma originally testified that during a meeting about 2016 sales goals, Mr. Shah posed the question, "Are we the limiter or is the market the limiter?" Tr. at 2348:18–23. According to Mr. Ma, when Mr. Desai responded,

15

"we are the limiter," Mr. Shah "sort of gestur[ed] like, then we should take the [sales] goal up."
Tr. at 2349:9–17. Mr. Shah's gesture apparently "suggested to [Mr. Ma] that he did not care that
there was a large inventory or contractual commitment gap," Tr. at 3028:19–3029:3, from which
Mr. Ma concluded that Mr. Shah was complicit with Mr. Desai. *See* Tr. at 3027:23–3029:3
(opining that Mr. Shah did not "operate with integrity at Outcome" because "the direction to
continually push for goals that we could not reach was the type of decision that only a CEO would
be able to meet" based on that meeting). Mr. Ma's interpretation of Mr. Shah's gesture, however,
far from being evidence sufficient to find Mr. Shah's knowledge beyond a reasonable doubt, is an
"inference[]" "too speculative to count as evidence." *United States v. Santos*, 201 F.3d 953, 963
(7th Cir. 2000) (holding that a lay witness's inferences must be "tethered to perception").

Setting aside the inherent ambiguity in any interpretation of a physical gesture, there was
no evidence, beyond Mr. Ma's own say-so, that Mr. Shah's question ("Are we the limiter or is the
market the limiter?") and Mr. Desai's answer thereto ("We are the limiter.") meant that "Outcome
couldn't get enough inventory" to meet contractual commitments. Mr. Shah's question could very
well have meant: "Are we the limiter?"—is our team not signing up doctors fast enough; "or is the
market the limiter?"—are there simply not enough doctors left in the various markets (e.g., the
rheumatology market) to sign up? Or it could have meant, is the limit on Outcome's sales growth
coming from a lack of supply ("are we the limiter?"), or a lack of demand ("or is the market")?
Given this ambiguity, the phrase "we are the limiter" simply "cannot bear the weight the
government would place on it." *See United States v. Jones*, 2012 WL 366893, at *12 (N.D. Ill.
Feb. 1, 2012), *aff'd*, 713 F.3d 336 (7th Cir. 2013) (rejecting the Government's effort to interpret
"the phrase 'weeped us'" as establishing "that Jones cooked the crack cocaine"); *Piaskowski v.
Bett*, 256 F.3d 687, 693 (7th Cir. 2001) (rejecting defendant's reference to "shit going down" as

16

evidence of his participation in the murder); *see also United States v. Harra,* 985 F.3d 196, 203 (3d Cir. 2021) ("[T]he Government must prove either (a) that its interpretation is the only objectively reasonable interpretation and that, under this interpretation, the defendant's statement was false, or (b) that the defendant's statement was false under each alternative, objectively reasonable interpretation."); *cf. United States v. Johnson*, 937 F.2d 392, 399 (8th Cir. 1991).

More importantly, even if "we are the limiter" did mean that Outcome had insufficient inventory to meet demand, that was a fixable problem. Even Mr. Ma admitted that "one of the ways in which you can fix the inventory problem is that you can hire salespeople" to sign up doctors. Tr. at 2923:8–14. And on cross, Mr. Ma remembered that Mr. Shah first consulted Mr. Garms—who managed the team responsible for signing up doctors, *see* Tr. at 2892:11–24—who before approving the 2016 sales goals to ensure Mr. Garms's team "could meet the 2016 sales goals." Tr. at 2920:11–17. Because Mr. Shah confirmed that the sales goals were not too aggressive, Mr. Ma's interpretation of Mr. Shah's "gesture" as raising sales goals (even if that were correct) cannot prove that Mr. Shah "push[ed] for goals that [Outcome] ***could not reach***." Tr. at 3027:23–3029:3 (emphasis added). To the contrary, Mr. Shah's actions demonstrated his good faith belief the goals ***could*** be reached.

Finally, none of Mr. Ma's testimony—even if taken at face value—gives rise to a reasonable inference that Outcome was "built on a lie," or that Mr. Shah knew that Outcome's customers were being lied to. Assuming Outcome's sales goals were, as Mr. Ma believed, overly aggressive, to infer that Mr. Shah was therefore aware of false representations to customers "requires a leap of logic that no reasonable jury should have been permitted to take." *Piaskowski*, 256 F.3d at 693.

