UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 19 CR 864 |
| RISHI SHAH, ET AL., | Judge Thomas M. Durkin |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Rishi Shah was convicted of mail, wire, and bank fraud following a jury trial earlier this year. The government has moved for a preliminary order of forfeiture as to Shah, R. 465, which Shah objects to on numerous grounds, R. 511. For the following reasons, the government's motion [465] is granted in part and denied in part.

## Background

On November 21, 2019, a federal grand jury returned a superseding indictment charging Shah with mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and bank fraud in violation of 18 U.S.C. § 1344. R. 14. The superseding indictment has two forfeiture allegations. Forfeiture Allegation One calls for any and all right, title and interest Shah may have in "any property, real or personal, which constitutes or is derived from proceeds traceable to" the charged mail and wire fraud offenses to be forfeited pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). *Id.* at 49. Forfeiture Allegation Two calls for "any property constituting, or derived from proceeds obtained, directly or indirectly, as a result of" the charged bank fraud offenses to be forfeited pursuant to 18 U.S.C. § 982(a)(2)(A).

1

*Id.* at 53. On April 11, 2023, following a jury trial, Shah was convicted of 19 of the 22 counts in the superseding indictment. Shah waived his right to have the forfeiture allegations considered by the jury and agreed that this Court would hear the issues pertaining to forfeiture.

Following Shah's conviction, the government moved for a preliminary order of forfeiture. R. 465. There are four components to the government's proposed preliminary order of forfeiture: (1) a personal money judgment in the amount of $55 million; (2) forfeiture of the directly traceable assets listed in R. 465-1 ("Exhibit A"); (3) forfeiture of the substitute assets listed in R. 465-3 ("Exhibit C"); and (4) the seizure and liquidation of the assets listed in R. 465-2 ("Exhibit B").

The Court held a forfeiture hearing on June 16, 2023. *See* R. 469; R. 480 ("Forfeiture Hr'g Tr."). At the hearing, the government presented testimony from FBI forensic accountant Megan Poelking, and Shah presented testimony from his accounting expert Ronald Braver. After that hearing, Shah moved to amend the protective order to release certain restrained assets, R. 474, and the government moved for a prejudgment writ of garnishment, R. 472. By agreement of the parties, further briefing on the motion for a preliminary order of forfeiture was deferred pending a ruling on those two motions. R. 470. On August 8, 2023, the Court ordered released the approximately $4.9 million in assets that the Government conceded were not traceable to criminal proceeds. R. 500. Shah subsequently moved for the release of additional restrained assets. R. 524. On October 12, 2023, the Court granted in part and denied in part that motion, ordering the release of additional assets that the

government conceded were not traceable to criminal proceeds, valued at approximately $8.6 million. R. 551. In the course of litigating these motions and others, the parties completed their briefing on the motion for a preliminary order of forfeiture. Following that briefing, the Court heard closing arguments on November 1, 2023. R. 563.

## Legal Standard

Forfeiture is a mandatory part of a defendant's sentence. *Libretti v. United States*, 516 U.S. 29, 41 (1995). "As soon as practical after a verdict or finding of guilty . . . on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute." Fed. R. Crim. P. 32(b)(1)(A). "If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense." *Id.* And "[i]f the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." *Id.* The government bears the burden of proof to establish that the property is subject to forfeiture by a preponderance of the evidence. *United States v. Smith*, 770 F.3d 628, 637 (7th Cir. 2014). "The court's determination may be based on evidence already in the record [and] any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). If the forfeiture is contested, as it is here, "the court must conduct a hearing after the verdict or finding of guilty." *Id.*

3

"If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria." Fed. R. Crim. P. 32.2(b)(2)(A). The court must do so "without regard to any third party's interest in the property," deferring determination of third party interests until any of those parties files a claim in an ancillary proceeding. *Id.* Additionally, "[u]nless doing so is impractical, the court must enter the preliminary order sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final as to the defendant under Rule 32.2(b)(4)." Fed. R. Crim. P. 32.2(b)(2)(B). The preliminary order of forfeiture becomes final as to the defendant at sentencing. Fed. R. Crim. P. 32.2(b)(4)(A).

## Discussion

Shah objects to entry of a preliminary order of forfeiture on numerous grounds. The Court begins with the personal money judgment, and then moves to the forfeiture of specific and substitute property that the government seeks in satisfaction of that judgment.

I.     Personal Money Judgment

The government seeks a personal money judgment in the amount of $55 million. The evidence shows by a preponderance that Shah obtained that amount in unlawful proceeds. *United States v. Del Giudice*, 594 F. Supp. 3d 998, 1004 (N.D. Ill. 2022) ("Money judgments representing unlawful proceeds are appropriate.")

4

(citations omitted). The money judgment here arises from two sources: the April 2016 bank loan and the 2017 capital raise. Starting with the April 2016 bank loan, the record includes the credit agreement between JPMorgan and ContextMedia Health LLC that was dated April 8, 2016. *See* GX 573. The record also includes an April 8, 2016 email to Shah with the subject "Wire confirm for RS for the dividend" that shows outgoing wire to "RISHI U SHAH" in the amount of $30,209,285.78. *See* GX 571. For the 2017 capital raise, Shah and Agarwal initially received a $225 million dividend. Following a settlement with investors, Shah and Agarwal kept approximately $31 million. *See* 75-2 at 7 (stating that Shah and Agarwal received "approximately $31 million in remaining value in Gravitas, an entity ultimately owned by Mr. Shah and Ms. Agarwal" as part of the 2018 Agreement). Shah reported that he "own[ed] about 80% of the company," while Agarwal owned about 20%. *See* GX 672. Applying that ownership interest to the $31 million results in $24.8 million for Shah. Finally, adding the amount Shah retained from the settlement ($24.8 million) to the April 2016 bank loan dividend ($30.2 million), equals $55 million.

