UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19 CR 864 |
| | ) | |
| RISHI SHAH, | ) | |
| SHRADHA AGARWAL, and | ) | Judge Thomas M. Durkin |
| BRAD PURDY | ) | |
| | ) | |

**GOVERNMENT'S COMBINED RESPONSE TO THE DEFENDANTS'
SENTENCING MEMORANDA AND OBJECTIONS TO THE
PRETRIAL SERVICES REPORTS**

Of the many tragedies to result from the Outcome Health story, one of
the most perplexing has always been the egregious waste and misuse of
extraordinary talent by the bright young people who committed this criminal
fraud scheme. The question that many have undoubtedly asked is, "Why?" The
trial evidence and the defendants' sentencing memoranda provide an answer.

The government starts with the undeniable truth that no defendant,
including not a single one of the defendants in this case, is solely defined by
his or her crimes. Each of the defendants here had significant good qualities in
them then, as they still do to this day. Yet, simultaneously, each has within
them significant flaws that enabled them to engage in a massive corporate
fraud scheme—and to do so over a number of years, with a high degree of

1

deliberation, and with an incredible level of deceit. This is proof that it is possible for people to be inclined towards doing good under certain circumstances, yet commit serious crimes when other opportunities present themselves.

That said, not all of the bright, promising, and talented young professionals at Outcome Health followed the same path as these defendants. Samir Kazi, Adam Prowker, Bryan Morgan, Bridget O'Donnell, several Growth Strategy analysts and others recognized that what the defendants were doing at Outcome was wrong and, unlike the defendants, these professionals chose to put their integrity first. They did so at significant risk to their careers, setting aside their egos and their dreams of being part of an exciting new company. And by putting their integrity first, those concerned Outcome employees prompted reactions by the defendants that place into sharp relief the deep, personal flaws that led Rishi Shah, Shradha Agarwal, and Brad Purdy to commit the serious crimes for which they are to be sentenced.

Consequently, notwithstanding their good character traits, the seriousness of these defendants' crimes calls for substantial punishment. As the Court knows, the defendants engaged in a long-running and egregious fraud scheme. A crime of this magnitude, that lasted this long, and that caused

this much harm to others must be punished to a sufficient degree to promote respect for the law and to provide just punishment.

Defendants' requests for probation, home incarceration, or minimal terms of incarceration is an affront to the rule of law. It also calls into question whether, long after being convicted, the defendants have come to grips with their misconduct and the harm it caused. Undoubtedly, the advisory Guidelines range is too severe in this case. Yet there is a point down the scale of options available to the Court at which the punishment would not fit the crime. To find that point and stay just clear of it, the Court must weigh *all* of the 3553(a) factors to find a sentence that reasonably balances the defendants' good characteristics with their bad ones, and accounts for the seriousness of their offenses and the need to uphold the rule of law.

## I. The Government's Sentencing Recommendations Strike the Appropriate Balance Between All of the 3553(a) Factors

The defendants' sentencing submissions do not change the jury's verdict that each of them intentionally engaged in—and, in Shah and Agarwal's case, initiated—a lengthy, pervasive, and harmful fraud scheme while they occupied senior executive positions at their company. The Court can appropriately and reasonably balance the good characteristics of each of the defendants against

the other information and public policy considerations at issue in any 3553(a) analysis.

## A.    The Defendants' History and Characteristics

Each of the defendants' submissions fails to answer this crucial question: What motivated these bright young professionals to commit these crimes? Nobody but perhaps the defendants themselves can pinpoint the answer. But the evidence from trial and the defendants' own submissions are telling.

### i.    History and Characteristics of Shradha Agarwal

Shradha Agarwal's history of service to others is compelling evidence that she has many good things to offer to society both during and after her sentence in this matter. And the government agrees that she was less motivated by financial gain than Shah and perhaps Purdy were in committing their crimes. Moreover, Agarwal's sentencing submission—while not coming close to accepting responsibility for her actions—does reflect some regret.

