IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

RISHI SHAH, et al.,

        Defendants.

Case No. 19 CR 864
Judge Thomas M. Durkin

**DEFENDANT RISHI SHAH'S RESPONSE
TO THE GOVERNMENT'S SENTENCING MEMORANDUM**

## TABLE OF CONTENTS

Summary and Introduction ........................................................................................... 1

Discussion ................................................................................................................... 3

    I.   The Government's Loss Calculations Improperly Fail to Credit the Value Received by Institutional Investors, Lenders, and Customers, Despite the Fraud ........ 3

        A.  The Government's Allegation of $25 Million in Lender Losses Runs Afoul of the Guidelines and Their Application Notes ............................................................. 4

        B.  The Government's Allegation of Nearly $440 Million in Institutional Investor Losses Ignores the Value Received by Investors Both Before and After Their Settlement with Mr. Shah and Ms. Agarwal ............................................................ 5

            1.   The Government's Allegations of Institutional Investor Loss Ignore Both the Structure and the Actual Value of the Original Investment ............................. 6

            2.   Any Dilution Investors May Have Experienced Occurred *After* the 2018 Settlement, in Which the Investors Received Value Exceeding That of Their Original Structured Equity .................................................................................... 8

            3.   The Defendants Cannot Be Held Accountable for Losses Claimed by Institutional Investors Post-Settlement, Because the Government Has Not Established That Any Such Losses Were Caused by the Fraud ........................... 9

        C.  The Government's Claim That Customers Have Suffered Losses Exceeding $48 Million Fails to Distinguish Between Restitution Provided Before and After the "Offense Was Detected" ........................................................................................ 11

    II.   The Probation Office Was Correct to Conclude That the Sophisticated Means Enhancement Does Not Apply ..................................................................................... 12

    III.   Regardless of Its Errors in Its Guidelines Calculations, the Government's Request for 15 Years Incarceration Is "Greater Than Necessary" to Achieve the Purposes of Punishment Under 18 U.S.C. § 3553(a) ................................................... 14

        A.  The Government Has Presented No Evidence That a Sentence of 15 Years Incarceration Is Necessary to "Deter Others," Nor That It Is Necessary to Deter Mr. Shah or Protect the Public ..................................................................................... 14

        B.  The Nature of the Offense and the History and Characteristics of Mr. Shah Do Not Warrant the Outlier Sentence Requested by the Government ......................... 16

        C.  The Government's Evident Desire to "Send a Message" to Would-Be Fraudsters in Light of the Case's Publicity Is Not a Valid Penological Purpose ..................... 17

Conclusion .................................................................................................................. 19

SUMMARY AND INTRODUCTION

The Government spends the first 20 pages of its submission recapitulating evidence it introduced at Mr. Shah's trial. In so doing, the Government fails, as it did throughout the trial, to distinguish between mere failures of contractual performance and actual fraud. It further seeks to blur the lines between the conduct of Mr. Shah and his codefendants, including most critically Mr. Desai, the Government's own cooperating witness, who admitted to hatching numerous aspects of the fraudulent schemes without Mr. Shah's involvement, often actively concealing them from Mr. Shah. And in crafting its narrative, the Government characterizes Mr. Shah as being driven merely by greed, all with the goal of justifying its whopping request for 15 years incarceration for Mr. Shah, a first-time offender who, by the Government's own account, committed the crimes at issue between the ages of 25 and 30.

The Government's characterization of Mr. Shah's motives cannot be squared with the evidence. While of course Mr. Shah received significant payments of salary and distributions as a result of his status as founder, CEO, and majority owner of Outcome, the vast majority of the funds that the Government seeks to hold Mr. Shah and his codefendants accountable for was invested or reinvested into Outcome itself—which, as the Government acknowledges, was a "legitimate" and "respected start-up company with legitimate operations." Gov't Mem. (Doc. #750) at 40, 41.

The loans and investments that the Government identifies were not personal loans to Mr. Shah, and Mr. Shah did not spend those monies on himself. Instead, the money that Outcome received was primarily used to promote Outcome's legitimate operations. The Government claims that Mr. Shah's crimes "paid off handsomely" on account of a "$225 million dividend in 2017"— but it omits mention of the fact that Mr. Shah did not spend any of that dividend on the "jet-set lifestyle" that the Government portrays. Gov't Mem. (Doc. #750) at 1. Instead, the entirety of that

1

dividend was either returned in the 2018 settlement to the company and the institutional investors (amounts totaling $190 million) or put into legitimate investments that ultimately produced significant returns, which the Government now stands to recover as part of its forfeiture efforts (at a value that likely exceeds $60 million).[1]

As Mr. Shah's sentencing memorandum explained, Mr. Shah and Outcome delivered real value to institutional investors, lenders, and customers both prior to and after the *Wall Street Journal* article was published. Mr. Shah's case is thus not like that of the prototypical Ponzi schemer whose sole motivation is to arrogate personal wealth to himself at his victims' expense, as the Government seems to suggest. To the contrary, Mr. Shah's focus remained always on building Outcome and spreading the benefits of its services to more and more people. Outcome was far from a shell corporation concealing a fraudulent scheme: it was a real company that provided valuable services to its customers, as it continues to do today.

