IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,               )    Case No. 19 CR 864
                                        )
          v.                            )
                                        )
RISHI SHAH,                             )    Chicago, Illinois
                                        )    September 9, 2024
                    Defendant.          )    2:30 p.m.

    TRANSCRIPT OF PROCEEDINGS - Motion for Bond Pending Appeal
            BEFORE THE HONORABLE THOMAS M. DURKIN

APPEARANCES:

For the Government:     MR. MORRIS O. PASQUAL
                        ACTING UNITED STATES ATTORNEY
                        BY:  MR. JASON YONAN
                             MS. HAYLEY ALTABEF
                        219 South Dearborn Street, Suite 500
                        Chicago, Illinois 60604


For Defendant Shah:     HOGAN LOVELLS US LLP
                        BY:  MR. NEAL KATYAL
                             MR. WILL HAVEMANN
                        Columbia Square
                        555 Thirteenth Street, NW
                        Washington, D.C. 20004

                        BRYAN CAVE LEIGHTON PAISNER LLP
                        BY:  MR. RICHARD E. FINNERAN
                             MS. HANNAH DEMAND
                        One Metropolitan Square
                        St. Louis, Missouri 63102

Court Reporter:         ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                        Official Court Reporter
                        United States District Court
                        219 South Dearborn Street, Room 1432
                        Chicago, Illinois 60604
                        312.408.7782
                        Elia_Carrion@ilnd.uscourts.gov

                        *    *    *    *    *
                PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; defendant present:)

THE COURT: Okay.

THE CLERK: All right. This is Case No. 19 CR 864, United States v. Rishi Shah.

May I please ask the attorneys present on behalf of the United States to state their names.

MR. YONAN: Good afternoon, Your Honor. Jason Yonan and Hayley Altabef on behalf of the United States.

THE COURT: Okay. Good afternoon.

THE CLERK: And on behalf of Mr. Shah.

MR. KATYAL: Good -- good morning -- good afternoon. I'm Neal Katyal on behalf of Mr. Shah, along with Will Havemann and Rich Finneran -- Finnerman. And the defendant is present as well.

THE COURT: All right. Good afternoon.

All right. We're here on defendant's motion for bond pending appeal. I've gotten three briefs on it. I've read the briefs and ready to hear oral argument. I've scheduled out about an hour. Have you talked about -- I -- I assume the defendant's going to go first, and you can reserve any time you want for rebuttal. And each side should keep the other's time. I'm not going to keep track of it, so you can all keep track of your own time. And when you're hitting limits or if you think -- your cocounsel thinks you ought to stop so you have some reply time, I'm sure they'll tell you.

You may begin. You can do it right from the podium or from the seat, wherever anyone prefers.

(Counsel conferring.)

MR. KATYAL: Thank you, Judge Durkin. And may it please the Court, Neal Katyal on behalf of defendant, Mr. Shah, and I'd like to reserve five minutes for rebuttal.

THE COURT: All right.

MR. KATYAL: The standard for bail under Section 3143(b) is whether there's a substantial question on appeal and if the defendant poses a flight or safety risk. Mr. Shah amply meets that standard.

There's only one issue really in dispute today. The parties agree that there's no flight or safety concern, and they agree that the substantial question doctrine applies. The only issue is really, is there a substantial question? And as our brief explains, there are several, and they are independent ones from each other. The government has to run the table on each to deny bail pending appeal.

And to begin, let me just say that Mr. Shah appreciates all the care that this Court has shown over the course of his trial. And we do not today need to persuade you that he is right on his many appeal arguments. We just need to win that, in the words of the Seventh Circuit in *United States v. Molt*, at least one issue is close or, quote, very well could be decided the other way.

So the first of these issues is the Sixth Amendment. The government admitted it improperly restrained millions of dollars of Mr. Shah's assets. That deprived him of his counsel of choice. Notably, the government doesn't cite a single case, a single case where a conviction was sustained when something like this happened. And there are many substantial questions embodied within the Sixth Amendment, such as whether Rule 12 required Mr. Shah to bring his claims earlier, whether the opinion in *Luis* is controlling, whether ability to pay is even part of the *Luis* plurality opinion.

Now, as the Court instructed us last week, I'll spend the bulk of my time today on the Sixth Amendment issues. But I'd like to before turning to them just spend a moment on the other two lurking issues here.

One is the Fifth Amendment, because the government agreed that the testimony -- excuse me -- the government gave testimony that the Court said was, quote, not accurate. The Court excused that because it said that there was no single official that knew the government's restraint to be improper. We think that's not the right standard. There's at least a substantial question as to whether the right standard is a collective knowledge one, as it is in other Fifth Amendment context, like Jencks and *Brady*.

The other matter is the substantial 801 question. The Court admitted wholesale many pages of grand jury

testimony from the prosecution's three star witnesses, even though that testimony had been drafted by the government, that testimony was developed after the three witnesses had a motivation to lie. And the Seventh Circuit in *Echols* just found recently a violation in a very similar circumstance.

THE COURT: Sir, and I -- you weren't trial counsel, nor was Mr. Finneran, but that wasn't even a basis for a motion for a new trial. You know, I -- I didn't hear this argument until this motion for bond pending appeal came in. I -- I, of course, got objections at trial, but I would have thought, if this is a substantial question, there would be some indication in a motion for new trial that it was incorrect.

MR. KATYAL: Your Honor, I'm not aware of any precedent, and I don't think the government has cited any that says that when you are to consider a bail pending appeal motion and the question is, will this be a substantial question for the Seventh Circuit, that a defendant is obligated to bring that in a motion for a new trial --

THE COURT: Fair enough.

MR. KATYAL: -- as well.

THE COURT: But I think you can see the logic of, if this was a big deal and a big error --

MR. KATYAL: But --

THE COURT: -- it -- it would have been preserved in

a motion for new trial.

MR. KATYAL: Well, Your Honor, it's certainly preserved for purposes of appeal, which is the only standard. And I will say, there is objection after objection based on *Tome* and 801 throughout the trial. I wasn't here, but I did read the relevant pages of the transcript and they're replete in many, so I don't think that the government is surprised in any way that this argument is made -- is being made --

THE COURT: I was.