Meanwhile, the sole witness called to testify to Outcome's early years was Mr. Ketchum. Despite promising that Mr. Ketchum would "take[] us back to the beginning of the story" and emphasizing that Mr. Ketchum "was there when Shah and Agarwal created Outcome's fraudulent business practices," Tr. at 552:12–24, the Government ultimately attempts to side-step Mr. Ketchum's testimony entirely in its Response, just as it did in closing, *see* Tr. at 9213:8–9. But Mr. Ketchum's testimony is a crucial part of the trial record and cannot be ignored. *See Wilson*, 879 F.3d at 802. Though misguided, the Government's desire to erase Mr. Ketchum's testimony from the trial record is understandable: Mr. Ketchum roundly refuted the Government's theory that Outcome was "built on a lie." Among other things, Mr. Ketchum testified:

- That there was "not a single instance" of "Mr. Shah telling [him] not to tell a client that the list match included projections, Tr. at 1342:4–9;

- That there were numerous examples of Mr. Shah's directing Mr. Ketchum to make disclosures to customers, *see, e.g.*, Tr. at 1283:21–24; 1340:1–12; 1848:19–25;

- That in "every single one of the campaigns" he had been shown, "the salesmen . . . [were] made aware of the projections," Tr. at 1879:24–1880:2[10];

- That he had incorrectly testified on direct examination that "generally the salespeople did not know that projections were being used," and no longer thought that was the case after cross examination, Tr. at 1648:18–24;

- That all of Outcome's major customers prior to 2013 (including Amgen, AstraZeneca, Johnson & Johnson, Novo Nordisk, Abbott, and Vivus) were informed of projections, Tr. at 1856:10 – 1857:19;

- That "early on, 2012, back when Mr. Shah was in the room with the clients, Outcome is explicitly disclosing how many sites it is currently in and what it projects to be in the future," Tr. at 1324:23–1325:2;

---

[10] The Government did not respond to Mr. Shah's argument that the Government failed to prove he had siloed employees, *see* Mot. (Doc. #489) at 11, except to assert in conclusory fashion that GX 494 amounts to siloing, *see* Resp. (Doc. #502) at 4, 35, 39. In addition to the evidence cited in Mr. Shah's Opening Motion, Mr. Ketchum's testimony completely refutes the theory that Mr. Shah "siloed" employees.

- That "the prospect of an ROI shortfall and lower expected delivery were disclosed to the client" in examples he was shown, Tr. at 1406:9–16; and

- That the only affidavit he was shown by the Government, for Humira, was not false, and instead accurately represented delivery, Tr. at 1882:1–12; *see also* GX 136.

Finally, and perhaps most importantly, Mr. Ketchum testified that after having "worked closely with Mr. Shah," "side-by-side in the trenches," as they both "***built the business***, particularly early on," he "believe[s] ***any suggestion of fraud was***," in his own words, ***"actually ridiculous***." Tr. at 1512:7–19. The Government does not rebut this evidence; instead, it simply asks the Court, as it asked the jury, to ignore it. But such unequivocal evidence from Mr. Ketchum renders the Government's inference that Outcome was "built on fraud" incapable of being sustained beyond a reasonable doubt. In short, though the absence of competent evidence of Mr. Shah's knowledge and intent is, itself, sufficient to undermine his conviction, Mr. Ketchum's testimony conclusively tips the scales in favor of acquittal.

## II.    The Government Failed to Prove Mr. Shah Defrauded Investors and Lenders

Given the Government's failure to adduce sufficient evidence to prove Mr. Shah's guilt on the pharmaceutical company fraud counts beyond a reasonable doubt, the investors and lender fraud counts must fail as well. Despite the length of its briefing, as proof of Mr. Shah's intent to defraud Outcome's investors and lenders, the Government relies upon only three specific pieces of evidence: (1) statements made by Mr. Shah to Deloitte during its audit of Outcome's financials, and (2) statements made to investors and lenders, such as that Outcome had "never missed an ROI guarantee," and (3) Mr. Shah's equity stake in Outcome. None of these are sufficient to establish Mr. Shah's knowledge and intent beyond a reasonable doubt.