Shah's first objection is that the Court lacks statutory authority to impose a personal money judgment. But while the forfeiture statutes may not include the exact term "money judgment," the statutory frameworks plainly authorize money judgments by incorporating 21 U.S.C. § 853. *See* 28 U.S.C. § 2461 (directing courts imposing forfeiture to use the procedures of 21 U.S.C. § 853); 18 U.S.C. 982(b)(1) ("forfeiture of property under this section . . . shall be governed by the provisions of [section 853]"). Under section 853, forfeitable property is broadly defined as "tangible

and intangible personal property, including rights, privileges, interests, claims and securities." 21 U.S.C. § 853(b). Substitute property is defined in similarly expansive terms as "any other property of the defendant." 21 U.S.C. § 853(p). More to the point, section 853 requires courts to "liberally construe[]" its provisions "to effectuate its remedial purpose." 21 U.S.C. § 853(o). In parallel to this broad language is the absence of "any language limiting the amount of money available in a forfeiture order to the value of the assets a defendant possesses at the time the order is issued." *United States v. Vampire Nation*, 451 F.3d 189, 201–02 (3d Cir. 2006).

Relying on this broad statutory language, the Seventh Circuit and numerous courts of appeals have either held or agreed with the proposition that section 853 allows money judgments. *See United States v. Baker*, 227 F.3d 955, (7th Cir. 2000) (stating that it was "proper" for the district court to state that "the government could enforce its forfeiture award against Baker as a regular in personam judgment") (citing cases); *see also United States v. Olguin*, 643 F.3d 384, 396 (5th Cir. 2011); *United States v. Bevelle*, 437 F. App'x 399, 407 (6th Cir. 2011); *United States v. Smith*, 656 F.3d 821, 827 (8th Cir. 2011); *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010); *United States v. McGinty*, 610 F.3d 1242, 1246 (10th Cir. 2010); *United States v. Padron*, 527 F.3d 1156, 1162 (11th Cir. 2008); *United States v. Day*, 524 F.3d 1361, 1377 (D.C. Cir. 2008); *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006); *Vampire Nation*, 451 F.3d at 201; *United States v. Casey*, 444 F.3d 1071, 1077 (9th Cir. 2006). In fact, as Shah acknowledges, Federal Rule of Criminal Procedure 32.2 "makes repeated reference to money judgments." R. 511 at 24 n. 6; *see, e.g.*, Fed. R. Crim. P.

32.2(b)(1)(A) ("If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay."). While the Committee notes that it "takes no position on the correctness of those rulings" approving money judgment forfeitures, the amendment was transmitted to Congress, and Congress has not overturned it.

The Supreme Court's decision in *AMG Capital Management, LLC v. FTC* does not dictate otherwise or upend the chorus of appellate courts on this issue. In *AMG*, the Court held that the FTC Act's language permitting the FTC to obtain "permanent injunction[s]" did not authorize the FTC to obtain court-ordered monetary relief. 141 S. Ct. 1341, 1347 (2021). The Court's holding was wholly based on a close examination of the language and structure of the FTC Act, which is not at issue here. *Id.* at 1347– 49. *AMG* does not instruct courts on how to interpret the statutory language of section 853, namely the broad definitions of forfeitable property and Congress's demand that the statute be "liberally construed to effectuate its remedial purposes." Moreover, *United States v. Surgent*, No. 04-CR-364, 2009 WL 2525137 (E.D.N.Y. Aug. 17, 2009), the other case relied on by Shah, was rejected by the Second Circuit in *Awad*. 598 F.3d at 79 n.5. The Court has the authority to impose personal money judgments.

Shah further argues that the government erred in calculating the money judgment. Shah first says that the government should not be able to include any portion of the $31 million received in the settlement with investors because that money was "proceeds" of the settlement, not the fraud. Shah previously raised this argument in challenging the protective order in early 2020. And the Court explained

7

that the "settlement agreement does not cleanse the taint." R. 108 at 11. Shah offers no basis for the Court to reconsider this prior ruling.

Shah next says that the $31 million remaining after the settlement with investors should not be included because Gravitas Holdings, LLC ("Gravitas") obtained that money, not Shah. This argument directly contradicts the position that Shah adopted earlier in this litigation, where he argued that the $31 million held by Gravitas was his. *See* R. 75-2 at 15 (stating that $31 million equity in Gravitas was Shah's "compensation" for giving up his indemnity rights); *Id.* at 16 (arguing that "the funds obtained from the [settlement] should be treated as free and clear of any encumbrances" for Shah to use in his defense). Additionally, courts have held that property obtained indirectly may include property received by entities under the defendant's control. *See, e.g.*, *United States v. Levya*, 916 F.3d 14, 30 (D.C. Cir. 2019) *Saccoccia v. United States*, 955 F.3d 171, 175 (1st Cir. 2020) (rejecting argument that defendant did not "obtain" proceeds when evidence showed he "controlled the bank account from which the funds at issue flowed and that he oversaw the distribution of those funds"). Here, the evidence shows that Shah controlled Gravitas. He was the authorized officer on its brokerage accounts at Pershing. *See* GX 1082 (citing GX 1254). And he previously represented that he liquidated assets from those accounts to pay attorneys' fees. *See* 75-2 at 8 ("On November 18, 2019, Mr. Shah then transferred $7 million to Quinn Emanuel from a Gravitas bank account."). As such, the evidence shows that Shah obtained the money from the settlement.

The evidence thus supports a $55 million personal money judgment against Shah. The Court turns next to the specific property the government asserts is subject to forfeiture. The government seeks these assets in partial satisfaction of, not in addition to, the money judgment.