Putting Agarwal's submission into the context of all the evidence introduced at trial, there emerges an explanation for her conduct. Agarwal probably did view Outcome as a means towards doing good for patients. Yet—at least as far as her role at Outcome was concerned—her motivation to serve others was not solely grounded in selflessness.  Agarwal craved recognition, and not only by her co-workers and co-founder. Agarwal wanted to be famous

and recognized on a global scale for building a company that she could say made the world a better place. As she put in in the November 14, 2015, email she sent to Shah—and has attached as Exhibit O to her sentencing submission:

> Just like you always dreamt of making a fortune, becoming a billionaire, and even read biographies for inspiration to study people in that realm, I always dreamt of being famous and being known for my work and the impact is has on the world. I always strived to be written into history in some way. Whether it was a journalist or editor, architect or run a network of schools, lawyer fighting for justice or serving in an important civil position for a country, all my career options growing up were based on my work making a mark and me being known for it.

The government agrees that this email is a telling window into Agarwal's role at the company, at least at that time in late 2015. And—regardless of whether Shah began reading Agarwal into more about Outcome's debt and capital raises after she sent the email—there is no dispute that Agarwal played a sideline role in bringing those funds into the company.

Nonetheless, *all* of Agarwal's culpable conduct throughout the scheme was necessary to accomplish Shah's dream of being a billionaire and Agarwal's pursuit of fame and recognition. And, lest we not forget, this conduct also led to her own receipt of many millions of dollars in fraudulent proceeds, which, of course, she did not refuse. To those ends, she pushed Ketchum to oversell inventory to solve the two-sided market problem and grow the company. She concealed the fraud from Deloitte. And she helped Shah circle the wagons when

5

employees with integrity raised concerns about how Outcome did business. She did all of this—despite being well aware of the harmful consequences of her actions to customers, financiers, and employees—because she was all-in for Outcome for whatever reasons or combination of reasons were most important to her.

### ii. History and Characteristics of Brad Purdy

Purdy's sentencing memorandum is, in nearly all respects, consistent with the government's view that Purdy was motivated both by his deep sense of loyalty to his friends, Shah, Agarwal, and Desai, and by his desire for financial gain and success. Purdy worked relentlessly to accomplish their shared dream of success for Outcome. As Purdy's sentencing memorandum candidly explains in its opening paragraphs:

> From an early age, Mr. Purdy was determined to excel to provide a better life for his mother and sister. Outcome Health and Rishi Shah presented him with what appeared to be a once-in-a-lifetime opportunity to make his mother proud by achieving incredible success at a very young age.

Purdy, of course, did not have to resort to the conduct described in the government's sentencing memorandum and in its statement of the offense to achieve this goal. Yet he did—having been recruited and used by Shah to loyally help Shah achieve his objective of becoming a billionaire.

Purdy's sentencing memorandum repeatedly minimizes Purdy's awareness of what he was doing during the fraud scheme. Purdy's memorandum and his own letter to the Court portray him as helplessly overworked and unaware of what was happening at Outcome. This, of course, was a major theme of Purdy's defense at trial, and it was necessarily rejected by the jury when it convicted him of fraud and false statements to a bank.

And, while the evidence clearly showed that Purdy was less involved in the sponsorship sales aspects of the fraud (though not completely uninvolved), it also showed that Purdy knew that Outcome was routinely lying to clients, that Desai was open with Purdy about hiding the scheme from Deloitte, that Purdy himself lied to Deloitte, and that Purdy lied to banks and investors to induce them to capitalize Outcome.

And the materials Purdy submitted as part of his sentencing further underscore that he was not some babe-in-the-woods, unfamiliar with the importance of being truthful to auditors, banks, and investors. True, Purdy was young when he started at Outcome. But he was also very smart, well-educated, and—by 2015 and 2016—experienced in the investment world through his short stint at a major investment firm before Outcome, and his work managing investments for Jumpstart Ventures. *See* Dkt. 749 at 20.

Purdy's minimization of his conduct becomes even more concerning knowing that he is viewed as a mentor by others in the business community. In maintaining his actual innocence and minimizing his own conduct to others who look to him for guidance, he is not meeting them honestly and not using the actual truth of his experience to guide those professionals towards responsible business practices. The government respectfully submits that this should cause concern to the Court in considering Purdy's sentence.