But as Mr. Shah said in his opening memorandum, a trial is about what happened; a sentencing is about what happens next. The Court sat through the trial for more than 10 weeks; it heard the witnesses and saw the evidence. It has already formulated its own conclusions as to the veracity of the Government's evidence and the mitigating and controverting evidence presented by Mr. Shah and his codefendants. Thus, rather than accept the Government's invitation to relitigate the extent of Mr. Shah's knowledge of specific aspects of the fraud itself, Mr. Shah will

---

[1]    *See* Joint Statement (Doc. #550) at 8 (reflecting total restrained value of approximately $50 million, excluding three restrained entities). The amounts in the Joint Statement do not include the value of the real property at 924 N Clark, which the Government estimates at $10 million. *See* Gov't Mem. (Doc. #750) at 1. It also understates the value represented by Investment Company E, from which the Government recently recovered approximately $8.7 million, approximately $2.7 million more than previously reported. *Cf. id.* (suggesting the value of the Investment Company E investment was only $6 million). Finally, the total in the Joint Statement does not take account of $1.5 million previously released to Mr. Shah from Investment Company B that he has agreed to return to the Government as part of their recent stipulation. *See* Stipulation (Doc. #759-1).

dedicate the remainder of his response to addressing the Government's Guidelines arguments and explaining why its request for a 15-year sentence is "greater than necessary" to achieve the legitimate purposes of punishment set forth in 18 U.S.C. § 3553(a).[2]

DISCUSSION

## I. The Government's Loss Calculations Improperly Fail to Credit the Value Received by Institutional Investors, Lenders, and Customers, Despite the Fraud

The Government acknowledges that Outcome was a "legitimate" and "respected start-up company with legitimate operations." Gov't Mem. (Doc. #750) at 40, 41.[3] Yet the Government ignores the importance of that fact in calculating the losses attributable to the defendants under the Guidelines. As a result, the Government's assessment of losses in this case markedly overstates the actual economic impact of the offenses for which Mr. Shah and his codefendants were convicted. As Mr. Shah's opening memorandum explains, the Government's errors are numerous, but at bottom, they all spring from a single mistake: the Government focuses on only half of the equation by reciting what institutional investors, lenders, and customers paid, without sufficiently accounting for what those entities received in return. By failing to present evidence from which

---

[2]  The Government's sentencing memorandum alleged, for the first time, that Mr. Shah was subject to an obstruction of justice enhancement on account of an affidavit that he executed in 2020 describing his available assets. After receiving the Government's memorandum, Mr. Shah's counsel investigated the Government's allegations and provided additional information to the Government. Mr. Shah understands that, based on the information provided by Mr. Shah's counsel, the Government is no longer seeking the two-level obstruction enhancement, and Mr. Shah therefore does not address the Government's allegations further.

[3]  The Government puzzlingly suggests that the fact that Outcome was a "legitimate start-up business" somehow makes Mr. Shah's crimes *more* serious than an outright scam where a company is only the "alter-ego of its fraudster owner." Gov't Mem. (Doc. #750) at 40. But surely the fact that the vast majority of Outcome's operations were legitimate and the fraud, even by its own expert's tabulation, accounted for only 20% of the company's revenue over a two-year period from 2015 to 2016 (and, according to Government's recent submission, only $3.5 million over an earlier three-year period from 2012 to 2014) make Mr. Shah's case *less* serious than a scheme that involved no legitimate business operation.

the Court can determine the **actual** losses, as opposed to the speculative and indeterminate losses submitted by the Government, the Government has failed to carry its burden to reliably establish any actual losses in this case.