MR. KATYAL: -- and -- well, it certainly, I think as the case goes to the Seventh Circuit, there's many circumstances in which an argument wasn't made and a new trial motion made before, particularly because, as you did, you did rule substantively on it, and so it may have been futile to bring it up once again at that stage.

But for -- be that as it may, our central point to you is the Supreme Court in the *Tome* case was really worried about a circumstance in which out-of-court statements are being introduced by -- by a witness and changing the focus of the testimony and the whole notion of the trial to what's happening out of court, rather than what's happening in court. And that's particularly true here where these are the three star witnesses. You yourself said their testimony all went to the central issue in the trial, which is Mr. Shah's *mens rea* and his knowledge.

THE COURT: And I considered the *Tome* case when I ruled but, so be it.

MR. KATYAL: Correct. And -- and -- you know, again, and our only point to you -- and I'll say this many times today -- I'm not here to try and persuade you you were wrong. We certainly appreciate so much all the care you -- you -- you showed throughout the trial in dealing with *Tome* and the other issues. We do think, though, for the relevant question here is, is the issue close? Could it come out the other way?

The Supreme Court in the *Thompson* case says: We don't need to even persuade you that we're -- that we're probably right on appeal. We just need to persuade you that there's a novel issue here. And we think that there is for each of these three issues.

And maybe I'll go back, following your instructions, to the Sixth Amendment questions.

So we think that there's at least four substantial questions on appeal here, any one of which would be enough for bail pending appeal. One is whether Mr. Shah's inability to pay is relevant to the *Luis* decision. *Luis* only says that when a defendant has funds to pay counsel outside of the funds that are forfeited, then there's no Sixth Amendment violation.

So that's a circumstance in which the defendant has too much money. The contrast here is to -- what -- and what you said was, Mr. Shah may have had too little money. That's

not part of the *Luis* test. It appears nowhere in there. And we think for good reason. So that's Issue No. 1.

Issue No. 2 is the Court's findings about timeliness and whether Rule 12 and other things required Mr. Shah to bring this argument about the Sixth Amendment earlier. And we think legally he was just not -- would -- not -- not required to do so, particularly in a circumstance in which the government didn't reveal the tracing problems until mid-trial.

THE COURT: The -- are you familiar with the *Jones* case? Judge Hamilton seemed to indicate that this is something that needs to be brought at the earliest possible moment if there's an issue relating to restrained assets that shouldn't be restrained, improperly restrained assets that are needed to pay for counsel. And judge -- in the *Jones* case, the Seventh Circuit seemed to indicate that is -- you can't sit on that; you can't wait.

MR. KATYAL: Yeah, so certainly, we do not think that we sat on it. So we think that, you know, that -- that what -- what Mr. Shah was told and what his lawyer Burck at the time had was a grand jury statement in which the government said that they were going to restrain all right, title, and interest. That's what they told the grand jury. That's what they did; they restrained all right, title, and interest.

And it was only many years later that they revealed,

well, actually, their theory of the fraud wasn't to restrain all right, title, and interest, but something far narrower than that. And --

THE COURT: Well, the theory of the case was known from the start. I know Mr. Burck thought that he had conversations with AUSA Madden that indicated that the entire company was founded on fraud and all proceeds of the -- anything anybody got from -- by way of proceeds from the company were fraudulent.

But that can't have been the knowledge of defense counsel once the grand jury testimony was turned over, the witness statements, the various meetings that occurred after that. I -- I -- it was pretty clear the -- the fraud related to -- you know, pharma fraud, some -- not -- not the entirety of the company was based on fraud, but a portion of the pharma proceeds were obtained through fraud, and then the lender fraud and the investor fraud.

MR. KATYAL: I --

THE COURT: I just don't think it was -- there was a point where all the way until right before trial or even after trial that it was discovered that there were -- the government was not claiming the entire company was fraud -- fraudulent.

MR. KATYAL: So, Your Honor, I -- I understand what you said and, you know, again, all I have to do is persuade you that the Seventh Circuit --

THE COURT: Right.

MR. KATYAL: -- will find a substantial question. And here's why we think that they would. It's two buckets of reasons. One is, we think that Shah and his counsel were absolutely entitled to take the grand jury indictment on its face, which was broader than that. It was all right, title, and interest. And, of course, that's what the government did. It was not just what they said; it is what they did. They took --

THE COURT: Well, that's the forfeiture allegation, but the indictment itself made clear it's not the entire company was -- everything they did was fraudulent.

MR. KATYAL: I don't think that there -- that that language is in the indictment, that not everything you did was for -- was -- was -- was a problem and was -- was fraudulent. And after all, what they did in forfeiture is what Mr. Shah and his counsel knew at the time, which is they sought to restrain all right, title.

And it's -- I think absolutely if the government thought that that was ultimately too broad language, it's under their -- they have an obligation to correct that grand jury testimony. Until they do so, I think it's absolutely appropriate for us to take the language at its word.

Now, you said, well, there was testimony in the

grand jury by Poelking which might have revealed -- which revealed a narrower theory. I don't think that -- I've read that grand jury testimony pretty carefully. I don't think that that grand jury testimony anywhere says that the government's forfeiture theory or their fraud theory is limited to just the first two categories, which were the two loans and the private equity stuff. It doesn't ever displace any allegations of pharmaceuticals or anything like pharma fraud or anything like that. And I think it contradicts the face of that right, title language.

Now, look, if this language weren't in the -- in the indictment and the forfeiture about right, title, and interest, I think it would be a very different case. But in the circumstance in which you've got, at best, ambiguous grand jury testimony and a very clear statement by the government that they are seeking all right, title, and then they do that, they actually live up to what they're saying, that to me is why I think the obliga- -- you know, that -- that the -- the -- the complaint was made at the earliest available time.

THE COURT: It didn't dawn on over the 3- or 3 1/2-year period that -- that this was pending before the trial, that Mr. Shah said, wait a minute, there's a lot of the money they've frozen that was there before the allegations, the -- the -- before the allegations of the indictment about

fraud occurred? I would have thought Mr. Shah would say, wait a minute, some of that money shouldn't have been frozen because that was earned or money that I had before they've said this -- the company was engaging in fraud.