### A. The Government Has Not Proven Mr. Shah's Knowledge of Falsity or Intent to Defraud as to Statements Made to Deloitte

As predicted, *see* Mot. (Doc. #489) at 7, the Government focuses on Mr. Shah's failure to disclose Mr. Desai's fraudulent activities to Deloitte during its 2015 and 2016 audits, which—according to the Government—caused the audited financials that investors and lenders relied upon to be false. *See* Resp. (Doc. #502) at 37. Far from "play[ing] an instrumental role in deceiving Deloitte," Resp. (Doc. #502) at 13, however, it is undisputed that Mr. Shah was not responsible for preparing Outcome's financials or managing the audit. Mr. Shah's involvement in the audits was limited to routine annual "fraud-inquiry meetings" and "management representation letters." Resp. (Doc. #502) at 14. The Government says that Mr. Shah should have disclosed the fraudulent business practices at Outcome in those meetings and letters, "having put many of them in place." Resp. (Doc. #502) at 15. But as shown above, the Government has not carried its burden to prove its theory that Mr. Shah "built [Outcome] on a lie." The record does not conclusively show that Mr. Shah "put in place" any of Mr. Desai's fraudulent practices. To the contrary, it is replete with examples of practices that Mr. Desai ***admitted*** to having crafted the scheme on his own—including ways Mr. Desai gave false "representations of full delivery," such as false affidavits and screenshots. *See supra* note 3. Given the evidence supporting Mr. Shah's good faith belief that there was no fraud at Outcome, the Government did not prove beyond a reasonable doubt that Mr. Shah's representation that he "had no knowledge" of fraud was knowingly false. Resp. (Doc. #502) at 15 (citing GX 562, 910).

The Government also argues that Mr. Shah should have disclosed any "***allegations*** of fraud," including the concerns of so-called "whistleblowers," to Deloitte. Resp. (Doc. #502) at 16 (listing Kazi, Prowker, Morgan, Raoof, and O'Donnell). Though Mr. Shah was aware of employee concerns, Mr. Shah's nondisclosure of the various concerns he received was reasonable under the

circumstances and does not evince intent to defraud. As a threshold matter, Mr. Shah did not view those concerns as "allegations of fraud," but rather ***operational issues***, which he was not asked to report.[11] *See* Tr. at 7325:23–24 (testimony of Tracy Harrison, Deloitte's witness) (Q. "Operational problems are generally not fraud, correct? A. "That's correct.").

And Mr. Shah wasn't the only one who didn't make connection between employee concerns and "fraud." In making his representations to Deloitte, Mr. Shah relied upon sub-certifications by 20 managers, each of whom led key teams within Outcome. *See* DX4841, 10714. ***Every one*** of those 20 managers certified that they were not aware of allegations of fraud at

---

[11] *As to Mr. Kazi*: Mr. Kazi testified that he "never observed someone committing fraud at the company," Tr. at 320:16-18, that he has "no specific recollection of either Ms. Pierce or Mr. Prowker" (from whom he got all his information, *see* Tr. at 320:19–22) "saying the word 'fraud'" to him, Tr. at 320:24-321:2. He further testified that when he spoke to Mr. Shah, he "never said to Mr. Shah [that] Mr. Desai is committing fraud." Tr. at 321:3–8.

*As to Mr. Prowker:* Mr. Prowker was never called as a witness by the Government. A recording of the January 30, 2017 meeting in which Mr. Prowker discussed his concerns with Mr. Shah reveals that Mr. Prowker never made any allegations of fraud. Instead, he merely brought up concerns about "the operations of the commercial business"—specifically, concerns that certain campaigns would not meet their ROI guarantees. Resp. (Doc. #502) at 8; *see* GX 818. Mr. Prowker made clear during that meeting that he didn't mean to alarm anyone with his concerns. *See* GX 818 (Mr. Prowker apologizing and stating, "I wasn't meaning to [alarm you]"); Tr. at 4717:20–22 (Desai testimony to the same).

*As to Mr. Morgan:* The only evidence of Mr. Morgan's concerns is an email that Mr. Morgan sent to Mr. Desai and Mr. Purdy *after* he had initially resigned. *See* Resp. (Doc. #502) at 11; GX 862. Given Mr. Morgan's previous compensation dispute with Mr. Desai, *see* DX 10779, and his sudden about-face regarding his desire to resign, his allegations of "inconsistencies" in client presentations were not viewed as credible allegations of fraud.

*As to Mr. Raoof:* Mr. Raoof was not called at trial, nor was there any evidence that he communicated directly with Mr. Shah. The only evidence of his complaints is a Voxer that Madan Nagaldinne (not Mr. Raoof himself) sent Ms. Agarwal, relaying Mr. Raoof's concerns. Mr. Nagaldinne himself characterized Mr. Raoof's concern as "most likely" "an extreme reaction and lack of maturity and lack of clarity behind our business model." GX 820.