## II.    Forfeiture of Specific Property

The government seeks the forfeiture of the specific property in Exhibit A. The task for the Court is to determine whether the government has established by a preponderance of the evidence "the requisite nexus" between that property and the offenses. Fed. R. Crim. P. 32.2(b)(1)(A). As previously described, the indictment seeks the forfeiture of "[a]ny property . . . which . . . is derived from proceeds traceable to" Counts 22, 24, and 26, *see* 18 U.S.C. § 981(a)(1)(C), and the "property constituting, or derived from, proceeds the [defendant] obtained directly or indirectly, as the result of" Counts 9 and 13, *see* 18 U.S.C. § 982(a)(2)(A).

Here, the government showed by a preponderance of the evidence that the specific property listed in Exhibit A derives from the proceeds of the April and December 2016 bank loans and the 2017 capital raise. The government presented a detailed tracing analysis conducted by FBI accountant and trained CPA Megan Poelking. Poelking testified that she reviewed hundreds of pages of financial records, including bank records and records obtained from Outcome Health and private equity firms, in conducting her analysis. Forfeiture Hr'g Tr. 51–52. At the hearing, she walked through her analysis step-by-step, relying on several summary charts that cited the relevant evidence in the record and illustrated how the proceeds moved from

9

account to account. She explained how she used both evidence in the record and the first-in, first-out ("FIFO") tracing rule[1] to trace proceeds from the 2016 bank loans and the 2017 capital raise as they moved through various bank accounts, commingling with untainted funds. The Court found Poelking to be a highly credible witness who supplied a sound tracing analysis. In contrast, Braver generally appeared unfamiliar with the tracing analysis and relevant evidence and his selective criticisms of Poelking's analysis were largely clarified or deflated on cross-examination.

The Court summarizes Poelking's analysis, which the Court found persuasive, as follows. Beginning with the 2017 capital raise, Poelking found that approximately $487.5 million was raised and deposited into an Outcome, Inc. account (ending in 9393) between March and July 2017. *See* GX 1082 (citing GX 1081, GX 1203, GX 1254). Over a similar time frame, approximately $487.5 million was deposited into an Outcome Holdings LLC account (ending in 9765). *Id.* On May 19, 2017, Outcome Holdings transferred $225 million to a Gravitas account held at JPMorgan Chase Bank (ending in 9898), which in turn sent that amount to a Gravitas account at Pershing Advisor Solutions ("Pershing") (ending in 6290), for which Shah was the authorized officer. *Id.*; Forfeiture Hr'g Tr. at 60. The Gravitas accounts had zero dollars in them before the $225 million deposits. *Id.* at 59–60. Using FIFO, Poelking then traced the specific amounts identified on page 2 of GX 1029 as the "Amounts

---

[1] FIFO is a commonly-used accounting methodology that, at a high level, assumes that funds are spent in the order they were received.

Traceable to Criminal Proceeds" to the deposit in Gravitas account ending in 6290. *See* GX 1029.

Poelking next found approximately $89 million of the $110 million bank loan was paid to a Contextmedia Health LLC account at The PrivateBank (ending in 7426) on April 8, 2016. *See* GX 1078 (citing GX 577). On the same day, $30.2 million was transferred from the Contextmedia Health account to Shah's account at JPMorgan Chase Bank (ending in 9002) as a "dividend distribution." *Id.* Shah's account had zero dollars in it before the $30.2 million deposit. Forfeiture Hr'g Tr. 68. Using FIFO, Poelking then traced the specific amounts identified on page 3 of GX 1029 as the "Amounts Traceable to Criminal Proceeds" to the deposit in Shah's account ending in 9002. *See* GX 1029.

Using FIFO, Poelking further traced the 2017 capital raise and the two 2016 bank loans to Shah's account at Pershing ending in 5573 and the Baroda Trust account at Pershing ending in 7793. *See* GX 1031. Two Contextmedia Health LLC accounts (ending in 6463 and 6471) received funds from the 2017 capital raise and the December 2016 bank loan. Poelking traced $13.8 million to a Gravitas Hardware account (ending in 5635). *Id.* From there, she traced $4.3 million to Shah's Bank of America account ending in 0955. *Id.* Poelking also traced $4 million from the December 2016 bank loan to Shah's Chase account ending in 9002. *Id.* She then traced $3.1 million in proceeds from the two bank loans from Shah's Chase account ending in 9002 to Shah's Bank of America account ending in 0955. *Id.* Poelking traced $7.4 million from Shah's Bank of America account ending in 0955 to his Pershing

11

accounts, and then $5.75 million from those Pershing accounts to the Baroda Trust account. For the Baroda Trust account, Poelking found that Shah or a trustee acting at his direction effectuated wire transfers out of the account. Forfeiture Hr'g Tr. at 69–70. Finally, Poelking traced those proceeds to the amounts identified on page 1 of GX 1029. The assets in Exhibit A match up with the "Amounts Traceable to Criminal Proceeds" identified in GX 1029.

Shah's challenge to the forfeiture of specific property is three-fold. He asserts that the government (1) fails to properly identify "proceeds" traceable to the counts of conviction; (2) uses multiple improper methods in the course of its tracing analysis; and (3) fails to trace criminal proceeds to any forfeitable asset.

    a.  Identification of "Proceeds"

Shah initially argues that the government fails to properly identify "proceeds" traceable to any counts of conviction. As a preliminary matter, the forfeiture allegations involve two different statutory frameworks, respectively. For Forfeiture Allegation One, which corresponds to Shah's wire fraud convictions for the 2017 capital raise, 28 U.S.C. § 2461(c) "authorizes criminal forfeiture of the proceeds of any offense for which there is no specific statutory basis for criminal forfeiture as long as civil forfeiture is permitted [for that offense]." *United States v. Silvious*, 512 F.3d 364, 369 (7th Cir. 2008). The civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C) permits forfeiture for the crimes identified in 18 U.S.C. § 1956(c)(7), which in turn incorporates the crimes listed in 18 U.S.C. § 1961(a), which includes wire fraud. For

Forfeiture Allegation Two, which corresponds to Shah's bank fraud convictions for the 2016 bank loans, 18 U.S.C. § 982(a)(2)(A) authorizes forfeiture for bank fraud.