### iii.    History and Characteristics of Rishi Shah

In contrast to Agarwal, as hard as Shah tries to portray his actions at Outcome as oriented towards the good, the evidence of his true motivation is overwhelming: Shah wanted to be a billionaire, and he went to great lengths to deceive his clients, his auditor, and his lenders and investors to achieve that goal.

Shah's sentencing memorandum repeats excuses that were at the core of his defense at trial. Excuses that fell flat when confronted with so much evidence of Shah's guilt—leading ultimately to his conviction. The effort to yet again "blame Desai" flies in the face of the jury's verdict. In finding Shah guilty, the jury necessarily rejected the idea that Ashik Desai, fresh out of college, singlehandedly designed and orchestrated the entire fraud scheme without

8

Shah's knowledge or participation. Rightly so—not only does that completely defy logic, it is inconsistent with the documents and testimony at trial.

Shah, of course, is not corrupt to the core. There is undoubtedly good in his life, and there are reasons to believe that he can someday—following rehabilitation away from his devotion to accumulating wealth to the detriment of others—provide valuable contributions to society. This is why a sentence of 15 years is appropriate for Shah.

**B.    The Need to Uphold the Rule of Law**

The defendants' memoranda fail to address the fact that their sentences must reflect the seriousness of their offenses, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). Society has an interest in the sentences given in this case: A sentence that fails to adequately address these needs will harm the greater good.

This case is not unique in that it involves a sweeping corporate fraud scheme led from the top. Nonetheless, this type of scheme is not commonly discovered and successfully prosecuted. Given the prominence of Outcome Health and Rishi Shah and Shradah Agarwal both in the greater Chicago business community and in the national health care advertising industry, it is not surprising that the case has garnered significant public attention.

Fraud schemes like this one cause systemic harm because—cumulatively—they lead some to question the integrity of the American approach to capitalism. And they undermine respect for the rule of law both generally and on an industry-specific level. An example of that lies in Shah's occasional statements about how other tech companies grew based off of false information or data.

The antidote to this erosion of respect for the rule of law is the unwavering and just enforcement of laws that apply to business transactions. Sentencing plays a fundamental role in that process because it sets the tone for the seriousness with which the executive and judicial branches treat the conduct and its harm.

The government has taken this into account when considering its recommendations to the Court. A below-guidelines variance is clearly necessary here. However, given the seriousness of the defendants' offenses and the circumstances under which they occurred, there is a threshold at which the downward movement of the sentence undermines the public's faith in the criminal justice system and respect for the rule of law. The government respectfully submits that its recommendations strike the appropriate balance.

### C.     The Need for Adequate General Deterrence

While multiple defendants dismiss the notion that general deterrence should be considered in weighing the appropriate sentences, 3553(a) requires that both specific and general deterrence be considered. Regardless of whether there is any correlation between the length of a sentence and the frequency of crime, it still stands to reason that the punishment of white-collar crimes can impact future behavior by similarly situated individuals.

This is particularly the case in a corporate setting in which executives are making decisions about how to treat negative results in the business's operations. Do they refund clients for poor delivery? Do they tell both the good *and* the bad to potential investors? When the stakes are high—as they were here, with nearly $1 billion involved—executives might determine to take a risk and commit fraud if they believe that the worst that will happen is a short prison term and the disgorgement of ill-gotten gains.

## II.     Shah's Investor Loss Arguments Are Simply Wrong

At the outset, the government notes that it is still analyzing the defendants' loss positions and developing its responses to their arguments—and principally those included in Shah's sentencing memorandum. Shah retained expert Carl Saba to issue a report and testify concerning losses pertaining to the 2017 capital raise investors, the 2016 lenders, and Outcome's

11

pharma clients. While the defense did provide a draft of Saba's report on April 1, 2024, the government did not receive his final report until June 14, when it was filed with Shah's sentencing memorandum. Moreover, there were other key materials that the government did not receive until well after April 1.[1]

A. **The Cut-Off for Credits Against Loss is No Later than June 2017**

Shah's loss position leans heavily on assertions that he deserves credits against loss under §2B1.1 Application Note 3(E)(i) which provides for a credit against the Guidelines loss amount for money returned or the fair market value of services rendered by the defendant (or other persons acting jointly with the defendant) to the victim *before* the offense was detected.