**A.** **The Government's Allegation of $25 Million in Lender Losses Runs Afoul of the Guidelines and Their Application Notes**

The Government claims that the Defendants are accountable under the Guidelines for approximately $25 million in losses asserted by lenders based upon those lenders' having traded in Outcome's debt on the secondary market. But as Mr. Shah explained in his opening memorandum, that is not how the Guidelines assess losses in the case of a secured loan. Instead, as in any calculation of actual loss, the Guidelines require the Court to determine not only the funds sent by the lender to the borrower, but also the value received by the lender in exchange for those funds, i.e., the value of the secured property. While that principle is implicit in any loss assessment under the Guidelines, the Application Notes to § 2B1.1 explicitly direct such treatment in any case involving a secured loan:

> Loss **shall be reduced** by the following: . . . In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, **the fair market value of the collateral** at the time of sentencing.

§ 2B1.1 App. Note 3(E)(i). In this case, all of the lenders were secured creditors: their loans were secured by the assets of Outcome. *See* Saba Report (Doc. #756-1) ¶ 134–39. Thus, for the Court even to consider counting any losses claimed by lenders, it would first have to assess the value of Outcome. And whether the Court judges loss at the time of the offense, as the Guidelines themselves suggests, or at the time of sentencing, as the above Application Note suggests, there is no dispute that Outcome's value has always exceeded $25 million. Thus, applying a plain reading

of the Guidelines and their Application Notes, no lender losses may be assessed against the defendants.

Yet even if that were not the case, the Government's analysis also obscures the fact that the losses claimed here by lenders are losses on the ***secondary market***, i.e., trading losses. But those are not the sort of losses that the Guidelines contemplate. The Guidelines do not ask the Court simply to ask whether a lender has achieved a gain or a loss vis-à-vis its basis in an asset—rather, the question is what the asset would have been worth absent the fraud. And in the case of a secured loan, the Guidelines' Application Notes are explicit: so long as the value of the collateral for the debt exceeds the principal of the debt at the time of sentencing, there is no loss. § 2B1.1 App. Note 3(E)(i). For all those reasons, the Government's claims of lender losses are squarely foreclosed under the Guidelines.

**B.  The Government's Allegation of Nearly $440 Million in Institutional Investor Losses Ignores the Value Received by Investors Both Before and After Their Settlement with Mr. Shah and Ms. Agarwal**

Despite acknowledging that "[t]he fraud against the investors is the biggest driver of loss in this case," Gov't Mem. (Doc. #750) at 26, the Government dedicates only three pages of its 54-page memorandum to the topic. Although it has had Mr. Shah's draft expert report for more than ten weeks and has retained its own expert to advise it as to the true impact of the fraud on the investors, the Government attaches no expert report and makes no effort to demonstrate causation between any of the asserted investor losses and the fraud. Instead, it attempts to substantiate its breathless claim of loss using the same debunked formula that Mr. Saba has refuted, by seeking to extrapolate hundreds of millions of dollars of losses from untested internal write-downs by a handful of investors. No analysis of financial statements. No market studies. Not even any consideration of Outcome's revenues or profits. In less than 700 words, the Government seeks to hold Mr. Shah and his codefendants accountable for nearly $440 million in alleged losses.

Needless to say, the Government's submission falls far short of the "reliable" evidence of loss that the Guidelines require.

Although it is not his burden to do the Government's homework, Mr. Shah's sentencing memorandum has already thoroughly explained why the institutional investors did not realize any immediate loss as a result of the revelation of the fraud at Outcome, and why the institutional investors received value in their settlement with Mr. Shah and Ms. Agarwal that actually enriched them relative to their original structured equity investment in the company. The Government's explanation in its sentencing memorandum only further illuminates how deeply the Government fundamentally misunderstands the nature of the investments at issue, causing it to reach untenable conclusions about the true economic impact of the fraud.

## 1. The Government's Allegations of Institutional Investor Loss Ignore Both the Structure and the Actual Value of the Original Investment

The Government asserts that "the value of what the investors purchased from Shah and Agarwal has diminished to pennies on the dollar." Gov't Mem. (Doc. #750) at 27. But the Government's narrative obscures exactly "***what*** the investors purchased from Shah and Agarwal" when they first invested in Outcome. As Mr. Saba's report explains, the institutional investors' initial investment in Outcome was in the form of a special type of structured equity which, unlike traditional equity, produced a consistent return regardless of whether the value of the company rose or fell. Saba Report (Doc. #756-1) ¶¶ 49–59. The institutional investors' structured equity also enjoyed a priority preference, such that they were entitled to have their investment returned to them (with interest) prior to any other distributions to other shareholders (including Mr. Shah and Ms. Agarwal). *Id.*

Thus, at the time the institutional investors learned of the fraud, the security of their original investment was not put at risk by any resulting diminution in the value of the company. Much like

the lenders maintained sufficient collateral to cover the principal of their loans, the investors maintained their priority claim against Outcome's assets that stood in front of the defendants, ensuring that the institutional investors would be the first to recover (after the lenders) in any sale or liquidation of the company.[4] And as Mr. Saba's analysis shows, even after accounting for the effects of the fraud (and the claims of lenders), Outcome was still worth many hundreds of millions of dollars more than the institutional investors' original investment. *See* Saba Report (Doc. #756-1) ¶ 15 (comparing the institutional investors' investment of $487.5 million to the value of the company after adjusting for the effects of the fraud and sums owed to lenders, which was approximately $780 million, an excess of nearly $300 million).