MR. KATYAL: So I think that there's two answers to that that make this is a substantial question for the Seventh Circuit. One is that it's not a question of Shah owning the dollars or looking at his bank accounts or something like that. The question is, what is the government's theory of fraud? The government was the one that had the best knowledge of that.

And I think that this kind of thinking gets the whole thing backwards. Yes, it's Shah's assets, but it's the government's theory, and it's the government's theory that led to the restraint. And Mr. Shah couldn't know the government's theory to be a narrower one than right, title, and interest. That's what the government said. They never corrected it; they never changed it. I'm not aware of government behavior that's typically like that. I mean, normally, of course, prosecutors come forth and they say, oh, well, actually, we did -- you know, our theory is narrower, we made a mistake, something like that.

And that's my second point to you. In answering -- in asking the question, did we bring this at the earliest available time, I think it's really notable, and I think the

Seventh Circuit would see it this way, that their standard -- they're trying to hold us to a standard they themselves didn't meet. They had access to every bank account, every financial transaction of Mr. Shah, and it took them years to come forth and say, oh, we made a mistake; we improperly restrained a number of assets.

And so when the Seventh Circuit is thinking about this question of forfeiture and whether or not we raised it in time, you know, they had access to everything we did, plus they had access to their theory of the case, which we didn't. All we could do was read the face of the indictment and the face of the forfeiture allegations, which the grand jury swore to, and that sought restraint of all right, title, and interest.

THE COURT: I thought there were a series of requests -- and I have to go back to the docket -- but a series of requests for a bill of particulars, which I denied, but I did tell the government they needed to delineate -- they needed to notify the defense of which campaigns they thought were -- pharma campaigns were fraudulent, where there was overbilling or under-delivery, because there were a large number of campaigns the government never alleged were fraudulent. And certainly, they -- they chose the campaigns they were going to prove up because the volume of paper for each of these campaigns was extraordinary.

MR. KATYAL: Look, if the government at any point came to us and said, hey, you know, we've restrained more, that, you know, that our pharma theory is more limited or we're not trying to restrain firm assets, of course we would have brought the motion. Indeed, we brought a motion on Sixth Amendment counsel of choice before you in January 2020 for a different thing, about settlement --

THE COURT: Entirely different. Agreed.

MR. KATYAL: Right. No, no, but my point to you is, you know, to the extent, okay, there are cases like *Jones* that are concerned with forfeiture and so on, there are cases in which the worry is a strategic sandbagging of the prosecution in which you're holding back an argument. You actually got the counsel of choice you wanted or good enough counsel, you're happy, but you're saving that argument in reserve until after you're convicted.

This is not that case. This is a circumstance in which, actually, Mr. Shah hired a counsel that he wanted of choice, Mr. Burck. That counsel had to withdraw because of the government's seizure of the money. And before Mr. Burck withdrew, he filed that motion. He tried to do what he could. He was highly incentivized, of course, to investigate and do the tracing analysis that the government wanted him to do, because that's what would have allowed him to stay in the case. He didn't do that. And that -- the reason is because

he was told a certain theory -- the indictment was -- told a certain theory of what the forfeiture was: all right, title, and interest.

Now, could you go back in, you know, retrospect and look at all of the financial transactions and come to a different conclusion? I think the government certainly could've, because they knew their theory of the case and it being more limited, but Shah and his counsel at that point couldn't.

And indeed, remember, the Supreme Court in the *Kaley* decision says, you can't file pretrial challenges to a government's theory of fraud. So there wasn't really an opportunity for us to do more.

I suppose you could adopt a rule, a legal rule that says, in every case you've got to go and interview standby counsel and you've got to try and, you know, interrogate all of the bases for a government's forfeiture even if you don't have any information that their theory may be more limited than the one that they presented to the grand jury. But that I don't think any Court has ever said.

THE COURT: No, that -- that would be unreasonable.

MR. YONAN: Your Honor, if I just may chime in. I -- I believe it was 15 minutes a side. I may have it wrong, but it has been longer than 15 minutes. If you want to give more time, I understand, but --

THE COURT: Did I? I thought it was an hour total.

MR. YONAN: Okay. Very good. I thought that was 15, but fair enough.

THE COURT: All right. What does everyone else remember?

MR. FINNERAN: You said an hour a moment ago, so I assumed we were getting an hour --

THE COURT: Well, we'll give you an hour. This is -- the briefs are substantial and I'd benefit from the argument, so you can each have half an hour, unless -- if you can't fill it -- I'm confident you'll both be able to fill it.

MR. KATYAL: Okay. I'm sorry to say, Your Honor, I probably could fill it.

THE COURT: Yeah. Go ahead.

MR. KATYAL: So -- you know, so our point to you is there are times in which we can understand the Court's concern about forfeiture being -- the reason it would strategically guard against certain circumstances. This is just really far from that. This is a circumstance in which the indictment said one thing, the government acted that way. I think now they've come forth and said, well, we made some tracing mistakes. But the very fact that it took years for them to do that I think really illustrates I think the problem here.

THE COURT: I thought the -- and going back to some of the findings I made, the June 30th date as the date where

we talked about whether or not Mr. Shah could afford Mr. Burck, didn't seem to be a lot of pushback from that -- from Mr. Burck or -- when he testified.  He viewed that as a reasonable time for Mr. Shah to try and find counsel, which is why we used that date as the benchmark for what --

MR. KATYAL:  Yeah --

THE COURT:  -- what he had available, Mr. Shah had available to hire counsel that he could afford as of that date.

MR. KATYAL:  Yeah.  So that's a whole separate set of issues, and I'm happy to get to them, but I just want to make very clear that right now we're just talking about whether that there is a way -- a forfeiture issue or a timeliness concern --

THE COURT:  Right.

MR. KATYAL:  -- and we think that's one substantial issue.  There's a separate substantial issue about whether Shah could've afforded Mr. Burck and the surrender date and could he raise the funds by that time.