*As to Ms. O'Donnell:* Ms. O'Donnell raised her concerns in an impromptu conversation after a town hall. *See* Tr. at 7490:23 –7491:10. In Ms. O'Donnell's own words, she raised concerns about "ROI discrepancies." Tr. at 7524:10–12. She also acknowledged that there was a potential that operational inefficiencies explained those discrepancies. *See* Tr. at 7501:4–13.

Outcome—including Madan Nagaldinne, who had firsthand knowledge of the alleged "whistleblowers."[12] In addition, Mr. Shah had investigated the concerns and been assured by Mr. Desai and others that they were unfounded or were already being resolved.[13] While Deloitte testified that it "expected defendants" to disclose any allegations, "even if defendants believed that the claims were frivolous" or had been resolved, Resp. (Doc. #502) at 16, Deloitte's expectation— which was not communicated to Mr. Shah—does not shed light on ***Mr. Shah's*** state of mind in not making the disclosure. Because Mr. Shah reasonably viewed the concerns as resolved, his failure to tell Deloitte about them was, at worst, inadvertent—not intentional fraud. *See United States v. Warner*, 2006 WL 2583722, at *13 (N.D. Ill. Sept. 7, 2006), *aff'd*, 498 F.3d 666 (7th Cir. 2007) (finding insufficient evidence to convict where the evidence was equally consistent with the

---

[12]   Indeed, it was Mr. Nagaldinne who had first come to Mr. Shah with Mr. Kazi's concerns. *See* GX 760.

[13]   *As to Mr. Kazi*: Mr. Nagaldinne, when he first raised Mr. Kazi's concerns with Mr. Shah, expressed skepticism at the legitimacy of Mr. Kazi's concerns. GX 760. Mr. Desai then subsequently reassured Mr. Shah that the issues Mr. Kazi had raised were purely operational and fixes were already underway. *See* GX 762 (Desai's reassurances re Kazi).

*As to Mr. Prowker:* The evidence showed that Mr. Shah took the time to "hear Adam out on his concerns" and to "get to the bottom" of his concerns—including by speaking with Mr. Desai. DX 5409; *see e.g.*, DX 5406, DX 5408, DX 4604. Mr. Desai emphasized that Mr. Prowker's issue was one of incorrect "methodology" for scoping campaigns, DX 5407, and that he had been relying upon false information, *see* GX 813. *See also* GX 824. To support the latter, moreover, Mr. Desai got confirmation from another employee, Jim Dominick. *See* DX 5412.

*As to Mr. Morgan*: Mr. Morgan's allegation came after prior a long chain of reassurances in which Mr. Shah had already been told that similar complaints had no merit. Given Mr. Morgan's previous compensation dispute with Mr. Desai, *see* DX 10779, and his sudden about-face regarding his desire to resign, his allegations of "inconsistencies" in client presentations were not viewed as credible allegations of fraud.

*As to Mr. Raoof:* The only example Mr. Raoof gave to substantiate his concerns was "a 400% inflation of available inventory" for Entresto. GX 820. Mr. Shah sought answers from Mr. Desai, *see* GX 820a, and Mr. Desai assured him that Mr. Raoof was mistaken. GX 824.

*As to Ms. O'Donnell:* Mr. Shah "expressed interest" in Ms. O'Donnell's concerns. He asked her to send the materials she had to him and told her to speak further to Mr. Desai "because he was probably closer to the area." Tr. at 7444:13-17; 7501:14-7502:17. Ms. O'Donnell did neither.

inference that the disclosure was inadvertent as it is with the inference that it was purposeful."). Under these circumstances, it is unreasonable to infer Mr. Shah's knowing participation in a scheme to defraud—even if Mr. Shah was technically wrong, in hindsight. *See also Pearlstein*, 576 F.2d at 544 (finding insufficient evidence of participation in the "overall fraudulent scheme" even though "the defendants occasionally made false or misleading statements").

**B.    The Government Has Not Proven Mr. Shah's Knowledge of Falsity or Intent to Defraud as to Statements to Investors and Lenders**

The Government's reliance on Mr. Shah's statements to investors and lenders is similarly flawed. The Government points to two categories of alleged misrepresentations: (1) failing to tell investors about "the company's well-trodden practices of over-selling, under-delivering, and over-billing," and (2) the affirmative representation that Outcome "never missed an ROI guarantee." Resp. (Doc. #502) at 37.

As to the first, as discussed *supra*, the Government has not shown Mr. Shah's knowledge of Mr. Desai's fraudulent practices beyond a reasonable doubt. Lacking such knowledge himself, Mr. Shah could not have knowingly and intentionally concealed the fraud from investors and lenders.