At the start, Shah claims that for bank fraud, "any calculation of the proceeds is subject to a 'deduction from the forfeiture to the extent that the loan was repaid, or the debt was satisfied, without any financial loss to the victim.'" R. 511 at 4–5 (quoting 18 U.S.C. § 981(a)(2)(C)). The problem is that the provision Shah cites appears in section 981, the framework for the wire fraud convictions, not in section 982, the framework for the bank fraud convictions. Shah urges the Court to apply the same deduction to section 982 forfeiture because sections 981 and 982 are part of the same statutory enactment. But several courts of appeals have held that the deduction does not apply to section 982 forfeiture. *See United States v. Annabi*, 746 F.3d 83, 84–85 (2d Cir. 2014) (citing *United States v. Peters*, 732 F.3d 93, 100–01 & n. 2 (2d Cir. 2013)) ("§ 981(a)(2)(C) of the civil forfeiture provision requires a deduction from forfeiture of any portion of the fraudulent loan that was repaid at no loss to the victim, whereas § 982(a)(2)(A) requires forfeiture of the entire amount of the fraudulent loan, regardless of whether it was repaid."); *United States v. Boulware*, 384 F.3d 794, 813–14 (9th Cir. 2004) (rejecting argument that criminal forfeiture under section 982 should be reduced by the civil forfeiture statute provision in section 981(a)(2)(C) that gives credit for funds returned to banks). In the absence of binding precedent from the Seventh Circuit, the Court finds the reasoning of the Second and Ninth Circuits persuasive.

Second, Shah argues that a credit must be given for "millions of dollars" in costs of providing services to Outcome's customers. R. 511 at 5. Shah relies on section 981(a)(2)(B), which provides that "[i]n cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term 'proceeds' means the amount of money acquired through the illegal actions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." However, while this provision could theoretically apply to the framework for the wire fraud convictions related to the 2017 capital raise, it is inapplicable to those convictions on the facts. The costs "of providing services to Outcome's customers," i.e., advertising, are not incurred by raising money from outside investors. Such a credit could theoretically be applied if the government were seeking the forfeiture of the proceeds of defrauding a pharmaceutical client, but the forfeiture the government seeks is limited to the 2017 capital raise and the 2016 bank loans. And Shah has not offered any evidence of any direct costs of the capital raise that require deduction. *See* 18 U.S.C. § 981(a)(2)(B) ("[T]he burden of proof with respect to the issue of direct costs" rests with "the claimant.").

Third, Shah argues that the government has not established what portion of the proceeds would not have been received "but for" Shah's conduct. However, the trial evidence showed that it was more likely than not that the loans and investments would not have been made but for Shah's misrepresentations and omissions. Jim McHugh from JPMorgan testified that the routine under-deliveries which were concealed, the inflated financials, and the return on investment ("ROI") studies based

14

on "cherry-picked" samples all would have been important to know in assessing the terms of the loans and whether to underwrite. Trial Tr. at 7747, 7760–61, 7763, 7785, 7811, 7849–50, 7853. He further testified that if the information that JPMorgan received was incorrect, it likely would have impacted his decision to recommend the deal to the credit group, and that the credit group "rarely" made a lending decision in spite of his recommendation against it. *Id.* at 7769–70; *see also id.* at 7811. Laela Sturdy from CapitalG testified that those same misrepresentations were material to her and that knowing about the inflated revenue "would have changed" her "decision to invest." *Id.* at 8624. Ken Eberts from Goldman Sachs testified along those same lines. *E.g.*, *Id.* at 6872 (Eberts agreeing that accuracy of the revenue figures that had been provided to Goldman "affect[ed]" the decision to permit the founders to take a distribution); *id.* at 6876–77 (Eberts agreeing that the integrity of Outcome's executive management was "fundamental to Goldman in making its decision to invest in Outcome"); *see also id.* at 6677, 6691–92, 6694–95, 6705–06, 6713. As did Todd Cozzens from Leerink. *See id.* at 7897–98 (Cozzens "absolutely" would have wanted to know about manipulated ROI reports); *id.* at 7905 (Cozzens testifying that Leerink "would be very hesitant to invest" if the revenue figures were different than those reported by the audit).

Shah also faults the government for not proving the amount by which any loan would have been reduced or the degree to which investors would have reduced their investments if not for the misrepresentations. But the case Shah relies on, *United States v. Horak*, does not require the government to prove what an alternative loan

or investment might have looked like. 833 F.2d 1235 (7th Cir. 1987). In *Horak*, the Seventh Circuit vacated a forfeiture order and remanded so that the district court could determine "what portion of Horak's interests would not have been acquired or maintained 'but for' his racketeering activities." *Id.* at 1243. The issue was whether the defendant had in fact "acquired" his entire salary, bonus, and retirement contributions through racketeering. Here, in contrast, the financing efforts for both the 2016 bank loans and the 2017 capital raise were all predicated on Shah's misrepresentations and omissions. *See, e.g.*, *United States v. $72,050.00 in U.S. Currency*, 587 F. App'x 241, 243 (6th Cir. 2014) ("all of Target Oil's investor funds obtained during the conspiracy" were proceeds even in the absence proof of that "overt acts of fraud directly generated" the funds at issue); *Annabi*, 746 F.3d at 85 ("§ 982(a)(2)(A), requires forfeiture of the entire amount of the fraudulent loan"). It is nonsensical to argue that if, for instance, half of Shah's representations were false, he would only have received half of the proceeds, especially when the integrity of the borrowers was so important to the lenders.