Note 3(E)(i) provides that the time of detection is the earlier of "the time the offense was discovered by a victim or government agency" or "the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency."

Pharma victim Pfizer detected the fraud when it learned about under-delivery and off-target delivery in June 2017. Tr. 6076-77. After learning about

---

[1] As of last night, the government now appears to have received all of the materials needed to evaluate and respond to the defense arguments concerning loss. Given the short amount of time afforded the government to finalize its positions, the government sets forth its views below but may need to supplement these positions information prior to or during the sentencing hearings.

this, Pfizer asked to pause all of their campaigns with Outcome because they were concerned that Outcome was not running Pfizer's ads as contracted. Tr. 6080. Shah, Desai, and Purdy were all aware of and looped into this issue. GX966, 967, 969; Tr. 6085-87.

Then, in July 2017, CapitalG heard a rumor from "someone at Stanford business school" that "there was something shady happening around measurement at Outcome Health" and that this person at Stanford was talking to a reporter. Tr. 8661. This person was David Ma, and he had started talking to a reporter at the *Wall Street Journal* about the fraud at Outcome. CapitalG shared this information with Shah, who dismissed it as coming from a disgruntled employee. *Id.* Nonetheless, CapitalG told Shah that he should hire a third-party to make sure that there was no misconduct. Tr. 8661:23 – 8662:5.

Sometime later, before the *Wall Street Journal* article publication in October 2017, Shah talked to CapitalG about the fact that the reporter was still seeking information, talking now to multiple employees. Tr. 8662. And, as has been covered extensively in the government's previous submissions, Shah knew then that several concerned employees had left the company earlier in 2017, and before that in 2016, after raising questions and concerns about Outcome's business practices.

13

There can be little doubt that by no later than June 2017, the scheme was not only discovered by a victim (Pfizer), but Shah knew or reasonably should have known that the scheme was detected or about to be detected by a victim or government agency.

## B. Shah was Aware of the DOJ's Investigation by at least November 2017

Shah's sentencing memorandum claims that he was not aware of the government's investigation when he settled with Goldman Sachs, CapitalG, and other investors in early 2018. Dkt. 764 at 1.

The *Wall Street Journal* first publicly revealed the fraud at Outcome on October 13, 2017. Soon after that, it became widely reported that the Department of Justice was investigating Outcome. For example, on November 9, 2017, the *Wall Street Journal* published an article titled "Outcome Health's Investors Receive Subpoenas From Justice Department," opening with the line, "Investors in Outcome Health on Thursday said in a court filing that they were receiving subpoenas from the Justice Department as part of a fraud investigation into the prominent Chicago advertising startup." Exhibit A. The article went on to explain how the filing was submitted in one of the lawsuits by the investors in which they accused Outcome of defrauding them. *Id.* It was these lawsuits that eventually led to the settlement involving Shah, Agarwal,

and the investors. There can be little doubt that Shah and Agarwal knew about the government's investigation of their fraud scheme well before the early 2018 settlement with the investors.

### C. The Defendants' Investor Loss Arguments Fail Because the Settlement Was Done Well After Their Fraud Became Known to Victims and the Government

Shah's investor loss arguments depend on a valuation of what the investors received in connection with the 2018 investor settlement. Shah argues that he deserves credit for value provided to the investors in the settlement because of the credits against loss rules in the Application Notes of §2B1.1. *See, e.g.,* Dkt. 764 at 23 ("In fact, as Mr. Saba's analysis persuasively shows, the institutional investors did not lose a dime as a result of their investment in Outcome—and in fact, they received consideration in the settlement that significantly exceeded their initial investment in Outcome, even ***after*** accounting for the effects of the fraud."). However, that argument falls apart when considering that Shah and Agarwal knew that their fraud had been detected by their victims and had become subject to the government's investigation well in advance of the settlement, and that they therefore cannot avail themselves of the credits against loss provision in the Guidelines.