The Government's analysis entirely ignores those undisputed facts, instead focusing on how a smattering of institutional investors have internally marked their investments today, after years of trading and refinancing. But as the Government seemingly acknowledges, the structure of the equity any particular institutional investor holds today differs dramatically from the "what the investors purchased from Shah and Agarwal" in 2017, since Outcome has since gone through numerous recapitalizations, refinancings, and even a major merger with PatientPoint, making Outcome a significant part of a larger (and very valuable) enterprise. The Government makes no effort to account for the changes in the nature and structure of the investors' equity through those

---

[4]    Indeed, as Mr. Saba explains, the structured equity investments made in 2017 functioned much more like debt than equity, including carrying with it a guaranteed rate of return that is economically equivalent to a fixed interest rate. Such agreed rates of return are, of course, excluded from any calculation of actual losses under the Guidelines, since any failure to receive such returns is in the nature of a lost expectancy rather than actual "pecuniary harm." *See* § 2B1.1 App. Note 3(A) (loss means "the reasonably foreseeable pecuniary harm that resulted from the offense"); *id.* App. Note 3(D)(i) ("Loss shall not include the following: "[i]nterest of any kind, . . . amounts based on an agreed-upon return or rate of return, or other similar costs.").

various events—but most staggeringly, it all but ignores the most critical event that occurred after the fraud was made known to the institutional investors: namely, the 2018 settlement.

### 2. Any Dilution Investors May Have Experienced Occurred *After* the 2018 Settlement, in Which the Investors Received Value Exceeding That of Their Original Structured Equity

Although the security of the institutional investors' structured equity remained intact after the revelation of the fraud, the institutional investors ultimately agreed to restructure their investment as part of their 2018 settlement with Mr. Shah and Ms. Agarwal. In that settlement, the institutional investors converted their prior fixed priority claim against Outcome into a more traditional form of equity, where they owned both Outcome's upside and its potential downside—though they still maintained a preference over other investors in terms of when their capital would be returned to them. Saba Report (Doc. #756-1) ¶ 113–14. That restructuring and the associated settlement, which was not itself fraudulently induced but instead occurred after the investors themselves had alleged fraud by Outcome's management, resulted in the investors receiving value that substantially exceeded the value of their original claim—according to Mr. Saba's analysis, by at least $26 million. *See* Saba Report (Doc. #756-1) ¶ 123.

As a result, by February 2018, the investors had not merely been made whole for any fraud committed against them; they ultimately ***improved*** their position as a result of the settlement. Not only did they get the company's upside, but they also received $31 million paid to them directly,

not to mention $159 million returned to the company.[5] And, as Mr. Saba shows, that conclusion holds even if one assumes a valuation for Outcome that was $68 million less than its true value according to Mr. Saba's analysis. *See* Saba Report (Doc. #756-1) ¶ 15.

The significance of the settlement cannot be understated, notwithstanding the Government's attempts to whistle past it. Not only does it demonstrate that the investors had been made whole by Mr. Shah and Ms. Agarwal long before the Government's investigation was even known to them, but it also gives the lie to the Government's insinuations that Outcome was worth only "pennies on the dollar." If that were the case, the institutional investors would have been foolish to trade their first-in-line priority claim against the company, which had hundreds of millions of dollars more in value than was needed to cover their initial investment, for ownership and control of what the Government suggests was a company on the verge of collapse. But as Mr. Saba's analysis shows, that was far from the case. Rather than simply hold onto their priority claim over the company's value, the institutional investors saw the upside, and they seized it.