And maybe just before doing that, I want to complete the forfeiture stuff and just make one final set of points and then get into the questions about June 30th.

And that is this:  As the case goes to the Seventh Circuit, even if you are right about everything we have been talking about for 15 minutes and Mr. Shah didn't bring this up

at the earliest available time, we think that there's a substantial question, to put it mildly, as to whether that kind of structural error in which the government's seizure of assets deprives Mr. Counsel of his counsel -- deprives Mr. Shah of his counsel of choice is the type of structural error that will be governed by plain-error review.

And we get there in two ways. Number one, the Supreme Court in the *Gonzalez-Lopez* case said, when there's a deprivation of counsel of choice -- not deprivation of counsel, period, in absolute wholesale -- but just deprivation of counsel of choice, that is inevitably a structural error.

And then second, we think that structural errors, as the Supreme Court indicated in the *Greer* case, are ones at which are, if not plain, almost certainly get you very close to plain error and subject to automatic reversal.

THE COURT: What about the fourth prong of the plain-error review where you look at whether or not basically the defendant got a fair trial? Is that contrary to -- does *Gonzalez-Lopez* take that out of the equation?

MR. KATYAL: We do think so, yeah. So *Gonzalez-Lopez* says -- and this is the language of it -- quote, where the right to be assisted by counsel of one's choice is wrongfully denied, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. Deprivation of the right is complete when the defendant is

erroneously prevented from being represented, regardless of the quality of representation he received because the consequences are necessarily unquantifiable and indeterminate, it unquestionably qualifies as structural error.

That is as powerful language from the Supreme Court as I've ever seen. And so, yes, when you get to the fourth prong, or when the Seventh Circuit were to get to the fourth prong, we think this is plain error.

And that's -- you know, it's notable again, the government hasn't cited a single case ever in which this kind of improper seizure of assets happened and the Court said that was okay. And it's --

MR. FINNERAN: You're four minutes -- you're four minutes from your rebuttal time, just so you know.

MR. KATYAL: -- and so we think that's the substantial question on appeal.

Just briefly on the June 30th question. We think that even if June 30th was -- we do think there was some pushback, but regardless, the June 30th date could have been -- even if Mr. Shah hadn't sold the assets by June 30th and had to sell them later, as the Court found might have happened, he could've brought Mr. Burck on as secondary counsel at that point. But the government's seizure of $10 million improperly of Mr. Shah's assets precluded him from doing that, and that deprived him of his counsel of choice.

20

THE COURT: Okay.

MR. KATYAL: Thank you.

THE COURT: All right. Thank you.

(Counsel conferring.)

MR. KATYAL: If the Court -- sorry. I thought I was in my rebuttal time. If the Court has any other questions. Otherwise, I'll just save it for rebuttal.

THE COURT: There was some suggestion that there was a request -- at least Mr. Burck talked about another counsel, Mr. Bennett, down in St. Louis coming on. That was never developed. We never heard from Mr. Bennett; we never heard from Mr. Shah. He has no obligation to testify, of course, but we never heard that but for Mr. Burck, that Mr. Hueston was his last choice, and that the other counsel that he wanted to get, that didn't get developed at all during the many hearings, many hearings we had on this. So I was surprised to see that.

And the fact -- I think there was a comment that Mr. Hueston has never defended a criminal case before. I find that irrelevant. He was outstanding, and he certainly is a good trial lawyer, whether it's on the prosecution or defense side or civil cases. But I -- I didn't understand from the theory of the defense until I got the brief that they had another lawyer they wanted to try and bring on if Mr. Burck couldn't -- they couldn't afford Mr. Burck.

MR. KATYAL: So -- so let me say three things about that. Number one, Your Honor, to the extent this Court is in any of its reasoning is motivated by, you know, Mr. Hueston being a good lawyer, *Gonzalez-Lopez* and *Kaley* both forbid any kind of analysis like that. You never look to prejudice or anything like that.

THE COURT: Right.

MR. KATYAL: Second, I think the government itself admits that the -- that the Bennett testimony was somewhat developed at page 6 of its brief. It's talking about it. And it's certainly, we think, developed enough for purposes of making a Sixth Amendment claim. After all, *Luis* itself never even talks about ability to pay or ability to find some other lawyer. That's just not in there. The question under *Luis* is, is there a deprivation of the fair opportunity to hire a counsel of choice?

And I don't think it is our burden --

THE COURT: Doesn't that include the ability to hire counsel, the financial ability to hire counsel of choice?

MR. KATYAL: It's nowhere in *Luis* that it -- that says anything like that. And I think, you know, for good reason. If you think back to like how the way the Chief Justice started his dissent in *Kaley*, it's a logical inference that whatever dollar someone has and they're facing the mighty resource of the federal government in a criminal

case, they're going to spend it on their defense.

This is what the Chief says. He says: An individual facing a serious criminal charge brought by the United States has little but the Constitution and his attorney standing between him and prison, he might readily give all he owns to defend himself.

And here --

THE COURT: If all he owns isn't enough to hire F. Lee Bailey in his prime, that can't be a constitutional deprivation if you don't have the money to hire somebody.

MR. KATYAL: The question again is not F. Lee Bailey, but just do you have money and funds that could have been used to hire someone else. That was Mr. Shah's claim, that he could've done that. It might have been Bennett. He also interviewed many other lawyers as well in his --

THE COURT: Which was news to me.

MR. KATYAL: Well, it may have been news to you, but that's, again, not I think something that is required by the *Luis* case for them to come forward and put forth evidence that they had interviewed other counsel.

I mean, if anything, that would make that -- make every defendant have to go and interview people on the theory that maybe one day the government is going to confess error about their forfeiture and then you'd have a record developed at that point of who interviewed what -- and, you know, who

was willing to do what, at what dollar amount, and so on. And I just think that's just never been the standard under *Luis*. And if the Seventh Circuit -- if this goes to the Seventh Circuit, I can't imagine that they would say that what Mr. Shah did here wasn't enough in terms of developing a record.