As to the second, the Government plucks a single statement from Mr. Shah's meetings with investors—one that is ambiguous at worst. Even if Mr. Shah had uttered the words "never missed an ROI guarantee" (and the record is far from clear that he did), Outcome's written presentations clarified his meaning: Outcome had never *paid out of pocket* for a missed ROI guarantee. *See* Mot. (Doc. #489) at 9. Mr. Shah believed that to be true, and the Government did not prove otherwise. Remember: it is undisputed that Mr. Shah was unaware of Mr. Desai's fabrication of ROI reports; that is a fraud Mr. Desai carried out on his own. In addition, Mr. Desai—who, unlike Mr. Shah, was responsible for the ins and outs of Outcome's ROI research—assured Mr. Shah that whenever

23

Outcome initially fell short of an ROI guarantee, Outcome always offered a make-good—instead of paying out of pocket—in order to ultimately deliver the promised ROI. *See* GX 762; Tr. at 4637:19–22. Given Mr. Shah's good faith basis for the representation contained in Outcome's presentations, any oral misstatement by Mr. Shah would not show fraudulent intent beyond a reasonable doubt. *Cf. Ingram v. United States*, 360 U.S. 672, 680 (1959) ("[T]o establish the intent, the evidence of knowledge must be clear, not equivocal."); *see also Harris*, 942 F.2d at 1129–30 ("[W]here the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt."). And even if Mr. Shah's statement could be "characterized as [a] fraudulent misrepresentation[], [it] do[es] not establish that [he] knew of the fraudulent purpose of" "the overall fraudulent scheme." *Pearlstein*, 576 F.2d at 544. After all, the statement does not relate to "big lie" alleged by the Government. Resp. (Doc. #502) at 1. It was, at most, a "false or misleading statement independent of" Mr. Desai's scheme. *Pearlstein*, 576 F.2d at 545.

## C.    Mr. Shah's Equity Stake in Outcome Does Not Prove Intent to Defraud

Finally, the Government asks the Court to infer from Mr. Shah's equity stake in Outcome— which therefore gave him an "incentive" to ensure Outcome's continued expansion—that he had an intent to defraud. Resp. (Doc. #502) at 37. But numerous as courts have recognized, "[t]he desire to increase the value of a company and attain the benefits that result . . . are basic motivations not only of fraud, but of running a successful corporation." *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *16 (N.D. Ill. Jan. 12, 2021); *cf. Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 775 (N.D. Ill. 2010) ("[A]llegations of financial motive do not necessarily establish scienter."). To infer knowledge of Mr. Desai's fraud—let alone fraudulent intent—from Mr. Shah's perfectly lawful desire to make Outcome successful amounts to nothing more than

impermissible speculation. *United States v. Thomas*, 453 F.2d 141, 143 (9th Cir. 1971) ("[M]ere suspicion or speculation cannot be the basis for the creation of logical inferences.").

CONCLUSION

At bottom, the Government asks this Court to uphold Mr. Shah's conviction on what amounts to a theory of vicarious liability: Mr. Shah was Outcome's CEO, so he must have known about Mr. Desai's fraudulent conduct. But the evidence at trial failed to prove that hypothesis beyond a reasonable doubt. Instead, the evidence, even viewed in the light most favorable to the Government, provides another equally if not more credible explanation of the available facts: that Mr. Desai concealed his false representations to customers from Mr. Shah. At best, the evidence showed that Mr. Shah was aware at times of under-deliveries—but those breaches of contract would only amount to fraud if Mr. Shah knew that Outcome was lying in order to conceal those under-deliveries from its customers. The evidence, however, showed that Mr. Shah believed that Outcome was "making good" for any shortfalls against its contractual obligations, and the Government presented no evidence to rebut those undisputed facts.

It is not enough for the Government to show that its interpretation of the facts is plausible, or even that it is the most likely explanation. Instead, to prove its case beyond a reasonable doubt, the Government needed to show that its explanation is the *only* explanation, i.e., that Mr. Shah is guilty of fraud beyond a reasonable doubt. But as explained above, the Government did not prove Mr. Shah's knowing participation and intent to defraud as to any of the fraudulent representations underlying his convictions. For that reason, and all the foregoing reasons, the Court should enter a judgment of acquittal.

Dated: September 5, 2023

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP


*/s/ Richard E. Finneran*
RICHARD E. FINNERAN
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*

*Attorney for Defendant Rishi Shah*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon all counsel of record by operation of the Court's electronic filing system.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN

26