Fourth, Shah contends that the government does not connect the 2017 capital raise proceeds to the wire fraud counts. To begin, Shah is mistaken that only Counts 24 and 26 relate to the receipt of funds from investors. Counts 22, 24, and 26 pertain to the investments from Goldman Sachs, CapitalG, and Leerink as part of the 2017 capital raise. In any case, the Seventh Circuit has made clear that "forfeiture is not limited solely to the amounts alleged in the count(s) of conviction." *United States v. Venturella*, 585 F.3d 1013, 1017 (7th Cir. 2009) ("The plain language of the section

16

981(a)(1)(C) along with the expansive definition of 'proceeds' indicates that the statute contemplates the forfeiture of property other than the amounts alleged in the count(s) of conviction."). When a defendant is convicted of mail and wire fraud counts that "also allege[] a fraudulent scheme," the amounts of the mailings and wires themselves may "not adequately account for the proceeds obtained from their crime of conviction." *Id.* In those circumstances, section 981 permits the forfeiture of the proceeds of the entire fraud scheme. *Id.* Here, Shah was found guilty of Counts 22, 24, and 26, which charged wires related to the 2017 capital raise totaling $117.18 million. To find Shah guilty of those counts, the jury had to find that he devised or participated in a scheme to defraud alleged in the superseding indictment. R. 444 at 23. That scheme alleged that Defendants obtained $487.5 million from investors as part of the 2017 capital raise. The evidence presented at trial showed that Shah made the same misrepresentations to all of Outcome's investors regarding its revenue, ROI, and the strength of its client-relationships. *See* GX 729, 912, 1053; Trial Tr. 6646, 6646, 6663–64, 6678, 7896–97, 7974, 8605, 8607–08, 8634. As such, $487.5 million are the "proceeds" of the wire fraud counts on which Shah was convicted.

     b.  Tracing Analysis

        i.  Choice of Tracing Method

In attacking the government's tracing analysis, Shah first urges that the government should have employed a "last-in, first-out" ("LIFO") method, rather than the FIFO method, because the latter purportedly operated to Shah's detriment. Yet Shah offers no case law that supports the use of one tracing method over another or requires the government to apply the method that gives a defendant the "benefit of

the doubt." In *Luis v. United States*, a plurality of the Supreme Court instructed courts to use "tracing rules" to determine "whether a particular bank account contains tainted or untainted funds" but expressed no view as to any preferred method. 578 U.S. 5, 22 (2016). And FIFO and LIFO are only two of several different tracing methods that courts have adopted. *E.g.*, *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1160 (2d Cir. 1986) (holding that either the "proceeds first" rule, or "lowest intermediate balance rule" could be used to trace commingled funds); *see also United States v. Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) ("We have three 'accounting choices' at our disposal to determine what amount of commingled funds are traceable to criminal activity.").

True, both Poelking and Braver testified that they were trained to give the defendant the "benefit of the doubt" when there is a question about traceability, even though there is no support in the case law for such an approach. Forfeiture Hr'g Tr. at 80, 166. Even if there were such a rule, however, it is not clear that it required the use of LIFO. Shah examined both Poelking and Braver on specific examples of assets that would have fared better under LIFO. But while LIFO may have reduced forfeiture for some assets, it may have increased forfeiture for others. *Id.* at 127 (Poelking testifying, "[P]erhaps there were other assets that I did not attribute to the fraud that then would be captured under a different method."). And neither witness testified that the total value of forfeited assets would have been higher or lower under one method as compared to another. *See id.* at 210 (Braver testifying, "I just can't remember . . . what was the most beneficial of the three [accounting methods].").

Moreover, Shah has not offered any evidence that the government's accountant chose FIFO in order to maximize the amount of forfeiture. Rather, Poelking testified that she chose FIFO because it was the only method she had used during her tenure as an FBI accountant. *Id.* at 63. Braver too testified that FIFO is a "generally accepted accounting methodology" that he utilized "during [his] tenure as a government agent [with the IRS]." *Id.* at 198–99. The utilization of FIFO was appropriate here and does not undermine the tracing analysis.

### ii. Use of Multiple Methods

Shah further asserts that the government arbitrarily switched between tracing methods. In particular, Shah claims that Poelking used LIFO to characterize the $30.2 million transfer from Contextmedia's account to Shah's account as criminal proceeds and then switched back to FIFO for subsequent transfers. But Shah's characterization is inconsistent with Poelking's testimony and is not born out by the exhibits. Poelking explained that she did not use LIFO for this one transaction. Rather, she did not use any tracing method because there was independent evidence that proved the entire $30.2 million came from the April 2016 bank loan, and thus were criminal proceeds. Forfeiture Hr'g Tr. at 144–45. That evidence includes the simultaneous disbursement of the loan and the dividend, GX 1071; the loan agreement authorizing a disbursement to the "holders of [Outcome's] equity interests," GX 573 at 15; and the memo line on the $30.2 million wire transfer into Shah's account, GX 571. Poelking then applied FIFO from that point forward. Forfeiture Hr'g Tr. at 151.

19

Tracing methods are assumptions that are applied to commingled funds where there is no real way to separate tainted from untainted funds. *See Luis*, 578 U.S. at 22 (describing how tracing rules are available to "help implement . . . the distinction" between a criminal defendant's tainted and untainted funds). As such, there are circumstances where those assumptions are not necessary to distinguish what is tainted from what is untainted in commingled assets. *United States v. Weisberg*, No. 08-CR-347, 2011 WL 4345100, at *6 (E.D.N.Y. Sept. 15, 2011) (recognizing circumstances where "despite the fungibility of money, it is possible to prove that a particular withdrawal from a commingled account includes, or does not include, tainted proceeds"). Poelking's reliance on the clear, unambiguous evidence in the record showing that the entire $30.2 million deposited into Shah's account was from the April 2016 bank loan does not undermine her tracing analysis.