**D.** **Shah's Framework for Evaluating Loss Misunderstands the Nature of the Investment Asset**

Shah's investor loss arguments also misconstrue the nature of the instrument purchased by the investors and its relationship to value for the investors. Shah argues that "so long as the value of Outcome did not dip below $487 million (which, Mr. Saba's analysis shows, it never came close to doing), the investors did not suffer *any* pecuniary harm as a result of the understatement of Outcome's liabilities and the resulting overvaluation of the company at the time of their investment."

First, to be clear, the fraud on Outcome's investors did not merely "understate liabilities" to customers and therefore overvalue the company. The defendants convinced Goldman, CapitalG, Leerink, and others, to invest in Outcome on the strength of its relationships with customers and the future revenue growth that could be expected based on those relationships. To convince the investors of this, the defendants had to conceal the fraud from the investors and from Outcome's customers. Otherwise, if the investors knew that some of Outcome's largest and most important customers had been defrauded, they would have viewed the value of Outcome differently. How could the investors expect the same amount of return on their investment if Outcome's customer relationships were at risk?

16

The government agrees with Shah that the investment at issue did involve a priority claim against Outcome's assets and revenues, making it different from traditional common stock. But that does not mean that the investors could have obtained the full value of its investment at any point in time after the fraud was revealed to Outcome's customers and investors.

Saba valued Outcome at $780 million at the time the investors purchased their investment in early 2017. Dkt. 764 at 28. The investors paid $487 million for their investment. Contrary to Shah's arguments, they did not receive an asset that could have been converted at just any time to the full $487 million value so long as Outcome was also worth at least $487 million.

This is because Saba's valuation of Outcome is a going-concern valuation—it depends in significant part on the forecasted revenues of the company, not just the value of Outcome's assets. In other words, Saba's valuation includes more value than just the liquidation value of the assets of the company. Therefore, the investors' fixed, priority claim in Outcome did not mean that the investors could access the full going-concern value of Outcome at any given time, thereby converting that value to cover the full $487 million of their investment. And Outcome's *liquidation* value—the value of the assets that could be sold and converted to cash to compensate the investors—was

substantially lower than Saba's going-concern valuation incorporating Outcome's projected future earnings.

For these simple reasons, Shah's arguments on this point are inapposite—they simply do not fit reality—and should therefore be disregarded.

### E. Saba's Calculations Rest on Incorrect, Faulty, and Unreasonable Financial Assumptions

Shah's loss arguments focus on Outcome's valuation at the time of the 2018 settlement with investors. They utilize that valuation to calculate the value of the investment at that point in time, and then point out that it is either $4 million less or $26 million more in value than their original outlay of $487 million.

Presumably Shah focuses on this early 2018 time period because Shah (erroneously—for the reasons described above) asserts that he is entitled to credits against loss for value provided in the settlement.

But, regardless of when Saba values the investment and compares it to the investors outlay—be it March 2017 or February 2018—Saba's methodology is untethered to reality.

As the government will show at the sentencing hearing, Saba's calculations rely on revenue assumptions that disregard the true impact that

18

the revelation of the fraud had on Outcome's customer relationships. Adjusting Saba's revenue inputs to numbers that begin to approach reality generates new outputs that compute to very large amounts of loss to the investors. The same is true for reasonable adjustments to the discount rate used in Saba's model.

Finally, adjusting Saba's calculations to remove the benefits of the credits against loss rule also has a significant impact on the result, again illustrating how even Shah's methodology for evaluating loss would show significant investor losses.

## F. The Government's Loss Calculations Are Correct

The government has provided a reasonable estimate of the investors' losses as a result of the defendants' fraud. While Shah repeatedly accuses the government of a "back-of-the-envelope" calculation, the truth is that—in contrast to Saba's approach—the government's calculation is rooted in real valuations placed on the investment assets following the revelation of the defendants' fraud.

Goldman Sachs recently provided an updated affidavit that further supports the government's estimate of the investors' losses. Exhibit B. It explains how—following the revelation of the defendants' fraud—the investors experienced two rounds of restructuring that resulted in the devaluation and dilution of their holdings. The first restructuring occurred during the 2018

settlement. Goldman explained that the "2018 restructuring became necessary after the discovery of the fraud resulted in customer and employee defections on a large scale, as well as significant legal and related costs." *Id.* at para. 3. As of December 31, 2018, annual audited financial statements reflected that the value of the investment purchased by Goldman for $100 million was now $22,977,835. *Id* at para. 11.