### 3. The Defendants Cannot Be Held Accountable for Losses Claimed by Institutional Investors Post-Settlement, Because the Government Has Not Established That Any Such Losses Were Caused by the Fraud

Once the institutional investors took control of the company, a dizzying sequence of financial maneuvers took place, all at the institutional investors' direction and without any

---

[5] Notably, the Government acknowledges that the defendants deserve credit their restitution for the $31 million returned to investors—but curiously do not offer any credit for the $159 million returned to the company by Mr. Shah and Ms. Agarwal in that same settlement. *See* **Ex. 4** (2d Supp. to Gov. Version) at 8. It defies logic that, after returning $159 million to the company that the investors now controlled, and into which they made their initial investment, the defendants might still be held liable to pay that money back to the investors a second time as part of their restitution obligation. *See United States v. Malone,* 747 F.3d 481, 485 (7th Cir. 2014) ("Any amount that the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution amount to prevent double recovery by the victim.").

influence or control by Mr. Shah or his codefendants. While it is true that the institutional investors experienced a dilution in their equity in 2019 (after Mr. Shah and Ms. Agarwal left the company), that dilution resulted not from any actions of the defendants, but rather from Outcome's decision not to honor a loan covenant that required them to maintain a minimum cash balance of only $20 million (despite Mr. Shah and Ms. Agarwal returning $159 million in cash to the company one year earlier, as well as $31 million to the investors directly). Saba Report (Doc. #756-1) ¶ 123. Ultimately the company merged with competitor PatientPoint to form what is now the dominant player in the point-of-care advertising industry, making it worth more (and probably significantly more) than $▇▇▇▇ today. *Id.* ¶¶ 28, 125.[6] The Government makes no effort to establish that any of these post-settlement events (either the positive ones or the negative ones) were caused by the fraud. Instead, their argument boils down to one of the oldest fallacies in the book: *post hoc, ergo propter hoc* ("after this, therefore because of this"). Needless to say, such speculative reasoning is insufficient for the Government to shoulder its evidentiary burden.

The Government's memorandum does not take a position as to when the losses in this case should be measured—but regardless of whether the question is evaluated at the time of the original investment, the time of the settlement, or the present day, the value that institutional investors received equals or exceeds what they gave up. While some institutional investors may have traded out of their positions, the investors who stepped into their shoes today hold more than 42% of the value of a ▇▇▇▇▇▇ company. To hold the defendants accountable for any "actual loss"

---

[6] Mr. Shah has still not received the additional information he has requested from PatientPoint that would permit a more precise estimate of the present value of PatientPoint and what portion of that value derives from its acquisition of Outcome. That information is required to assist the Court in assessing the true economic impact of the offenses in this case. Mr. Shah reserves the right to call a representative of PatientPoint at sentencing if need be in order to ascertain that information.

in such circumstances would distort the very meaning of those words, as well as the economic reality of this case.

### C. The Government's Claim That Customers Have Suffered Losses Exceeding $48 Million Fails to Distinguish Between Restitution Provided Before and After the "Offense Was Detected"

The Government claims that the defendants are accountable for losses to customers totaling approximately $48 million. But the Government's analysis does not explain why it has not provided any credit against those alleged losses for the very significant restitution made to any of Outcome's customers "before the offense was detected." *See* § 2B1.1 App. Note 3(E). It is the Government's burden to establish what the actual amount of any such losses is, as well as to establish when the Government or each of the victims first "detected" the offense. Having failed to carry that burden, the Government has simply not given the Court the evidence it needs to formulate a reliable estimate of any losses to customers.

The Government's apparent position that at least $11 million of the $48 million is still owed back to those customers is also inconsistent with the Government's prior settlement with Outcome itself, in which Outcome "set aside an additional $4.5 million" (in addition to the $65.5 million that Outcome had already paid back to customers in cash, in kind, as credits) "to compensate any additional pharmaceutical clients who ha[d] not yet been made whole."[7] If there are, as the Government claims, $11 million worth of victims who have not been made whole, why has Outcome not been required to pay at least $4.5 million of that amount under its nonprosecution agreement with the Government?

---

[7] DOJ Press Release, "Outcome Health Agrees to Pay $70 Million to Resolve Fraud Investigation" (Oct. 30, 2019), https://www.justice.gov/opa/pr/outcome-health-agrees-pay-70-million-resolve-fraud-investigation.

As with its cursory treatment of the alleged losses to institutional investors and lenders, the Government's analysis leaves too many questions unanswered for the Court to rely upon it as a fair assessment of the losses in this case.

## II. The Probation Office Was Correct to Conclude That the Sophisticated Means Enhancement Does Not Apply

The Government's request for a two-level enhancement for sophisticated means under § 2B1.1(b)(10)(C) is not appropriate. As the Probation Office agrees, there is not an adequate basis to apply the enhancement, which the Application Notes indicate is appropriate in cases that involve "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 App. Note 9(B). None of the traditional indicators of "sophisticated means" are present here, such as "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id*.