He hired a counsel, Mr. Burck. Mr. Burck was willing to do it, and then had to withdraw once the government seized those funds. We think that's certainly enough for *Luis* under the plurality. It is 100 percent enough under Justice Thomas's separate opinion, which we think is controlling and a separate question for why there's a substantial question here, so --

MR. FINNERAN: You're in your rebuttal now.

MR. KATYAL: -- so -- so we think all of those are different reasons why there are substantial questions on appeal.

THE COURT: All right. Thank you.

MR. KATYAL: Thank you.

THE COURT: All right. Let's --

MR. FINNERAN: 4 minutes and 42 seconds remaining.

THE COURT: Okay.

Let's hear from the government.

MR. FINNERAN: 4 minutes and 32 seconds remaining.

THE COURT: Okay.

MS. ALTABEF:  Good afternoon, Your Honor.

I want to start by setting the table a little bit about the standard that we're talking about today.  We're talking about 18 U.S.C. 3143(b).  That is to ensure that postconviction bail for defendants who are seeking appeal is the exception and not the rule.  In order to make that standard, you have to prove that there is, one, a substantial question on appeal; and two, that that substantial question is likely to result in a reversal or in a new trial.

Here, the government contends that the defense cannot prove either of those prongs for the three areas that they have suggested so far.

I'm going to focus my argument and start with the Sixth Amendment.  I know that's where the Court asked us to focus our efforts, and I will then pivot to the other two arguments later on.

THE COURT:  All right.

MS. ALTABEF:  I think at the start, the defendant has not raised a serious question regarding his Sixth Amendment right to counsel.  You acknowledged this in your decision previously that the Sixth Amendment only guarantees you the right to hire an attorney that you can afford.  It does not guarantee you the right to hire an attorney that you do not have the money to pay for.  Nothing about *Luis* changes that analysis.

25

I know that the defense has argued today and somewhat in its briefs as well that perhaps the Thomas concurrence means that ability to pay is not an issue. That is not a substantial question for review because -- for two reasons:

First, it's not relevant to this case. In this case, you've already made an evidentiary finding that Mr. Shah could not afford his first counsel of choice, Quinn Emanuel. Because of that, regardless of whether, you know, he had the money or not -- or regardless of whether we are -- I apologize. I lost my train of thought. We're going to get it back.

That -- so we don't actually -- we don't have to go down this road of what is the plurality versus the concurrence and what do they talk about here in terms of ability to pay, because we know that's the background rule. That's what you found as the background rule in your memorandum opinion.

For what it's worth, it's also what the Seventh Circuit indicated is the correct rule in a previous case where they said that the rule was cabined by the money that you'd need for an attorney.

THE COURT: Was that the -- the *Jones* case or a different --

MS. ALTABEF: I'm actually referring to another case. Balsiger, 910 F.3d 942.

THE COURT: Okay.

MS. ALTABEF: 942.

And in that case, the Seventh Circuit characterized the *Luis* holding as pretrial restraint of legitimate, untainted assets needed to retain the counsel of choice violates the Sixth Amendment.

THE COURT: All right.

MS. ALTABEF: The government has argued that in the Thomas concurrence the correct reading, which you have also acknowledged, is that we are still cabined by the ability to, you know, afford to pay that attorney.

I think that if we take the counterfactual and go on sort of the thought experiment that the defense is having us go on by saying that perhaps Thomas is saying that any pretrial restraint of assets violates the Sixth Amendment, or any unwarranted restraint of pretrial assets violates the Sixth Amendment, then I think we inevitably back into a different issue for the defense. And it's an issue they didn't talk about. It's an issue of who is controlling here if we are going to consider this the plurality and the concurrence, which is the narrower opinion.

If we accept the defendant's view that Thomas is saying that pretrial restraint violates the Sixth Amendment in every instance in which they are restraining untraceable funds, we're now creating an absolute blanket policy. The plurality doesn't do that. The plurality says in a certain

subset of those cases, we would have a Sixth Amendment violation.

To me, it's very clear that the plurality, not the concurrence, is the more narrow finding. And, therefore, even if we are going to read Thomas's concurrence the way that the defense has asked us to, we still don't get to a substantial question because his holding doesn't control.

I also wanted to point out that you have made this evidentiary finding that, you know, regardless of the overrestraint, the defendant did not have the money to hire Quinn Emanuel. In its argument and also in its briefing, the defense comes up with multiple ways that, you know, they are attempting to scattershot into what that is, but the fact is it's an evidentiary ruling on your part. It is going to be difficult for a -- an -- an appellate court to overrule that based on the standard that evidentiary rulings get on appellate review, and based on the fact that you were here and heard days and days and many, many people's testimony regarding that.

THE COURT: What about the defense's argument that there are no cases like this where -- I mean, the government -- I made clear in the opinion, the government overrestrained assets that were not traceable to the fraud. You admitted it. The government admitted it themselves. That's fairly unprecedented. And then layer on that the issue

of whether those funds could have been used for an attorney of choice.

Are you aware of any cases like this where the courts have addressed the issue at all?

MS. ALTABEF: I'm not aware of any specific case that, you know, tracks those exact facts, but I do think that there are cases that are cited within both the government's briefs and in your memorandum opinion that shed light on it.

I think *United States v. Lindell* is one of those cases, that's the Ninth Circuit case, in which the def- -- in which the defendants forfeited their argument to pretrial restraint of funds because they did not bring it up until after trial. While the specifics of that may be different -- you know, the specifics of the circumstances in *Lindell* may be different than those here, I think that the same analysis regarding a standard of review applies.

THE COURT: Well, I -- I'm not revisiting -- as defense counsel noted, this is not a motion to reconsider.

MS. ALTABEF: Uh-huh.

THE COURT: This is just a question of whether or not there's enough of a substantial question to raise that satisfies the requirements of the statute to allow for bail pending appeal. I'm not reconsidering my decision. I think it was a correct one, but that -- that's not ultimately the decision today.

So how do you address that? They -- they -- it's -- the reason I raise it is it sure seems on its face, at least, there's -- there's a substantial question of law being raised here when there's no other cases analogous to it.