### iii. Consolidation of Accounts at the Same Bank

Shah also argues that the tracing analysis collapsed multiple accounts at the same bank and therefore effectively disregarded transfers between those accounts. Specifically, Braver criticized the consolidation of two Contextmedia accounts at Chase and several accounts at Pershing for Shah and the Baroda Trust. *See* Forfeiture Hr'g Tr. at 170, 172, 215–216. But Shah does not explain how this analytical choice rendered the tracing analysis unreliable. Instead, Poelking testified that collapsing those accounts "would have only eliminated the inner Pershing transfers" for the purpose of the spreadsheet, as they "net to zero," and that all transfers in and out of those accounts would have been accounted for. *Id.* at 123–25.

20

As such, the consolidation of these accounts does not undercut the government's tracing analysis.

      iv.  Commingled Deposits

Shah next faults the government's expert for how she handled commingled deposits into new accounts. Shah cites instances where Poelking split a commingled deposit into two portions: "clean" and "dirty," and then assumed that the assets were acquired using only the "dirty" portion in the subsequent analysis. Additional context is key. Under the FIFO method, when a withdrawal from a commingled account exceeds the amount of remaining "dirty" funds, it follows logically that the withdrawal had to include "clean" funds. *See id.* at 116 (Poelking agreeing that "under a FIFO method . . . [you can] trace some dirty proceeds to that deposit, but not the entirety"). So, Poelking kept track of the exact amount of "dirty" and "clean" funds that were contained within the single deposit into the new account. Shah characterizes this as switching between tracing methods, namely from pro rata to FIFO. But the pro rata method preserves the ratio of tainted to untainted funds in an originating account following withdrawal. Forfeiture Hr'g Tr. at 92–93. And whenever Poelking broke out a deposit between "dirty" and "clean" funds, the originating account had been emptied of all "dirty" funds. Poelking's testimony thus makes clear that she was not switching between methods, but consistently applying FIFO.

Shah further claims that by arbitrarily treating the "dirty" portion as the "first" deposit in her analysis, Poelking could then incorrectly find that the entirety of the immediately following transfers were traceable under FIFO. If, instead, the "clean"

portion had been treated as the "first" deposit, then, according to Shah, the majority of those same transfers would have been characterized as derived from untainted sources under FIFO. As stated previously, there is no legal requirement that the government use a particular tracing method. And while Poelking testified that while she was not aware of an accounting principle that would direct her to choose this particular order, she applied this procedure consistently. Forfeiture Hr'g Tr. at 118–20, 122. That analytical choice, applied consistently, does not make the government's tracing analysis defective.

### c. Tracing to Forfeitable Assets

Shah next challenges that the way the government identified forfeitable assets in its motion. Shah asserts that by identifying "capital contributions" as the property to be forfeited, the government did not identify any property belonging to Shah, but rather property belonging to the receiving entity that was exchanged for some other interest in the property, such as stock or payments. *Id.* The tracing analysis shows that the capital contributions identified in the proposed preliminary forfeiture order originally belonged to Shah. Shah may be right that those capital contributions have since been exchanged with a third party for some other interest. But that is a matter to be determined after the entry of a preliminary order of forfeiture. Rule 32.2 requires the Court to enter the preliminary order of forfeiture "without regard to any third party's interest in the property." Fed. R. Crim. P. 32.2(b)(2)(A). The Rule further mandates that "[d]etermining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule

22

32.2(c)." *Id.* These provisions are consistent with the Rule's provisions permitting "discovery the court considers proper in identifying, locating, or disposing of the property" following the entry of a preliminary order, Fed. R. Crim. P. 32.2(b)(3), and ensuring that a preliminary order is entered "sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications" before it becomes final, Fed. R. Crim. P. 32.2(b)(2)(B). *See also* Fed. R. Crim. P. 32.2(e)(2) (permitting amendments to a preliminary or final order of forfeiture). This is not a basis to deny the government's motion.

III.   <u>Appreciation</u>

Shah further contests the forfeitability of the appreciation of the forfeitable assets. This argument is contrary to the statutes and the case law. The plain language of both 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 982(a)(2)(A) require forfeiture of any property which is "derived from" proceeds "traceable to" or "obtained directly or indirectly, as a result of" the offense. Appreciation on the proportion of an asset traceable to criminal proceeds can fairly be said to "derive from" those proceeds. *See, e.g.*, *United States v. Hill*, 46 Fed. Appx. 838, 839 (6th Cir. 2002) (holding that appreciated value of stock shares were forfeitable as "directly 'traceable to' the original shares involved in the money laundering conviction"); *United States v. Tartaglione*, No. CR 15-491, 2018 WL 1740532, at *29 (E.D. Pa. Apr. 11, 2018), *aff'd*, 815 F. App'x 648 (3d Cir. 2020) (holding that the government was entitled to the appreciation on the proportion of a building traceable to criminal proceeds). In addition, the relation back doctrine provides that title vests in the United States upon

23

the commission of the crime that gives rise to forfeiture. *See* 21 U.S.C. § 853(c). It follows that after title vests with the United States, any proportional appreciation in the value of that asset belongs to the United States. *See, e.g.*, *United States v. Wahlen*, 459 F. Supp. 2d 800, 813–14 (E.D. Wis. 2006) (applying the relation back doctrine in holding that "portions of real properties which are subject to forfeiture include appreciation attributable to the criminal proceeds").