Goldman also explained that the "restructuring that occurred in 2019 was a debt restructuring to reduce existing debt and provide capital to the company, which continued to suffer financially from the loss of customers and employees, as well as legal and related costs." *Id.* at para. 8. As of December 31, 2019, audited financial statements reflected a fair value of the investment shares to be $7,974,726—more than a $90 million loss to Goldman.

These restructurings were prompted by financial challenges caused by the losses of customers and employees, as well as significant legal costs. The loss of customers, defections of employees, and legal costs are all reasonably foreseeable results of the defendants' fraud. The fraud scheme was both the but-for and the proximate cause of those financial problems that necessitated the restructurings. Therefore, the loss in value to the investments following the revelation of the fraud are attributable to the defendants and reasonably

included in the Court's calculation of both Guidelines loss and loss for restitution purposes.

## III.   Shah's Customer Loss Arguments

Shah's suggestion that make-goods to pharma customers were routine at Outcome before the any victim detected the fraud is not consistent with the evidence introduced at trial. The government will present additional evidence at or before sentencing to assist the Court in determining whether there truly is any portion of the amount of the government's estimate of customer losses could have been the subject of make-goods prior to the detection of the defendants' scheme.

In any event, any make-goods paid after Pfizer detected the scheme in June 2017 cannot be credited against Guidelines loss.

## IV.   The Government No Longer Recommends the Obstruction Enhancement for Shah

Based upon information provided by Shah's counsel, the government no longer seeks the two-level obstruction enhancement for Shah.

## V.   Leader-Organizer Enhancement for Shah and Agarwal

Shah and Agarwal were undoubtedly "organizers" or "leaders" of the scheme with which they were convicted.

The evidence at trial showed that Shah and Agarwal exercised decision making authority and control in a scheme involving numerous participants, a scheme that was also otherwise extensive. They were involved in planning and organizing and directing the offense.

In one example that was further detailed in the government's version of the offense, Agarwal directed Ketchum to massively inflate the list match for Pradaxa in 2012. GX67. This later caused a problem in August 2013 when the client decided to do a study of the performance of the campaign. Because Outcome had lied in the list match process about which offices and how many offices ads were running in, any study done by the client would be inaccurate. Agarwal explained to Shah and Desai that "the biggest issue here is that the list they have of 1819 matches isn't the true list (not even 1/3 of it was installed at the time)." GX265. Shah explained the problem to Desai and directed Desai to dissuade the client from studying the campaigns internally, encouraging him to lie to the client about the nature of Outcome's relationship with IMS. GX272. And there were many other examples presented at trial of Agarwal and Shah directing and encouraging Desai or Ketchum to lie to or conceal from customers.

Also, as explained in detail in the government's version of the offense at pages 26 through 35, Shah and Agarwal took the lead on marginalizing and

retaliating against Outcome employees who expressed concerns about the fraud.

Finally, Shah and Agarwal both recruited accomplices, including Desai and Purdy, into the scheme. And Shah and Agarwal stood to gain by far more than any other participant in the scheme. These are also reasons to find that both Shah and Agarwal were leaders or organizers of a scheme which indisputably involved five or more participants and was otherwise extensive.

Because the Aggravating Role enhancement under §3B1.1 applies to Shah and Agarwal, they do not qualify for the zero-point offender reduction under §4C1.1.

## VI.  Sophisticated Means

The government continues to assert that the sophisticated means enhancement applies for all of the reasons noted in its sentencing memoranda and the government's statements of the offense.

Respectfully submitted,


MORRIS PASQUAL
Acting United States Attorney

By:    _s/ Jason Yonan_
Jason Yonan
William Hogan
Corey B. Rubenstein
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 886-2050

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice


By:    _s/ Kyle C. Hankey_
Kyle C. Hankey
Assistant Chief
1400 New York Ave NW
Washington, D.C. 20530
(202) 616-2639