Nor does Mr. Shah's case resemble the sort of cases where the Seventh Circuit has recognized a sophisticated means enhancement to be appropriate. Mr. Shah did not "repeatedly channel[] money into foreign bank accounts" (*United States v. Ghaddar*, 678 F.3d 600, 603 (7th Cir. 2012) (collecting cases)); "exchang[e] currency for cashier's checks to carry overseas" (*id.*); launder funds through third-party bank accounts (*United States v. Wu*, 81 F.3d 72, 73–74 (7th Cir. 1996)); "use . . . fictitious contact information to help conceal the invalidity of [the] scheme" (*United States v. Robinson*, 538 F.3d 605, 607 (7th Cir. 2008)); or fraudulently open a bank account with a false address to ensure that victims did not receive notifications of the fraud (*United States v. DeMarco*, 784 F.3d 388, 397–98 (7th Cir. 2015)).

Instead, this case is more akin to *United States v. Valdez*, where the Fifth Circuit found error in the application of the enhancement where the defendant had "used no false names, fictitious entities, shell companies or complicated financial transactions, or any other particularly

sophisticated means to hide or conceal the assets." 726 F.3d 684, 695 (5th Cir. 2013). Courts

outside the Fifth Circuit have followed *Valdez* to find that such an enhancement is not appropriate

without similar hallmarks of sophisticated means. *See, e.g.*, *United States v. Hulse*, 989 F. Supp.

2d 1224, 1226 (M.D. Ala. 2013) (relying on *Valdez* to find sophisticated means enhancement

inappropriate); *id.* ("[T]he defendants all signed documents, made representations, and received

funds in their own names. While corporations were involved, including overseas corporations in

tangential respects, nothing about the involvement of the corporate form suggests the intent or

effect of concealing the offense. The same is true of the fact that the conduct involved multiple

jurisdictions."); *see also United States v. Brown*, 877 F. Supp. 2d 736, 752 (D. Minn. 2012)

(finding sophisticated means enhancement inappropriate where defendant "did not create fictitious

entities, corporate shells, or offshore financial accounts for Fund X assets, but rather opened

readily identifiable accounts at local banks").

By comparison to the paradigmatic case involving sophisticated means, the offenses in this

case were not "especially complex or especially intricate." § 2B1.1(b)(10)(C). And while the

Government sings a different tune today, its recently revealed internal correspondence reflects that

even the prosecutors who brought this case shared the Probation Office's view. *See* **Ex. 3** (email

from W. Johnston dated July 22, 2019) (admitted as Shah Evidentiary Hearing Ex. 8800) ("The

scheme was fairly simple and involved overselling and underdelivering its advertising inventory.

The company would bill its clients for inventory it did not have and then cover up its under-

delivery in its invoices and proofs of performance back to its clients."). Under those circumstances,

it would be especially inappropriate for this Court to accept the Government's claim that Mr. Shah

and his codefendants employed sophisticated means, when the Government has itself spoken to

the contrary behind closed doors.

13

III. **Regardless of Its Errors in Its Guidelines Calculations, the Government's Request for 15 Years Incarceration Is "Greater Than Necessary" to Achieve the Purposes of Punishment Under 18 U.S.C. § 3553(a)**

Although the Court must calculate the Guidelines before imposing a sentence in this case, its ultimate sentence must meet the requirements of 18 U.S.C. § 3553(a) of the Sentencing Reform Act, which instructs the Court to impose a sentence that is "sufficient, but not greater than necessary" to achieve a number of legitimate penological purposes. As explained in Mr. Shah's memorandum, a lengthy prison sentence is not necessary to achieve those purposes. Imposition of such a term of imprisonment would create an unwarranted disparity between the sentence in this case and the sentences imposed against other white collar defendants who crimes that had a much greater economic impact than Mr. Shah's, and it is not necessary either to deter Mr. Shah or to promote restitution for any victims of the offense.

To the contrary, the 15-year prison sentence the Government requests would accomplish exactly the opposite: if courts refuse to take cognizance of steps that corporate executives might otherwise take to civilly settle or otherwise provide restitution to those affected by their companies' conduct, then it would discourage executives who identify or participate in wrongdoing from taking such steps in the future. Instead, to promote respect for the law and to provide just punishment for the offenses in this case, this Court should sentence Mr. Shah to a sentence of home confinement.