MS. ALTABEF: I think there is an academic question that is raised here about how we interpret *Luis*. I don't think that this case applies. And I think that's for the very reason that you've already found regardless of what can -- you know, regardless of whether we accept the concurrence or the plurality, the defendant didn't have the money to pay for Quinn Emanuel. We know that. You've made that evidentiary finding.

We also know that when the defendant did get the money in August of 2022, I believe he received a $12 million influx in -- in funds, he still didn't choose to reach out and rehire Quinn Emanuel or bring them on as additional counsel.

Because of the facts of this case, I don't think we reach those broader legal -- legal questions. There may be a case that's appropriate for that, but this isn't that case.

THE COURT: All right.

MS. ALTABEF: I did also want to touch on the standard of review. I don't think there's a substantial question here about whether plain-error review applies or automatic reversal applies. I know that the defense made mention to the *Greer* case and relied on that in its briefing

as well. *Greer* does say that there is a structural error that mandates automatic reversal in certain cases. It, however, does not apply here, because there was none of the forfeited analy- -- there was none of the analysis about forfeiting or waiving an argument over time. That's what differentiates us from *Greer*, and that's what puts us in the realm of plain error.

THE COURT: But in light of the *Gonzalez-Lopez* case, even if it's plain error, isn't this a structural error? If -- if an error occurred, isn't it a structural error and, therefore, the issue of whether or not a fair trial occurred is not -- the fourth element on a plain-error review is not really applicable?

MS. ALTABEF: I agree that if we are -- you know, based on *Gonzalez-Lopez*, it is likely we would categorize this as a structural error. I don't think that that means that Elements 3 and 4 of the plain-error analysis collapse into one. That would not make any -- any sense if we were going to say this was under plain-error review. But the plain-error review essentially leads to automatic reversal if you're going to say that there is no element for -- for this particular structural -- you know, for this particular structural claim.

I think we also know based on the *Johnson* case in the United States Supreme Court that the seriousness of the claimed error does not remove consideration of it from the

ambit of the Federal Rules of Criminal Procedure.

I don't think it's the case that we automatically get rid of Element 4 simply because we have a structural error. And I think that, you know, that is -- when we do the analysis on Element 4, it's very clear that there was no miscarriage of justice here. The defense received very good representation, as you have said multiple times. And because of that representation, we don't have anything akin to a miscarriage of justice or akin to a situation where, you know, someone who was likely innocent is, you know, going to be unfairly subjected to prison time.

THE COURT: Okay.

MS. ALTABEF: Okay. I wanted to address a few other items, sort of the specifics on the Sixth Amendment issue, in particular regarding the other attorney's argument. From my understanding and review of the case, this is, you know, the first time that the defense has argued that they could -- that some hypothetical third-party attorney could come in and be the choice of counsel. I think that defendant's representations that they developed a record on these other counsel options is absolutely incorrect.

Based on my review of the record, there's about three emails that speak to this. There's an email between Mr. Burck and Mr. Shah when Mr. Burck passes along to Mr. Shah the names of three potential counsels. Mr. Shah acknowledged receipt of

that. But there's nothing in the record that tells us that he followed up with any of those people or considered them. There's also nothing in the record that tells us that those people would or would not have represented him for the amount of money that he had.

THE COURT: Well, I agree. I -- I raised this with opposing counsel. I -- I just don't think there was -- I -- I was surprised. I know there was some mention of Mr. Bennett, but I don't know what Mr. Bennett would have taken to represent Mr. Shah. He said -- he gave a figure he thought was too low, but I don't know what he would have taken to represent Mr. Shah, and I didn't hear from either Mr. Bennett or Mr. Shah on that issue, and so I -- I viewed this as a trying to get Mr. Burck to represent him, he couldn't afford him, and then he got Mr. Hueston. And that -- that was the evidence I was presented.

MS. ALTABEF: Understood.

I think that that is, you know, the analysis that we've come down to as well. And the idea that it -- you can -- the idea that the question I believe that the defense said is the question they're bringing to you is whether there's some other counsel who could've done this. I don't think you can answer that in the hypothetical that there might have been some other counsel somewhere. I think the record has to tell you, or at least strongly indicate, who that would

be and that they would have fit the bill.

Regarding --

THE COURT: Well, and actually -- you know, Mr. Hueston was just as expensive, ultimately, as Mr. Burck. It's just a matter of the kind of money or the form of the money or the timing of the money that Mr. Burck, understandably, didn't want to risk versus Mr. Hueston agreeing to take proceeds that were going to be developed that were going to be obtainable in the future. That's how I saw it, anyway.

MS. ALTABEF: And I -- I think that that's indicative in Mr. Burck's testimony as well, that he wasn't going to take, you know, proceeds from illiquid funds.

And, you know, in the memorandum opinion and through your evidentiary holding you've also said that those were too speculative upon which to rely in order for Mr. Shah to make out a claim that he could actually afford Quinn Emanuel or any other counsel that was going to request that much at that time.

I do want to briefly touch on the other two issues. But before I do, please let me know if there are other questions I can answer regarding the Sixth Amendment.

THE COURT: I always interrupt, so keep going. I'll interrupt if I have any questions.

MS. ALTABEF: Okay. Regarding the Fifth Amendment

issue, I think that this has been briefed pretty substantially already, that, you know, the Court has held that the government did not knowingly present false testimony. That is the standard here for what would amount to a Fifth Amendment violation. I think the defense's attempt to apply a collective *Brady/Giglio* standard to this fails for a few reasons. First, because *Brady/Giglio* is meant to impose an affirmative obligation onto the government to produce exculpatory evidence. If the government fails that obligation, it could fail that obligation in bad faith or not in bad faith. The bad faith element doesn't matter. It's an obligation that the government collectively holds.

What we're talking about here with a knowing presentation of grand jury evidence is one individual person in the grand jury knowing that what she or he was saying at that time was false. That does not graft on to a collective obligation like they think it does. It also doesn't make sense based on the rationale behind *Brady* and -- and *Giglio*. There isn't an information asymmetry here. I know that the defense has really emphasized that because we had the theory of the case and they allegedly didn't until 2023, there was an asymmetry.