*United States v. Genova*, the sole case Shah relies on, does not state otherwise. In *Genova*, the defendant had received bribes in exchange for making city employees available for political purposes. 333 F.3d 750, 754 (7th Cir. 2003). The district court ordered forfeited the value of the renovations to the defendant's home that were done by city employees. *Id.* at 761. Acknowledging that "value added independently by the accused is neither forfeitable gain nor a loss to the victim," the Seventh Circuit remanded so that the district court could "determine how much of the [increased] value represents 'proceeds' of crime," that is, what portion of the home's increased value was due to the tainted labor and what was due to the untainted materials. *Id.* at 762. In other words, *Genova* supports what the government seeks here: the forfeiture of appreciation on the proportion of an asset traceable to criminal proceeds.

IV.  <u>Substitute Property</u>

21 U.S.C. § 853(p) governs the forfeiture of "substitute property." The provision "provides a means for the Government to recoup the value of [directly forfeitable] property if it has been dissipated or otherwise disposed of" by a defendant. *See United States v. Honeycutt*, 581 U.S. 443, 452 (2017). Section 853(p) requires a court to order

the forfeiture of "any other property of the defendant" up to the value of the directly forfeitable property if:

> any property described in subsection (a), as a result of any act or omission of the defendant—
>
> > (A) cannot be located upon the exercise of due diligence;
> > (B) has been transferred or sold to, or deposited with, a third party;
> > (C) has been placed beyond the jurisdiction of the court;
> > (D) has been substantially diminished in value; or
> > (E) has been commingled with other property which cannot be divided without difficulty.

21 U.S.C. § 853(p). Section 853(a), in turn, refers to persons "convicted of a violation of this subchapter or subchapter II." 21 U.S.C. § 853(a). Shah challenges the forfeitability of the assets identified as substitute property on several grounds.

### A. Statutory Authority

Shah first asserts that the Court does not have the authority to order forfeiture for substitute assets in this case because section 853(p), by referring to section 853(a), only applies to defendants convicted under Title 21, not Title 18.[2] Shah acknowledges that the "procedures" of section 853 apply to criminal forfeiture proceedings through 28 U.S.C. § 2461(c), but maintains that section 853(p) is a substantive provision, not a procedural one. But the Supreme Court in *Honeycutt* expressly referred to "the *procedures* outlined in § 853(p)." 581 U.S. at 452 (emphasis added). And numerous appellate courts have held that section 853(p) is a procedure incorporated into criminal forfeiture. *See United States v. Javat*, No. 20-13310, 2022 WL 703940, at *7

---

[2] Shah does not claim that section 853 is unavailable for forfeiture under section 982, only under section 981.

(11th Cir. Mar. 9, 2022) (citing *United States v. Gregoire*, 638 F.3d 962, 971 (8th Cir. 2011)); *United States v. Valdez*, 911 F.3d 960, 967 (9th Cir. 2018); *United States v. Capoccia*, 402 F. App'x 639, 640 (2d Cir. 2010); *United States v. Alamoudi*, 452 F.3d 310, 313–14 (4th Cir. 2006)). While the Seventh Circuit has not yet spoken on this precise issue, courts in this district have ordered the forfeiture of substitute assets in criminal forfeiture proceedings premised on section 981. *E.g.*, *Del Giudice*, 594 F. Supp. 3d at 1008. Shah does not cite any case law to the contrary.

      B.  Section 853(p) Requirements

Shah next argues that the government fails to satisfy the statutory criteria of section 853(p). Beginning with the bases for finding that the directly forfeitable property is unavailable, the evidence shows that two of those bases apply here. First, directly forfeitable assets have been "commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p)(E). Shah received a $30.2 million dividend from the 2016 bank loan and retained $31 million in the Gravitas account, of which he was an 80% owner, after the settlement with investors. *See* GX 535 at 7; GX 571; R. 75-2 at 7; GX 672. As these criminal proceeds moved through the spiderweb of bank accounts he created and that were described previously, there was extensive commingling with other assets. Indeed, many of Shah's objections to the traceability of the proceeds are premised on this very fact. As a result, Poelking was only able to trace $32 million, *see* GX 1029, which is approximately 58.2% of the criminal proceeds Shah obtained through the convicted offenses. Additionally, directly forfeitable property has been "transferred or sold to, or deposited with, a third

26

party." 21 U.S.C. § 853(p)(B). Shah was convicted in Counts 10 and 12 of engaging in monetary transactions with the proceeds of the April 2016 bank fraud, namely making a $450,000 rent payment for his home and a $65,423.39 payment to a private jet company. *See* GX 587, 604, 1078, 1079, 1242.[3]

Moving next to the requirement that the directly forfeitable property was made unavailable "as a result of any act or omission" by Shah, the evidence shows that the proceeds were deposited into bank accounts that were in Shah's name or on which he was a signer. *See* GX 571, 1078, 1079, 1082, 1242. In addition, the transactions underlying Counts 10 and 12 demonstrate how Shah controlled how those proceeds were spent. *See, e.g.*, *United States v. Faulk*, 340 F. Supp. 2d 1312, 1315 (M.D. Ala. 2004) (government satisfied its burden under section 853(p) by showing that "laundered money ha[d] been substantially dissipated due to the dispersion of funds by the defendants themselves"). The government has presented sufficient evidence to satisfy the statutory requirements of section 853(p)(1).