A. **The Government Has Presented No Evidence That a Sentence of 15 Years Incarceration Is Necessary to "Deter Others," Nor That It Is Necessary to Deter Mr. Shah or Protect the Public**

A custodial sentence is not necessary to promote general deterrence. *See* Gov't Mem. (Doc. #750) at 45–46. For most white collar offenders, the motive to commit a fraud offense is the financial payoff. The prosecution in this case has already sent a strong signal that any short-term gain will be substantially outweighed by long-term consequences. The Court's forfeiture order will

14

deprive Mr. Shah of any ill-gotten gains, and in the meantime, this prosecution has destroyed any hope Mr. Shah might have for a successful future career as an entrepreneur. Those reputational and financial penalties are far more relevant to deterring white-collar defendants (and Mr. Shah himself) than the threat of a lengthy prison term.

More importantly, the Government's focus on general deterrence ignores Mr. Shah's efforts to make the victims of Outcome's wrongdoing whole before the prosecution began. By seeking a sentence calibrated for an unrepentant fraudster who left victims with virtually nothing, the Government sends the counterproductive signal that efforts to address wrongdoing and ensure compensation for those harmed will receive no credit. Sentencing Mr. Shah on that premise creates a perverse incentive for criminals to double down on their wrongdoing.

Nor is a custodial sentence necessary to deter Mr. Shah from future wrongdoing. He has no criminal history, and "[r]esearch suggests that true first time offenders . . . have a very low recidivism rate." *United States v. Lupton*, 2009 W: 1886007, at *10 (E.D. Wis. June 29, 2009). Moreover, Mr. Shah is the rare fraud defendant who engaged in good-faith efforts to make customers and investors whole before the Government even began its prosecution, further suggesting that he is unlikely to repeat the conduct that led to this conviction. The reputational harms imposed by this prosecution make it very unlikely that Mr. Shah will again occupy a position that would give him the means to reoffend. No doubt for that reason, the Government does not attempt to argue that its proposed outlier term of incarceration is needed to "protect the public from further crimes of the defendant" or "provide restitution to any victims." 18 U.S.C. § 3553(a)(2)(C), (a)(7). A lengthy prison term is simply not necessary to protect against the risk that Mr. Shah would reoffend.

**B.    The Nature of the Offense and the History and Characteristics of Mr. Shah Do Not Warrant the Outlier Sentence Requested by the Government**

The Government's argument on the Section 3553(a) factors turns heavily on its view that this case is "more serious than the vast majority of corporate fraud schemes." Gov't Mem (Doc. #750) at 41. Tellingly absent from the Government's memorandum, however, are any citations to cases substantiating that claim. *See id.* at 40–47. The Government cites no case involving comparable conduct in which the defendant was sentenced to anything close to 15 years imprisonment. By contrast, Mr. Shah has identified a number of cases involving defendants with analogous—indeed, more significant—culpability who received sentences substantially below the sentence recommended by the Government or the probation office here. *See* Shah Mem. (Doc. #756) at 49–52. Those sentences reflect the widespread consensus that the loss guideline is "fundamentally flawed, especially as loss amounts climb." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring). Imposing a sentence at or near the Government's or the Probation Office's recommendation in this case would therefore result in precisely the kind of sentencing disparities that § 3553(a) directs courts to avoid.

The Government's portrait of Mr. Shah as a brazen schemer also does not fit the facts from trial. Mr. Shah was focused on building a legitimate business that provided real value to clients, and Outcome remains a prosperous going concern to this day. The record contains numerous examples of Mr. Shah attempting to make good on under-deliveries when they were pointed out to him—long before this prosecution or *Wall Street Journal* article. *See* Shah Mem. (Doc. #756) at 9–11. Such evidence is far more consistent with a "well-meaning executive playing it close to the line" than the unrepentant fraudster the Government portrays Mr. Shah to be. *See* Gov't Mem. (Doc. #750) at 42.

16

Finally, the Government is simply wrong that Mr. Shah lacks remorse. *See id.* at 44. As the Court will hear from Mr. Shah directly at his sentencing hearing, Mr. Shah deeply regrets the problems at Outcome and his role in them. Mr. Shah's regret is compounded by the dramatic changes in his family circumstances that have occurred during the course of this case. Mr. Shah is convinced that the stress of this prosecution contributed directly to his father's death, for which he blames himself. And Mr. Shah is acutely aware that his young son, ■■, will grow up with a view of Mr. Shah indelibly shaped by the events of this case. Mr. Shah is determined to become a role model for ■■. That begins with accepting his ultimate sentence, meeting conditions imposed by the Court, and committing to an honest career founded on the values of integrity and hard work that Mr. Shah learned from his own parents.