THE COURT: Why don't you address that. I -- I thought the theory of the case was pretty evident once discovery was turned over, which was early in this case. And,

in fact, I think it was turned over during -- primarily during Mr. Burck's brief tenure in the case, but certainly well -- very early in the lifespan of this case. And I would have thought the theory of the case could be discernible from the discovery.

MS. ALTABEF: The government completely agrees. The discovery --

THE COURT: Well, I know you agree --

MS. ALTABEF: We agree --

THE COURT: -- but why don't you point out why that would be true.

MS. ALTABEF: Yes.

THE COURT: Why is it something they could've recognized as the theory of the case that this was not one total fraudulent company, but it was a company that operated, made legitimate income, but then was cheating on some of the customers -- with some of the customers, and then, ultimately, cheating and misrepresenting their financial status to investors and lenders.

MS. ALTABEF: I think that you can really see that when you look at the grand jury testimony itself. I know the defense said that the grand jury testimony -- they claimed it was ambiguous. It was not ambiguous regarding what items were subject to forfeiture. The testimony of the accountant specifically references the items that are subject to

forfeiture and it references the dollar amounts associated with each -- with each of those specific items.

To me, that doesn't leave a lot of room for ambiguity. I also think that defense is in a difficult position to argue that they couldn't possibly have figured out the theory of the case, precisely because Mr. Burck admitted he didn't even read the grand jury testimony. So to the extent they had that information available to them in January or February of 2020 and chose not to engage with it, that doesn't appear to -- you know, that isn't a reason to allow such a belated Sixth Amendment claim.

THE COURT: Okay.

MS. ALTABEF: Also, on this point regarding the Fifth Amendment, I think it's important to really note that we have no due process violation here because the inaccuracies we are discussing are the inaccuracies in the forfeiture piece. They are not inaccuracies in the elements of the offense charged. And in order for there to be a due process violation, there would have to be a violation that would actually prove that the jury's decision to indict was substantially influenced by the testimony that was inappropriately before it. The amount of assets on the forfeiture piece simply doesn't go to what Mr. Shah was indicted on.

Finally, regarding the grand jury statements, the

grand jury statements, regardless of sort of the rehashing of them, you've already issued multiple rulings on these. I don't think we need to go into it. But for purposes of what we're talking about today, I think it's important to note that that's a discretionary decision on your part. That will be -- that will be reviewed for abuse of discretion at the appellate level. That is a very high standard. And regardless of minds differing, that doesn't present a substantial question when we're dealing with that standard.

THE COURT: Well, that's why I asked the parties to focus on the Sixth Amendment issue, because I don't think an evidentiary ruling where I issued brief written rulings and -- at least creates a substantial question. I could -- Seventh Circuit could find I abused my discretion, certainly. They -- they -- but I don't think on its face that's a substantial question. I think the -- nor do I think the collective -- the idea of collective knowledge standard for a Fifth Amendment issue, when it deals with forfeiture, not with the substance of the case, there's no railroading, no use of false testimony to get somebody indicted. This deals with the forfeiture. The -- the -- in my mind -- and it's no surprise -- it's the Sixth Amendment issue is the critical one.

MS. ALTABEF: Uh-huh.

THE COURT: The government messed up. You know it, you admitted it. And the question is whether that creates a

Sixth Amendment violation that should've resulted in a -- my granting a motion for new trial or dismissal. I found that it did not, but did that create a substantial question. That's the issue of today, and that's the issue you've all briefed very well, so...

But I have no more questions of the government, unless there's anything else you want to check with Mr. Yonan.

MS. ALTABEF: I would like to check with him really quickly.

THE COURT: Go ahead.

MS. ALTABEF: Thank you.

THE COURT: Sure.

(Counsel conferring.)

MS. ALTABEF: No, nothing further at this time.

THE COURT: All right. Thank you.

MR. KATYAL: I'd like to begin with the Court's statement about the Sixth Amendment. Quote, on its face there's a substantial question of law. There are no cases analogous to this.

The government's answer to this was, quote, I'm not aware of any specific fact -- any specific facts or cases like this, but there are cases that shed light on it. And the cases she cites are *Lindell* and Balinger. *Lindell* is miles away from this case. Balinger is just a quote from the *Luis* decision. Neither of them are anything like this, and that's

why there's a substantial question.

Now, my friend began her argument by saying that the Sixth Amendment only guarantees, as she put it, a right to hire an attorney you can afford. That itself is a substantial question. The *Luis* decision says nothing like that. There's no precedent that says that. I understand it might be something that courts one day will adopt, but it is certainly not the law right now. The relevant language in *Luis* is a circumstance in which a defendant has too much money and so there's deprivation of a right to counsel, not too little. It's at least novel and a substantial question by definition.

And it -- that standard that the government poses would be unreasonable. It's logical that a deprivation of $10 million is going to deprive someone, to use the language of *Luis*, of a fair opportunity to select the counsel of their choice. This is not just about Bill Burck. It's about that -- their depravation of counsel.

And that is why, Your Honor, it is not our burden to show Mr. Bennett or anyone else would have taken the case for a certain amount of money. The relevant language in *Luis* is just the deprivation of a fair opportunity -- fair opportunity to hire counsel of choice.

THE COURT: Doesn't the -- I think it's a quote from Justice Thomas's concurrence where he says -- he's quoting *Wheat*: A defendant may not insist on representation by an

attorney he cannot afford.

How does that square with the idea that any improper freezing of money that could be used to pay for a lawyer is a Sixth Amendment violation?

MR. KATYAL: It could -- well, I think if -- if it were a circumstance where he absolutely couldn't afford any lawyer, something like that, that would be one thing. But here, when you're talking about a large pot of money, $10 million, yes, it stands to reason that that $10 million is going to be helpful in hiring a counsel of choice.

Now, you said, well, maybe then you'd have to make a record of that at the trial court and so on before trial. That is I think an unreasonable burden for a defendant to have to do. It would mean that a defendant would have to guess that the theory of fraud might change down the road and interview people and -- and the like.

And here, the indictment said all right, title, and interest. And that's why it makes it very unlike the *Jones* case, which you started the argument with. We had no access to the government's theory of fraud.

THE COURT: And I'll give you a different issue, though, but the -- the reference to $10 million being frozen, that -- in the end, that's not what was found to be the amount that was improperly restrained.

MR. KATYAL: Or 4.9 million. Whatever -- you know,

it's a large amount of money.

THE COURT:  It was a large amount of money --

MR. KATYAL:  Yeah.

THE COURT:  -- for all of us normal people, but it's -- it -- we're not up at $10 million.  I thought that -- maybe that was what the government originally said, but then they clawed back some of that.  And -- and really, the analysis is what was --

MR. KATYAL:  Boy --

THE COURT:  -- improperly frozen.

MR. KATYAL:  -- and by the way, the fact that the government kept on switching its tune, even after they admitted the mistake, underscores why we acted reasonably and brought the stuff up the first opportunity that we could.

They couldn't even figure it out.  And when they made a mistake, they made a mistake about the mistake and the like. And that's why we think we did raise it at the earliest available time --

(Indiscernible crosstalk.)

MR. KATYAL:  Now, you had said that the government theory of the case was clear to us when the grand jury materials were turned over.  It's notable there's no citation she can give you to anything that -- that where she says here's the theory of our case.

The one thing that she mentioned was the chart of

assets. But that chart of assets, you know, when that grand jury chart was written, the question before -- that was before the examiner, she -- Poelking was examined before the grand jury, and she was asked: Do these charts reflect the assets purchased with fraud, and each time she answered, Yes. And some of those, I believe, included pharmaceutical fraud as well.

So I do not think when you read the grand jury statements that it was clear on its face that the government's theory of fraud was something else than what they said; all right, title, and interest. And indeed, Poelking didn't think so. The government's own folks didn't think so.

The last thing I'd like to say big picture is this. I mean, Your Honor last week asked us to focus on the Sixth Amendment issues. That wasn't a surprise because your rulings have underscored throughout the case the gravity and seriousness of the Sixth Amendment questions.

And you took the very serious step of piercing attorney-client privilege and work product privilege to try and get the government to turn over all these privileged materials. You had many hours of testimony from the government. That is really highly unusual. And while you didn't rule in our favor, I think it's fair to say that your ruling didn't identify any precedent that is anything like this case, and I think the government just conceded that.

And in a situation like that when we're on uncharted territory in which the government has admittedly improperly restrained millions of dollars, however you want to count it, we think that there's at least a quintessential substantial question warranting bail. And we're only talking about bail.

If you grant our motion and the Seventh Circuit later says you were right and affirms the conviction and sentence, of course Mr. Shah will serve it. And the question today is just a timing one. Should he go to prison immediately? Or is his appeal substantial enough to warrant deferring his prison term so that he can spend time with his 5-year-old son and while the Seventh Circuit decides whether he ought to go to prison at all.

The Seventh Circuit has adopted a -- a weak substantial question standard for this -- this kind of case in which there's a novel question it could go either way.

THE COURT: All right. Thank you.

All right. Well, I'm not going to rule today.

And you have time on the table. If you want to use it, you can, but I'm not requiring you to.

MS. ALTABEF: No. Thank you, Your Honor.

THE COURT: Okay. I'm not going to rule today. The date to surrender is September --

MR. FINNERAN: 26th?

THE COURT: -- 26th, I believe. In fairness to the

defendant, I should either give you a ruling well in advance of that date or extend the time for surrender so I can take the time I need to decide the issue. I expect no matter what I rule, I'll get an appeal from one side or the other, so it'll likely -- it will be a written ruling, not just a yes or no. And if I need more time, I'll -- I'll extend the surrender date until I have given you a decision. And I'll do that soon enough where, in fairness to the defendant, he's not, you know, on his way to a designated facility and then he gets a phone call saying, you don't have to go. It's unfair, and I'm not going to do that.

MR. FINNERAN: Yeah. And, Judge, I -- I emailed Sydney earlier today on the whole October 1st problem and that sort of thing.

THE COURT: Yeah.

MR. FINNERAN: That's obviously just a few days after his current surrender date anyway. It doesn't seem to me it would make a ton of sense for us to, you know, send him off to bring him back five days later, so --

THE COURT: No, he has a right to be present for the restitution hearing. I'll -- I'll be extending the surrender date --

MR. FINNERAN: Okay.

THE COURT: -- under either circumstance until -- not -- if I decide not to grant the motion, I'm not going to

extend it to whenever this restitution hearing is going to be completed if we can't get Mr. Gupta's testimony in when planned.

MR. FINNERAN: Okay. Yeah, I just wanted to make sure you were thinking about that -- that timing --

THE COURT: No, it's a good point. There's --

MR. FINNERAN: -- in consideration.

I'm still -- I'm still working on it, and I -- I didn't have the chance to talk to the government before the hearing about it. We'll try to find a way to make it possible to get everything done by the 2nd.

THE COURT: All right.

MR. FINNERAN: But I just wanted to keep -- keep -- get that date in your mind.

THE COURT: No, I appreciate that. Mr. Shah has a right to be present for the hearing and -- what's the -- did Ms. Agarwal make a similar motion for bail pending appeal? I don't believe she did.

MR. FINNERAN: She has not. Now, I know that her appellate counsel, Mr. Sokoloff, is actually sitting in the gallery.

THE COURT: Uh-huh.

MR. FINNERAN: I -- he's only recently been retained, and whether or not he's going to make a similar motion or not I don't think has yet been decided, but she's not made one to

date.

THE COURT:  Okay.  I didn't think so, and I wanted to confirm that.  All right.

MR. FINNERAN:  Correct.

THE COURT:  Very good.  Well, thank you all for coming in.  I appreciate the -- the time you spent, and very good arguments on both sides.  Thank you all.

MR. FINNERAN:  Thank you, Judge.

THE COURT:  Okay.

MR. KATYAL:  Thank you, Your Honor.

(Concluded at 3:27 p.m.)

*   *   *   *   *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Elia E. Carrión*                    *30th day of September, 2024*
_____      _____
Elia E. Carrión                              Date
Official Court Reporter