Lastly, Shah argues that the majority of the assets the government seeks to forfeit as substitute property are not "property of the defendant" but instead property of legal entities such as Gravitas, Jumpstart Ventures, LLC, or Jumpstart Ventures II, LLC. But Shah concedes that he has an interest in these entities, and puts form over substance. *See* R. 511 at 21. And as discussed previously, Rule 32.2 requires the

---

[3] Poelking's inability to trace 100% of the proceeds is not necessarily, as the government argues, an example of property that "cannot be located upon the exercise of due diligence." *See* 18 U.S.C. § 853(p)(1)(A); *e.g.*, *United States v. Messino*, 122 F.3d 427, 428 (7th Cir. 1997) (noting that district court forfeited motorcycle where the government could not locate the cash proceeds of the defendant's drug activities).

court to enter a preliminary order of forfeiture "without regard to any third party's interest in the property." Fed. R. Crim. P. 32.2(b)(2)(A). The determination of any third party interests in forfeitable property is deferred until a third party files a claim in an ancillary proceeding. *Id.*; *see also United States v. Erpenbeck*, 682 F.3d 472, 480 (6th Cir. 2012) (claim that substitute property was not "property of the defendant" was properly dealt with in an ancillary proceeding as the "*sole* avenue for a third party to assert an interest in forfeitable property" (emphasis in original)). As such, the government has also satisfied the criteria in section 853(p)(2).

V.  Excessive Fines Clause

Shah asserts that the forfeiture sought by the government violates the Eighth Amendment's Excessive Fines Clause. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const. amend. VIII. It is well-established that the Excessive Fines Clause applies to criminal forfeiture. *United States v. Bajakajian*, 524 U.S. 321, 328 (1998). The "touchstone" of the constitutional inquiry is proportionality. *United States v. Malewicka*, 664 F.3d 1099, 1103 (7th Cir. 2011) (quoting *Bajakajian*, 524 U.S. at 334). "If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional." *Bajakajian*, 524 U.S. at 336–37 (affirming the forfeiture of only $15,000 due to the disproportionality between the crime (violating a currency reporting statute) and the amount of undeclared cash ($357,144)).

28

Certainly, the requested forfeiture here is significant. But Shah obtained millions of dollars in the fraudulent scheme for which he was convicted. *See United States v. Segal*, 495 F.3d 826, 840 (7th Cir. 2007) ("This was a massive fraud. When a defendant commits a multimillion-dollar crime, he can be required to forfeit assets also running into the millions."). The forfeiture of $55 million is directly proportional (indeed, identical) to the $55 million that Shah personally gained from the 2016 bank loans and the 2017 capital raise. *See United States v. Johnson*, 956 F.3d 510, 518 (8th Cir. 2020); *United States v. Romeo*, No. S1 19 CR 586, 2023 WL 2648191, at *4 (S.D.N.Y. Mar. 27, 2023) (forfeiture of substitute assets did not violate the Excessive Fines Clause where the money judgment was equal to the amount of money that the defendant fraudulently obtained, and the substitute assets only partially satisfied the judgment); *United States v. Black*, 526 F. Supp. 2d 870, 886 (N.D. Ill. 2007) (rejecting Excessive Fines Clause argument where "the forfeited amount corresponds to the amount that Defendants wrongfully diverted"). Because the government cannot trace all $55 million, it properly seeks to make up the difference with substitute assets, just as section 853 contemplates.[4] The forfeiture here is not grossly disproportional to Shah's crimes.

---

[4] Shah argues that the forfeiture of substitute property necessarily violates the alternative "instrumentality" test set forth by the Seventh Circuit in *United States v. Plescia*, 48 F.3d 1452, 1462 (7th Cir. 1995), which he says requires that property subject to forfeiture have more than an "incidental or fortuitous" connection to the offenses of conviction. *Plescia* preceded *Bajakajian*. And *Bajakajian* held that in a criminal case, "the test for the excessiveness of a punitive forfeiture *involves solely* a proportionality determination." 524 U.S. at 333–34 (emphasis added).

VI.    Counsel of Choice

Shah lastly argues that granting this motion would violate the Sixth
Amendment because he is entitled to use the substitute assets, which are untainted,
to retain counsel of his choice for his sentencing and appeal. At bottom, the parties
are arguing about seizure. The government argues that section 853(g) requires the
Court to order the seizure of substitute property with the entry of a preliminary order
of forfeiture. Section 853(g) provides, "Upon entry of an order of forfeiture under this
section, the court shall authorize the Attorney General to seize all property ordered
forfeited upon such terms and conditions as the court shall deem proper." 21 U.S.C.
§ 853(g). The use of the word "order" without any modifier makes it unclear whether
this subsection applies to preliminary orders of forfeiture, final orders of forfeiture,
or both. Indeed, while Rule 32.2(b)(3) provides that "[t]he entry of a preliminary order
of forfeiture authorizes the Attorney General (or a designee) to seize the specific
property subject to forfeiture," that subsection is silent as to "substitute property."
Fed. R. Crim. P. 32.2(b)(3). Given this ambiguity, the Court will not order the
immediate seizure and liquidation of the substitute assets.

Yet, the idea that a preliminary order of forfeiture directs the forfeiture of
substitute property but allows a criminal defendant unfettered access to that
property defies logic. Restraining the substitute property is entirely appropriate, if
not inherent in the preliminary order of forfeiture itself. The Court is inclined to allow
Shah use of at least some of the restrained substitute property to secure counsel of
his choice, but Shah has not indicated how much he anticipates needing for that

purpose. The government raised the possibility that an agreement can be reached between the parties in this respect. If the parties cannot come to an agreement, they can raise the issue before the Court.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part the government's motion for a preliminary order of forfeiture. The government shall submit a proposed preliminary order of forfeiture that sets forth the amount of the money judgment, directs the forfeiture of the specific property identified in Exhibit A and the substitute property identified in Exhibit C up to the value of the money judgment, and orders the seizure of the specific property identified in Exhibit A and the restraint of the substitute property identified in Exhibit C up to the value of the money judgment.[5]

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: November 15, 2023

---

[5] The government requested a minor amendment to Exhibit C, which erroneously includes $6.5 million turned over to the government from Law Firm A. That money is properly added to Exhibit A. *See* R. 75-2 at 10. The government should make that amendment before submitting the revised proposed preliminary order of forfeiture.