### C. The Government's Evident Desire to "Send a Message" to Would-Be Fraudsters in Light of the Case's Publicity Is Not a Valid Penological Purpose

Shockingly, the Government argues that Mr. Shah should be sentenced to 15 years in prison because of how the public may perceive whatever sentence this Court imposes. It expresses concern that "a lower sentence could signal a lack of serious interest in holding corporate executives accountable" and worries that such a public reaction "could feed the perception that the powerful and wealthy receive preferential treatment in our justice system." Gov't Mem. (Doc. #750) at 46–47. The Government believes this concern is heightened by the fact that Outcome "was a well known company in Chicago and nationally" and the *Wall Street Journal*'s 2017 article "garnered significant public attention." *See id.* at 46.

Whatever arguable force the Government's concerns might have, they are not legitimate concerns for this Court under § 3553(a). The Sentencing Reform Act does not instruct courts to consider a defendant's notoriety in imposing a sentence. Nor does it countenance the Government's desire to make Mr. Shah's case into a cautionary tale for other corporate executives

17

as a legitimate penological purpose. Instead, § 3553(a) instructs the Court to impose a sentence that is "sufficient, but not greater than necessary" to achieve the specific legitimate purposes set forth in that section.

The Government's memorandum is unusually candid in expressing the Government's objective of making an example of Mr. Shah. But Mr. Shah is not an example. He is a human being, with a family, and a young son. The Sentencing Reform Act instructs this Court not merely to look at the seriousness of the offense as a general matter, nor to concentrate solely on deterring future criminal conduct, but also to the nature and characteristics of Mr. Shah as an individual. Indeed, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *See Gall v. United States*, 552 U.S. 38, 52–53 (2007). Giving proper weight to those consideration here, it is not "necessary" to impose a lengthy term of incarceration to serve any purpose of punishment under § 3553(a), especially when one considers Mr. Shah's relative youth, his unlikelihood of recidivating, and the steps he has already taken to compensate the institutional investors, lenders, and customers for the effects of the fraud, long before he knew of the Government's investigation. *Cf. United States v. Redemann,* 295 F. Supp. 2d 887, 896–97 (E.D. Wis. 2003) (holding that individualized consideration of defendant's circumstances warranted downward departure, including: (1) a restitution order stemming from a civil enforcement action, (2) adverse publicity in his small town, (3) soured relationships caused by his criminal conduct, (4) the injury to his business, and (5) the death of his wife, which was thought to be partially caused by the stress of the criminal investigation, all of which helped to serve the purposes of punishment, including deterrence).

## CONCLUSION

No one denies there was fraud at Outcome. And while Mr. Shah and his codefendants all maintained their innocence at trial, the jury found them guilty, thereby making them ineligible for acceptance of responsibility credit under the Guidelines (even though Mr. Shah has long accepted his moral responsibility to make right for the wrongs that were committed on his watch as Outcome's CEO). But while Mr. Shah and his codefendants have been found guilty of the offenses charged in the indictment, that alone is insufficient for Government to carry its burden of proving up the losses from those offenses. Not only does the Government fail to address the relative effect of other confounding factors and post-settlement developments on the losses experienced by any alleged victims; it also ignores any value initially provided or later returned to institutional investors and customers, as well as the value of any collateral supporting any loans on which it claims losses. Far more is required to substantiate a claim of loss that exceeds half a billion dollars.

Yet regardless of whether any of the Government's claimed losses are cognizable under the Guidelines, the economic and practical realities of this case make the Government's request for a 15-year term of incarceration far in excess of what is "sufficient, but not greater than necessary" to achieve any legitimate purpose of punishment. 18 U.S.C. § 3553(a). The value returned to institutional investors, the collateral held by lenders, the repayments and credits provided to customers both before and after the fraud was uncovered all distinguish this case from the typical fraud case in which victims have been left penniless.

Mr. Shah, meanwhile, contrary to the Government's portrayal, is not an unrepentant criminal nor a likely recidivist. Mr. Shah understands the gravity of the offenses of which he has been convicted and the mistakes he made that led him to this fateful day. Imposition of a lengthy prison term is not necessary to deter him or others from future criminal conduct, to protect the

public from Mr. Shah, or to provide restitution to victims. And imposing such a sentence would here in fact create unwarranted disparities with other similarly (or worse) situated defendants who have committed much worse offenses and received much lighter punishment.

Mr. Shah respectfully asks that the Court sentence him to a lengthy sentence of home confinement.

Dated: June 19, 2024     Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN LLP

*/s/ William A. Burck*
WILLIAM A. BURCK
1300 I Street N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
williamburck@quinnemanuel.com

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*

*Attorneys for Defendant Rishi Shah*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon all counsel of record by operation of the Court's electronic filing system.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN